# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MERGENTIME CORPORATION, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **WASHINGTON METROPOLITAN AREA** | ) |
| **TRANSPORTATION AUTHORITY,** | ) |
| | ) |
| **Defendant, Counter-Plaintiff,** | ) **Civ. No. 89-1055 (TFH)** |
| | ) |
| **v.** | ) |
| | ) |
| **INSURANCE COMPANY OF NORTH** | ) |
| **AMERICA,** | ) |
| | ) |
| **Counter-Defendant.** | ) |

## AMENDED MEMORANDUM OPINION

In Herman Melville's <u>Moby-Dick</u>, the first mate is the ironically named Starbuck, a star-crossed sailor who cannot "buck the stars" and avoid his fatal destiny. Just so this protracted litigation. This star-crossed case has been in the hands of two prior judges in this Court, who both died shortly after rendering opinions in this litigation. Indeed, due to no fault of any court or counsel, this litigation has begun to assume the dimensions of <u>Jarndyce v. Jarndyce</u>, the protracted litigation in Charles Dickens's <u>Bleak House</u>. Charles Dickens, <u>Bleak House</u> (J.M. Dent & Sons 1972) (1953).

Most recently, this star-crossed judicial journey comes before the Court after a 25-day bench trial to determine whether defendant and counter-plaintiff Washington Metropolitan Area Transit Authority ("WMATA") justifiably terminated for default the joint venture contractor responsible for construction of the Shaw Street and U Street Stations and connecting tunnels for

the Washington, D.C. metropolitan area's subway system, called the Metrorail System ("Metro"),

on May 11, 1990.  The joint venture and plaintiffs in the case -- two construction companies,

Mergentime Corporation ("Mergentime") and Perini Corporation ("Perini") (collectively, "M/P"

or "the Joint Venture") -- allege wrongful termination and claims for breach of contract under the

terminated Shaw Street Station ("Shaw Station") and U Street Station contracts.  WMATA

counterclaimed to recover reprocurement costs, liquidated damages, and other credits and

damages.  Counter-defendant Insurance Company of North America ("INA") was the surety for

the performance bonds on both contracts and also asserts claims against WMATA.

After carefully reviewing all the evidence presented, the representations made at trial, the

record in this case, and applicable law, the Court concludes that WMATA's termination for

default of the Joint Venture was justified and that the Joint Venture is liable to WMATA for

damages as detailed below.  The Court also concludes that WMATA is responsible to the Joint

Venture for the outstanding claims detailed below.

### Historical Overview of the Dispute and Litigation

To determine the disputed issues, including whether WMATA lawfully terminated M/P

for default, this Court must decipher a complex factual history that began in 1984 with

WMATA's bid invitation for construction of the Shaw Station.  In addition, the litigation history

has involved years of discovery, separate proceedings before three trial court judges and the

Court of Appeals, and multiple opinions from both this Court and the appellate court.  To decide

this dispute, the Court conducted a trial -- which included oral testimony from numerous live

witnesses and thousands of exhibits -- and carefully reviewed the entire record in this case,

including the many Opinions issued by the two predecessor judges and the Court of Appeals.

While the procedural history and facts were extensively described by the D.C. Circuit in Mergentime Corp. v. WMATA, 166 F.3d 1257, 1260-61 (D.C. Cir. 1999), the Court will detail the most relevant aspects for the sake of context.  As Judge Revercomb succinctly stated, "[t]his case is about how not to build a subway system" -- the Shaw and U Street stops on Metro's Green Line.  Mergentime Corp. v. WMATA, No. 89-1055, 1993 WL 328083, at *1 (D.D.C. July 30, 1993) ("Revercomb Op.").  In 1985 and 1986, WMATA awarded two separate contracts totaling $94 million to M/P to build the stops and associated tunnels.  During the course of the construction, this Joint Venture encountered various circumstances that caused delay.  For example, M/P was faced with differing site conditions, including unanticipated boulders and the need for grouting.  In addition, the District of Columbia Department of Public Works ("DPW") rejected M/P's traffic maintenance plan, which resulted in prolonged negotiations and reworking of the plans to handle street closings and traffic during the projects.

Among other things, M/P claimed it was owed reimbursement for additional costs incurred during construction as a result of these delays.  Accordingly, M/P filed suit in this case on April 14, 1989 for breach of contract due to WMATA's alleged failure to process claims submitted by M/P in a timely fashion.  Mergentime Corp. v. McElhenny, Civ. No. 89-1055 (D.D.C. Apr. 14, 1989).  Negotiations and subsequent agreements aimed at salvaging the projects followed; however, WMATA eventually terminated M/P for default on May 11, 1990.  As a result, M/P amended its complaint and the litigation resumed.

M/P now seeks to collect on its reimbursement claims and subsequently added claims for

breach of contract and wrongful termination, while WMATA has counterclaimed to recover the

costs it paid to other contractors to complete the work, credits owed to it by M/P, and other

damages.[1]  Following a 45-day bench trial, Judge Revercomb issued a 251-page opinion in July

1993 that found, among other things, that WMATA justifiably terminated M/P for default and

was entitled to reprocurement costs, and that M/P established the merit of Shaw Street

reimbursements but not an entitlement to the claims.  Judge Revercomb was unable to quantify

the claims and did not make any conclusions with respect to U Street claims before he passed

away two days later.  Judge Green, serving as the successor judge pursuant to Federal Rule of

Civil Procedure 63, handled the post trial motions.

     Upon both parties' appeals, the Court of Appeals reversed the successor judge's rulings

for failing to comply with Federal Rule of Civil Procedure 63, and remanded the case back to this

Court.[2]  After additional briefing by parties regarding the remand procedures, this Court ruled

that a new trial would be necessary in this case because it could not certify adequate familiarity

with the record pursuant to Rule 63.  Specifically, the Court determined that this case could not

be completed in the absence of a new trial without prejudice to the parties.  Thus, the Court

conducted a 25-day bench trial, which was followed by closing arguments by counsel.

     This opinion provides the Court's findings of facts and conclusions of law, pursuant to

Federal Rule of Civil Procedure 52(a).  These findings of fact are based on a thorough evaluation

---

[1] INA, a counter-defendant, is a party to this case because they issued a surety bond to
M/P.

[2] Mergentime Corp., 166 F.3d at 1267.  Because Judge Green had passed away after the
remand, the case was subsequently reassigned to its current judge.

of all the evidence and the parties' proposed findings, and replies thereto.  In making these

findings, the Court relies in large part upon its determination of the credibility of those witnesses

based on, among other things, its observation of their demeanor and the inherent probability of

their testimony in light of the documentary evidence and other known facts.[3]

## FINDINGS OF FACT

Mergentime and Perini -- the plaintiffs and counter-defendants in this case -- are two

construction companies that entered into a joint venture agreement to bid on and perform two

construction contracts: the Shaw Station and Tunnels contract and, subsequently, the U Street

Station contract.  These contracts were awarded by defendant and counter-plaintiff WMATA, an

instrumentality and common agency created by the Interstate Compact by and between Maryland,

Virginia, and the District of Columbia that, among other things, oversees and manages the

construction and operation of the Metro.  Counter-defendant INA was the surety for the

performance bonds on both the Shaw and U Street Station contracts.  After evaluating the record

compiled by the parties in this case -- including the testimony of many witnesses and thousands

---

[3] The Court followed its obligations under Rule 63 to rely on the record resulting from the independent proceedings.  This opinion and the findings herein are a product of those proceedings, as well as a thorough and independent review of the overall record.  Any citations or references to Judge Revercomb's opinion does not contradict these Rule 63 obligations, and are merely used to indicate Judge Revercomb's concurrence with the findings independently reached by the Court after remand.

In addition, the Court required the parties to use Judge Revercomb's opinion to make stipulations of fact as appropriate.  As a result, parties compiled and submitted stipulated facts that correspond with the paragraphs in that previous opinion.  See Jt. Filing of Pls. Mergentime and Perini, Counter-Def. INA, and Def. WMATA on Pretrial Issues, Attach. C (Stipulation of Agreed Upon Facts) ("SAF").  Of course, a stipulation concerning what a person testified or what a document states is not necessarily a stipulation that the testimony is true.  While the Court may not directly refer to each of these stipulated facts in this opinion, it hereby adopts and incorporates these stipulations of fact in their entirety.

of pages of exhibits -- and the arguments made by their counsel, the Court now makes the

following findings of fact.

## I.  The Invitations

### A.  Shaw Station Invitation

To initiate bidding on the Shaw Station and Tunnels construction project, WMATA

issued Invitation for Bid No. IFB-C-663 for Contract 1E0012 ("Shaw Station Invitation") on

December 10, 1984.  WMATA described the project as follows:

> This is a two-part multi-year funded Contract for Construction of the Greenbelt
> Route segment from Seventh and Q Streets, N.W. to Vermont Avenue and U
> Street, N.W., consisting of Section E-1/b and E-1/c, and as follows:
>
> Part I:  Cut-and-cover construction of Shaw Station
> Part II: Soft ground tunneling as follows:
> > South of Shaw Station--445 linear feet
> > North of Shaw Station--1450 linear feet

SAF No. 106.  The Shaw Station Invitation called for competitive bidding with a public opening

of bids on March 27, 1985, and WMATA's estimate for the contract price was $53,338,512, with

$16,798,502 allocated to Part I of the contract and $36,540,010 allocated to Part II.  Id.

In response to this bid invitation, Mergentime and Perini entered into a Joint Venture

Agreement on March 23, 1985.  SAF No. 107.  Pursuant to this agreement, the two corporations

"agreed to enter into a Joint Venture for the purpose of submitting a joint bid" for the Shaw

Station construction project.  Def. Ex. 12, at 1.  In addition, they agreed to "associate themselves

as joint venturers for the purpose of performing and completing this work . . . in the event [the

contract was] awarded to them."  Id. at 2.  The agreement designated Mergentime as the

"sponsoring joint venturer," meaning that the construction contract would be carried out under its direction.  Id.  In addition, the agreement allocated the profits, losses, contribution responsibilities, and other interests between the two parties, assigning Mergentime 60% of the project and Perini 40% of the project.  SAF No. 107.  Data submitted by the Joint Venture included letters from financial institutions stating that Mergentime had lines of credit totaling $14 million and Perini had lines of credit totaling $18 million.  SAF No. 108.

After opening and receiving the bids for the Shaw Station Invitation, WMATA awarded Contract 1E0012 to the Joint Venture for the firm-fixed price of $50,895,000 on August 17, 1985.[4]  Specifically, the project was divided into two parts with separate prices and completion dates as indicated in the invitation.  SAF No. 110.  Part I, which dealt with the station area work, was priced at $19,300,000.  Part II involved excavating and constructing the tunnels and finishing the station for $31,595,000.  M/P was to complete Part II work within 1280 days after receiving the Notice to Proceed ("NTP").[5]

## B.  The U Street Station Invitation

WMATA followed a similar process for the U Street Station by first issuing its Invitation for Bid No. IFB-C-716 for Contract 1E0021 for the construction of Greenbelt Route U Street Station ("U Street Station Invitation") on January 6, 1986.  SAF No. 112.  This U Street Station Invitation described the work as follows:

---

[4] SAF No. 109.  WMATA disqualified the lowest bidder as a result of a bid protest. Because M/P was the second lowest bidder, they were the lowest remaining bid after this disqualification.  Id.

[5] INA issued bonds on this contract naming M/P as principals and WMATA as obligee. The bond sum was $50,895,000 -- the base amount of the contract.  SAF No. 111.

The work of this two-part Contract includes the following:

a. Part I:

(1) Construction of line segment from Vermont Avenue and  U Street, N.W. to Fourteenth Street and V Street, N.W.

(2) Cut-and-cover construction of U Street Station.

b. Part II:

(1) Cut-and-cover construction of line section.

(2) Finish work for entire project.

Id.  The bid also set forth "Instructions to Bidders" describing the necessary qualifications, which included satisfactory evidence of adequate financial resources and ability to comply with performance schedules.  SAF No. 828.

WMATA estimated the cost for this contract at $47,282,000.  It also set two periods of performance for the distinct parts of the contract:  Part I was slated for 1000 days after receipt of the NTP for the project, while Part II was set for 1190 days after receipt of the NTP for that part of the contract.  SAF No. 112.  After opening the bidding on February 12, 1986, WMATA received the lowest responsive bid from M/P.  SAF No. 113.  Thus, on April 1, 1986, WMATA awarded this contract to M/P for the firm-fixed price of $44,298,000.[6]

## II.  General Contract Provisions

The contracts for both of the projects were largely governed by the WMATA General Provisions and Standard Specifications for Construction Projects of 1973 ("General Provisions").  In addition, both contracts included various special provisions and governing documents as well.

---

[6] The INA bond for this contract was for $44,298,000, the base amount of the contract, and contained the same terms and conditions as the performance bond for the Shaw Station project.  SAF No. 114.

Given that the relevant portions of these contracts were set forth at length by Judge Revercomb,

Revercomb Op. at *2-23, the Court now will provide the following descriptions of the key

provisions.[7]  There is no significant dispute about the contractual provisions.  SAF Nos. 106-172.

## A.  M/P's Responsibilities

Among other things, M/P had the following responsibilities in connection with the

construction projects:

- provide its personal superintendence to the work or have a competent foreman or superintendent, satisfactory to the Contracting Officer, on the work at all times during progress, with authority to act for the Joint Venture;

- obtain any necessary licenses and permits, at no additional expense to WMATA;

- comply with all applicable federal and local regulations in connection with the prosecution of the work, at no additional expense to WMATA;

- take proper safety and health precautions to protect the work, the workers, the public, and the property of others;

- erect and maintain signs, fences, barricades and pedestrian bridges and provide watchmen wherever necessary and as indicated in the contracts;

- take positive measures to prevent the entry to the work site and storage areas by children, animals and unauthorized adults;

- keep the construction area, including storage areas, free from accumulations of waste material or rubbish at all times and, prior to the completion of the work, remove any rubbish and all tools, scaffolding, equipment, and materials not belonging to WMATA;

- leave the work and premises in a clean, neat and workmanlike condition satisfactory to the Contracting Officer upon completion of the construction; and

- provide sufficient and adequate equipment to complete the work as specified in

---

[7] The description paints with a broad brush, and exceptions may apply to many of the described contract provisions.  When relevant, these exceptions and other details will be described in this opinion, and the Court adopts in full the findings of Judge Revercomb regarding the contract provisions, which the parties mostly adopted in their joint factual stipulations.  The description of the contracts in this opinion is intended to provide a brief overview and is not a substitute for the complete contractual language, largely quoted by Judge Revercomb and adopted here.

the contracts within the deadlines, adequate maintenance of this equipment throughout the project, and improvement or removal of any ineffectual or hazardous equipment.

## B. Contract Modifications

There were two mechanisms to deal with changes. M/P could propose changes by issuing a Contractor Proposal Number ("CPN"). WMATA, on the other hand, could issue a Proposed Change Order ("PCO"), in which it would seek to make a change and would be responsible for any increased costs or delays stemming from that change.

The General Provisions allow the "Contracting Officer" (i.e., the person executing the contract on behalf of WMATA), to make any change in the work within the general scope of the contract. The contractor could designate such changes as a "change order," which could involve anything including the projects' specifications, the method or manner of performance of the work, and the projects' time schedules. In addition, the Contracting Officer's written or oral orders causing any such change were to be treated as a "change order" if M/P provided written notice that it regarded the order as such to the Contracting Officer (including any order to accelerate the project performance).

If any changes caused an increase or decrease in the projects' cost or the time required for the work, whether or not changed by any order, an equitable adjustment was to be made and the contract modified in writing accordingly. If M/P intended to assert a claim for an equitable adjustment, it was required, within 30 days after receipt of a written change order or furnishing a change order written notice, to submit to the Contracting Officer a written statement setting forth the general nature and monetary extent of such claim.

Changes to the projects also could involve differing site conditions. The contracts

required M/P, before such conditions were disturbed, to promptly notify the Contracting Officer

in writing of (1) sub-surface or latent physical conditions at the site that materially differed from

the contracts' descriptions, or (2) unknown and unusual physical site conditions differing

materially from those ordinarily encountered and generally recognized as inherent in such work.

After an investigation, the Contracting Officer would determine whether such a material

difference caused an increase or decrease in cost or time.  If so, an equitable adjustment would be

made and the contract modified in writing accordingly.

In connection with any proposal for a contract modification, the contracts mandated that

M/P provide an itemized price breakdown as required by the Contracting Officer.  This

breakdown needed sufficient detail to permit an analysis of all material, labor, equipment,

subcontract and overhead costs, and profit.  The breakdown also must cover all work involved in

the modification, whether such work was deleted, added, or changed.  Any amount claimed for

subcontracts required support by a similar price breakdown.  In addition, if the proposal included

a time extension, a justification for such an extension was required.  If the modification price was

not agreed to before commencement of the work involved in the modification, M/P and any

subcontractor were required to maintain separate accounts of all incurred segregable direct costs

allocable to the change.

### C.  Conditions Affecting the Projects

The contracts also required M/P to ascertain the nature and location of the work, as well

as the general and local conditions that may affect the projects.  Any failure to do so would not

relieve M/P from successfully performing work without additional expense to WMATA.  Indeed,

under the contracts, WMATA assumed no responsibility for any understanding or representations

concerning conditions made by any of its officers or agents prior to the execution of the contracts, unless expressly stated in the contracts.

### D.  Sequence, Progress Schedules and Deadlines

M/P's work was to be performed generally in accordance with the contracts' construction sequence requirements, the contract drawings, and a detailed plan of the work in a logical sequence developed by M/P and approved by WMATA's engineer.  M/P was required to submit a schedule to the Contracting Officer for approval showing the proposed order of work, the dates on which several major features would be started, and the contemplated dates for completing those features.  The schedule was to be in the form of the graphic network diagram or progress chart indicating the work scheduled for accomplishment at any time.  Specifically, M/P was required to enter on this schedule the actual progress at monthly intervals, which was to be immediately delivered to the Contracting Officer.  A failure to submit or update the progress schedule in a timely manner would allow the Contracting Officer to withhold approval of progress payment estimates.

The contracts also required M/P to prepare and submit a two-part schedule to be used for planning and executing the projects.  This schedule would provide details about the construction activities and the attendant "cost loading" of each segment.[8]  The Part I schedule would depict M/P's planned activities for the first 180 days of the contracts.  The Part II submittal would be a cost-loaded Critical Path Method ("CPM") schedule depicting all milestone dates through

---

[8]  "Cost loading" meant that dollars were assigned to each activity on the schedule and payments were made by WMATA in accordance with the schedule as activities were completed. Post-Trial Proposed Findings of Fact of Def. & Counter-Pl. WMATA ("Def. FOF") ¶ 108.

contract completion.[9]  In addition, M/P was required to submit monthly computer updates to the schedule, monthly narratives stating the general progress during that period, a discussion of problems and proposed solutions, and Monthly Progress Status Reports ("Monthly Report"). The two-part network submittal, the Monthly Reports, and revisions to the activity network and analysis were collectively referred to as the Network Analysis System ("NAS").

The Part I submittal would include a narrative explaining M/P's general approach for meeting the interim and final completion dates.  Also, the cost of all activities expected to be completed before delivery and approval of the Part II submittal would be included, and this data would be used as a basis for payment.  No progress payments were allowed until the Part I submittal was approved, and approval could only occur if the submission was complete as specified and represented a realistic approach to the work.

The Part II submittal, which was due 120 days after the Part I NTP, would provide a schedule for the entire contract, including the approved Part I schedule used for the first 180 days of work.  This "cost loaded" submittal also would include a narrative on how M/P proposed to perform the balance of the work.  Once the Part II schedule was approved, this schedule (unless subsequently changed) was to be the schedule used by M/P for planning, scheduling, managing and executing the work to be accomplished.  No progress payments were allowed for work performed after the first 120 days of the contracts until the complete initial Part II schedule was submitted, and no progress payments were allowed for work performed after the first 180 days of the contracts until the initial Part II submittal was approved and the first Monthly Report based

---

[9]  In the context of such construction contracts, the CPM consists of a logical sequence of detailed work activities describing how the projects will be built and becomes "cost-loaded" when a value is attached to each work activity.  SAF No. 126.

on Part II submittal was provided to WMATA.[10]

Monthly Reports were first required 180 calendar days after the NTP and monthly thereafter.  M/P was required to participate in monthly meetings with WMATA engineers to allow for joint review and agreement on job progress.  Activities that were not included in the initial Part II submittal were to be added to the Monthly Reports for approval in various circumstances, including introduction of change order activities, addition of onsite material delivery activities, or actual or potential delay to contract deadlines.  These reports were to be the basis for progress payments, and a failure to provide acceptably updated reports (based on the sole judgment of WMATA engineers) would disallow progress payments.

Original contract milestone dates could not be changed except by contract modification.  If M/P's NAS document submittals were not approved, the Contracting Officer was authorized to suspend progress payments.  Also, if the Contracting Officer determined that M/P had fallen "significantly behind the approved progress schedule," M/P would have to take any steps needed to improve the progress.  The Contracting Officer could require an increase in shifts, initiate or increase overtime operations, increase days of work, increase the amount of construction plant, and/or require the submission for approval of supplemental progress schedules proposing changes to regain the approved schedule, all without additional cost to WMATA.  M/P's failure to comply with these requirements of the Contracting Officer would be grounds for terminating M/P's right to proceed with the work, or any separate part thereof, in accordance with the

---

[10] A revised Part II submittal was required upon the WMATA engineers' request if the Contracting Officer directed a change that affected the milestone date(s) or altered the length of a critical path or if M/P elected to change any sequence of activities so as to affect a critical path of the approved NAS documents.

contracts.

### E. Disputes

Disputes about a question of fact arising under the contract and not disposed of by agreement were to be decided in writing by the Contracting Officer.  The Contracting Officer's decision would be final and conclusive unless M/P properly lodged a written appeal with the WMATA Board of Directors.  In turn, the Board's decision was to be final and conclusive unless determined by a court to have been fraudulent, capricious, arbitrary, so grossly erroneous as necessarily to imply bad faith, or unsupported by substantial evidence.  Pending a final decision about any dispute, M/P was required to proceed diligently with the performance of the contract and in accordance with the Contracting Officer's decision.  In addition, M/P and/or any subcontractor performing the affected work were required to maintain separate accounts of all incurred segregable direct costs.

### F. Work Commencement and Completion

M/P was required to commence work within 10 calendar days after receiving the NTP and to prosecute the work diligently to completion.  Regarding interim work completion, the contracts required M/P to complete all work in specific areas within the number of calendar days after receiving the NTP if specified in the contracts and release the areas to other contractors. Each contract had Special Provisions pertinent to the particular contract that contained, *inter alia*, interim completion dates for the two projects requiring that certain aspects of the work be completed within specified periods of time to allow WMATA's system-wide contractors to

complete follow-on work.[11]  Final completion of the entire project, including the final cleanup and readying for use, was required within not more than the number of calendar days specified in the contracts.

The milestone dates could only be adjusted upon modifications to the contracts.  Further, actual slippage of activities could not be the basis for time extensions unless such slipped activities were on the critical path or caused one or more new critical paths, thus resulting in a delay in achieving any milestone date or in achieving the Contract completion date.

If M/P failed to complete the work within the specified time for interim completion dates, the contract required it to pay WMATA liquidated damages of $2500 per each day of unexcused delay for each affected area.  For final completion, failure to complete the work on time required M/P to pay WMATA $1500 in liquidated damages for each day of delay.  The liquidated damages were not to exceed $5000 per day.

## G.  Termination for Default

If M/P failed to complete its work (or any separable part) on time, or refused or failed to prosecute such work with the diligence required for completion by the agreed-upon deadlines, WMATA could terminate by written notice M/P's right to proceed working.  Further, WMATA could take over and complete the work, by contract or otherwise.  The contracts provided that, regardless of any such termination, M/P and its sureties would be liable for any damage to WMATA resulting from the refusal or failure to complete the work in the specified time.

Termination and any resulting damages claims were disallowed if the delay was caused

---

[11] For example, the WMATA contractors were to install automatic train control systems, track work, traction power substations, escalators and elevators for operation of the stations. SAF No. 120.

by unforeseeable causes beyond M/P's control, fault, or negligence (e.g., natural occurrences, acts of WMATA or its other contractors, fires, floods, strikes, freight embargoes, unusually severe weather, or certain delays by subcontractors or suppliers).  Also, M/P could prevent termination by notifying the Contracting Officer in writing of the causes of delay within 10 days from the beginning of any such delay.  The Contracting Officer would then ascertain the facts and the extent of the delay and extend the time for completing the work when, in his judgment, the findings of fact justified such an extension.  Such findings of fact would be deemed final, subject only to appeal as provided in the General Provisions' "Disputes" article.  The rights and remedies of WMATA under the termination provisions were in addition to any other rights and remedies provided by law or under the contracts.

## H.  Termination for Convenience

M/P has asserted that the "Termination for Convenience of [WMATA]" provision is relevant.  In this provision, WMATA could terminate the contracts whenever the Contracting Officer determined that such action was in WMATA's best interest.  Such termination would be effectuated by delivering a "Notice of Termination" that specified the extent to which performance under the contract was terminated, including the date termination became effective. M/P would be required to stop work as directed, place no further orders and terminate existing orders outside the scope of the non-terminated work, transfer rights and titles to WMATA as directed, settle all outstanding liabilities, and otherwise complete the non-terminated work.  M/P would submit a termination claim to WMATA, and in the event the parties failed to agree on the outstanding payments owed to M/P, the provision set forth the method to calculate the termination amount to be paid to M/P.

17

### III.  Shaw Station Project Provisions and Early Performance

"The Shaw project consist[ed] of a 'cut-and-cover' station and service area construction under 7th Street, between Rhode Island Avenue and S Street, N.W., with machine-bored tunnels to the north and south."[12]  With this "cut-and-cover" method, M/P would "cut" a trench into the earth, which would be covered with decking to allow traffic to flow on the surface while work was proceeding underneath.  The major elements of work were the South Tunnels, the station south vent structure, the Shaw station (including south and north service rooms), the station north vent structure, the North Tunnels, the 8th Street fan structure, and the crossover.  SAF No. 141. The project would interface with the U Street Station project at Vermont Avenue and U Street.

### A. Shaw Station Contract Provisions

Various provisions unique to the Shaw Station project also set forth construction sequence and staging requirements, as well as internal and final deadlines.  These provisions required M/P to undertake Parts I and II of the Shaw project construction work in a particular order.  However, within the parameters set by these provisions, M/P had discretion regarding the order in which to perform particular items of work or particular work stages, so long as this planned sequence was set forth in approved Part I and Part II submittals.  SAF No. 150.

### 1.  Sequencing

The contract divided the Shaw Contract work into Part I and Part II, each part separately funded.  In the beginning, funds were sufficient for Part I only, in the amount of $27 million, and Part II was contingent on the future availability of additional funding.  As such, M/P could not

---

[12] SAF No. 140.  The South Tunnels and station are referred to as "E-lb," while the North Tunnels are referred to as "E-lc."  Id.

begin Part II work until specifically authorized to do so by the Contracting Officer. WMATA

would issue the NTP for Part II 182 days after issuance of the Part I NTP. SAF No. 142.

Part I work involved the construction of the Shaw Station Structure, which would run

under 7th Street, between R Street and north of S Street. M/P was required to construct this

reinforced concrete Station Structure in the area excavated in 7th Street between R and S Streets.

The structure would comprise of three major concrete components: inverts that formed the floor

of the cylindrical Station Structure, lower arch-like walls resting on the inverts, and upper arches

that made up the roof. In addition, Part I required the relocation of the following utilities running

in the area beneath Rhode Island Avenue and R Street:

- water lines running under 7th Street;
- a 60-inch diameter sewer line (the "S-3 line") running under the south side of Rhode Island Avenue that flowed into a 102-inch diameter sewer line (the "S-5 line") under the intersection of 7th and R Streets;
- a main Potomac Electric Power Company ("PEPCO") electric line (the "E-5") under the east side of 7th Street;
- a 48-inch diameter water line running below R Street;
- a telephone line running just under R Street; and
- a 102-inch diameter sewer line running below R Street.

Finally, Part I of the project required restoration work around the Shaw Station Structure,

including "backfilling" (*i.e.*, placing fill dirt over the Station Structure), restoring utilities,

backfilling over those utilities, and finishing the streets and sidewalks. SAF No. 143.

Under the Shaw Contract's Part II, M/P would construct the South Service Area, a

concrete structure by the station's south end under Rhode Island Avenue. In addition, M/P

would construct two other concrete structures: the South Vent Shaft Structure, which adjoined

the South Service Areas, and the North Service Area, which was at the station's north end.

Tunnel boring work for both the South and North Tunnels was also included under Part II.

Finally, the overall restoration work was to be completed, which consisted of placement or relocation of utilities, backfilling around Part II concrete structures and over replaced utilities, and construction of streets, curbs, gutters, and sidewalks.  SAF No. 144.

The construction sequence provisions unique to the Shaw Station contract required M/P to follow certain time intervals, divided into four terms.  The first term encompassed all of Part I's work, while the final three terms split up the work required in Part II.  Also, for the first three terms, the following work was required throughout: setting up of traffic detours, setting of piles, utilities replacement, construction of slurry walls, decking and utility support installation, excavation system support installation, excavation, sewer and drainage system installation, utilities restoration, and backfilling and restoring the street.  SAF No. 145.

The first two terms involved the South Tunnels and station referred to as "E-lb" -- indeed, both were titled "E-1b Structural."  The first term was for the construction of the station vault, the north service rooms, and the north entrance and service rooms.  In addition, "button-up" work would be done, if required.  This term was slated for the first 28 months after M/P received the NTP.  The second term was slated for 30 months, specifically the 6th-36th months after receipt of the NTP.  This construction work involved the station platform, mezzanine, south vent structure, south service rooms, and station south entrance and service rooms.  Id.

The third term involved the North Tunnels referred to as "E-lc," and was titled "E-1c Structural."  This term, which was slated for 34 months starting with the sixth month after receipt of the NTP, required the construction of the station's north vent structure, fan structure, and crossover.  Id.

The final term, which was titled "E-1b/E-1c Finish," was to occur for 20 months between

20

the 22th and 42nd months after receipt of the NTP.  As the title suggests, M/P was to finish work

on the various parts of the project, including work for the South Tunnels; the south vent structure

and service rooms; the station itself; the entrances, passageways and related service rooms; the

north vent structure and service slabs; the chilled water lines; the pumping station; the fire stand

pipes; the light and power elements; the fire protection system; the electrical and mechanical

systems; and the architectural system and work.  Id.

Thus, the following sequence was required by the contract:

- Term I (Part I work titled "E-1b Structural") during the 0-28th month period.
- Term II (Part II work titled "E-1b Structural") during the 6-36th month period.
- Term III (Part II work titled "E-1c Structural") during the 6-40th month period.
- Term IV (Part II work titled "E-1b/E-1c Finish") during the 22-42nd month period.

This sequence made clear that the parties intended from the outset for Part II work, if authorized,

to overlap with Part I work.  In addition, an amendment added an access restriction that

prevented work on the South Tunnels during the first 700 days of the project to accommodate

work on an adjacent project to the south.  SAF No. 146.

**2.  Deadlines**

The construction contract required M/P to complete the project within 1280 days after

receiving the NTP.   Because M/P received the NTP on Part I of the Shaw Station contract on

September 3, 1985, the contract completion deadline was March 6, 1989.  SAF No. 148 (quoting

Special Provisions of Shaw Station Contract).

In addition to setting this final completion date, the contract also established interim dates

for certain identifiable portions of the work.  Generally, Part I was to be completed 840 days after

the NTP for Part I was received.  Also, the contract specified certain areas where M/P was

required to complete all work and release those areas to other contractors within a certain

number of calendar days after receiving the NTP for Part I.  A portion of the inbound and

outbound trackways, including the station limits were to be completed 1150 days after receipt of

the NTP.  The remaining trackways were to be completed by 1020 days after receipt.  The

deadline for work on permanent power and all branch circuits, the tiebreaker room, the train

control and communications room, the escalator wellways, the elevator hoistways, the machine

rooms, and the kiosk area was 1200 days after the NTP was received.  SAF No. 149.

### 3.  Staging for Traffic Maintenance

The Shaw Station contract also set forth certain guidelines for the staging of construction

operations.  M/P was directed to pay "particular attention . . . to the fact that both vehicular and

pedestrian traffic must be maintained on the various existing streets within and adjacent to the

project site in accordance with the maintenance of traffic notes."  SAF No. 148.

Given the need for urban excavation, temporary decking was required over open

excavations to allow for vehicular and pedestrian traffic to continue.  To minimize disruptions to

traffic, M/P was required to perform the decking operations, the utility work, and the subsequent

paving and restoration operations in stages.  The contract drawings set forth a staging method, as

well as requirements for the number of traffic lanes provided during rush hours and non-rush

hours, the shifting of traffic lanes, the use of working and storage areas, and other traffic

maintenance concerns.

M/P would determine the particular order in which the various stages were to be

performed, provided that all other traffic maintenance requirements were met.  However, stage

work within the limits of one stage must have been completed before work in another stage is

commenced.  M/P was required to prepare and submit to the DPW working drawings including comprehensive staging and decking plans for its approval, and could not start any work without such approval.

### B.  M/P's Planned Work

Thus, as Judge Revercomb pointed out, the Court must examine the planned work versus the actual work sequence on the Shaw Contract to understand the parties' disputes.  M/P's basic planned sequence of work ran from south to north.  First, during the first 180 days, M/P planned to relocate major utilities, including the S-3 and S-5 sewer lines and the E-5 electrical line.  The early work at the south end was to include the start of support of excavation work, including installation of soldier piles for the south vent structure and slurry walls for the support of station excavation.

M/P then planned to proceed with support of excavation, including installation of deck beams, capbeams, and decking in the open cut area along 7th Street.  This work would permit M/P to proceed with its excavation operations under the street using the cut-and-cover method.

After completing the excavation to subgrade at a certain location north of R Street, M/P intended to mobilize its Tunnel Boring Machine ("TBM"),[13] including trailing gear, track, and grout plant, in the excavated area between Rhode Island Avenue and R Street.  The muck bin for the material excavated by the TBM was to be installed in the area of the south station entrance on the north side of R Street.  M/P then planned to proceed with the excavation of the South Tunnels using the TBM.

_____

[13] The TBM is "a machine [M/P] used on the Shaw [Station] contract to mine both the South tunnels and the North tunnels."  Tr. 12/3/1991, at 200.

While South Tunnel work was proceeding, M/P planned to continue mass excavation of the station area moving from south to north, followed by station concrete operations. When the excavations of the station and South Tunnel were complete, the TBM would be remobilized to the north end of the station to excavate the inbound and outbound North Tunnels.

During the North Tunnel excavation, M/P planned to complete its station concrete work and work on the concrete in the south service rooms. Concrete work for the station north service rooms and vent structure was to occur after the completion of the North Tunnels. Finally, upon completion of structural work in the station area, M/P planned to backfill above the station to below the utilities, complete work on restoring utilities, backfill to the surface, and perform surface restoration (restoring the streets, curbs, gutters, and sidewalks that had been removed at the beginning of the excavation) along the alignment of the Shaw station and under 7th Street. M/P's original plan then called for station lower arches, followed by the upper arches, to proceed from north to south.[14]

This planned sequence of work deviated from the contract in several ways. For example, M/P acknowledged that starting the South Tunnels first was a deviation from the contract's 700-day access restriction. Def. Ex. 32. However, with Perini performing the adjacent contract to the south, M/P was easily able to arrange for excavation of the South Tunnels to be performed before the adjacent project was completed. SAF No. 629.

_____

[14] Thus, the Court adopts WMATA's proposed Findings of Fact regarding the planned work. Def. FOF ¶ 26 (citing Def. Exs. 13, 1271, 1541; Retr. 10/16/1991, at 2689; Tr. 10/22/1991, at 28-37, 41-53; Tr. 1/17/1992, at 82-87; Tr. 1/23/1992, at 107-108; SAF Nos. 145-48, 150, 156, 161, 164.1, 170, 171, 172); id. ¶ 27 (citing Def. Ex. 1271, 1601, 1603; Retr. 10/16/2001, at 2694-95; Tr. 11/4/1991, at 27; Tr. 1/17/1992, at 97-101; SAF Nos. 150, 156, 161, 164.1, 170).

### C.  Actual Work Sequence

The sequence of work for the Shaw station largely proceeded as planned.  The Court finds that the major deviations from the general sequence of the planned construction were of M/P's choosing for M/P's convenience.[15]  For example, M/P deviated from its planned sequence of station concrete operations for its own convenience, opting for a "skip-and-fill" method of pouring the inverts in which the inverts are poured alternately instead of sequentially to save concrete forming costs.[16]  M/P also decided to pour station arch concrete from the south end to the north, rather than north to south as originally planned.[17]  M/P also altered the sequencing for tunnel excavation as well for its own convenience and benefit.  See discussion infra ___ (M/P's resequencing claims).

### D.  Shaw Project Performance

### 1.  Traffic Pattern Claims (CPN 002)

The initial traffic maintenance plan presented by M/P to WMATA and the DPW, as required by the contract, was rejected, necessitating prolonged negotiations to develop an acceptable traffic plan.  As such, M/P contends the associated delays substantially disrupted and delayed its performance on the Shaw Station project by, among other things, restricting work space and altering the sequence of work.  Proposed Findings of Fact of Mergentime, Perini, &

---

[15]  Retr. 10/16/1991, at 2693-95; Retr. 9/21/2001, at 816-19; Tr. 1/13/1992, at 46-49; Tr. 1/17/1992, at 103-104; Tr. 1/21/1992, at 154-55; see also Revercomb Op. at *45-47.

[16]  Retr. 10/16/2001, at 2692-94; Retr. 9/21/2001, at 817; Tr. 1/13/1992, at 48; Tr. 1/17/1992, at 103-04; Def. Ex. 1602.

[17] Retr. 10/16/2001, at 2694-95; Retr. 9/21/2001, at 818-19; Tr. 1/13/1992, at 48; Tr. 1/17/1992, at 103-04; Def. Ex. 1602.

INA ("Pl. FOF") at 250.  The claim was asserted as Contractor Proposal Number 2 ("CPN 002"), one of two substantial claims by M/P that posed problems for the parties during the course of the Shaw Station construction project.

As detailed above, the contract documents reflect that Part I of the Shaw Station construction project involved utility relocation below street level, decking, and excavation, impacting traffic patterns in the area.  As such, the contract required plans on how the traffic would be maintained during the construction operations.  SAF No. 500.  Specifically, M/P was responsible for obtaining all necessary licenses and permits from the District of Columbia related to prosecuting the work, including approval from the DPW of M/P's traffic maintenance plan. SAF Nos. 501-02.

In its pre-bid contract drawings, WMATA's original suggested traffic plans proposed closing four lanes of traffic on Rhode Island Avenue while maintaining two lanes of westbound traffic and a left turn lane and diverting Rhode Island Avenue's eastbound traffic to Q Street. The contract also provided that 7th Street would remain partially open for southbound traffic. Def. Exs. 1508, 1754; see also Revercomb Op. at *24.  This plan was reflected in WMATA's contract drawings E1b-G-13 through E1b-G-18.  Before their issuance, these traffic plans were approved by the District of Columbia government.

However, on March 21, 1985, six days before the bidding opened for the Shaw Station project, William Leech, WMATA's Resident Engineer for the Shaw Project, was told by representatives from the DPW that it could not approve the traffic maintenance plan in contract drawings E1b-G-13 through E1b-G-18 because it would divert too much traffic from Rhode Island Avenue to Q Street.  Mr. Leech was advised that the DPW would require four lanes of

traffic -- two west bound lanes and two east bound lanes -- on Rhode Island Avenue at all times during the construction of the Shaw Station.  Tr. 1/13/1992, at 6-7, 71-72; Pl. Ex. 1528, at 15-16, 21-24; Pl. Exs. 22, 23, 24, 24(a).

While WMATA determined that it was too late to advise bidders of this change, purportedly to avoid delaying the bidding process, it appears that WMATA also did not formally advise M/P of its knowledge regarding the DPW position for some time either.  Indeed, on September 25, 1985,[18] Mr. Leech reviewed and approved M/P's Maintenance of Traffic Drawing TC-001 that was substantially the same as depicted in the contract drawings, and allowed M/P to forward these plans to the DPW for permit issuance despite his apparent knowledge (based on his March 21, 1985 meeting with the DPW representatives) that the DPW would not approve the plan given its reliance on a Q Street detour.  Tr. 1/13/1992, at 7-9, 72-73, 82-83; Pl. Ex. 32.  As such, this Court finds -- and agrees with Judge Revercomb -- that WMATA "did not advise M/P of [this] fact for nearly six months."  Revercomb Op. at *24.  Specifically, it appears from the evidence that the first recorded indication of M/P's knowledge regarding the DPW's position comes from WMATA's minutes from an October 1, 1985 meeting between the DPW, WMATA, and M/P:

> Proposed traffic control for Rhode Island Avenue is inacceptable [sic].  Mr. Chardon stated that since Q Street is a small residential street, it can't handle traffic detoured from Rhode Island Avenue.

Pl. Ex. 34, at 2; see also Tr. 11/6/1991, at 142; Tr. 1/13/1992, at 82-83; Tr. 9/19/2001, at 643-44.

---

[18] Mr. Leech has testified during this litigation that he informally advised M/P representatives of the DPW position, Tr. 1/13/1992, at 9-11; however, there is no recorded corroboration of such discussions.  In any event, the first recorded notice to M/P does not occur until October 1, 1985.  Pl. Ex. 34, at 2.

M/P gave formal notice to WMATA that its maintenance of traffic plans for Rhode Island Avenue, using the Q Street detour, had been disproved by the D.C. government on October 21, 1985.  SAF No. 508.  On the same day, Mr. Leech informed Don Miner, Mergentime's Vice President and Project Manager for the Shaw Station project, that WMATA would seek a credit for a 7th Street closure if approved against any claim by M/P for time and money arising from the rejection of its traffic plan.  SAF No. 509.  Several days later, M/P assigned CPN 002 to the Rhode Island Avenue traffic plan changes on October 30, 1985.[19]  SAF No. 508.

In subsequent correspondence, the DPW indicated that it was instead willing to approve the full closure of 7th Street (between R and S Streets, N.W.) to expedite construction.  Pl. Exs. 37, 38; Tr. 1/13/1992, at 12-13.  Accordingly, in late 1985, M/P submitted a series of revised traffic plans for Rhode Island Avenue eliminating the Q Street detour.  On November 8, 1985, Mr. Leech wrote Mr. Miner about the new traffic control requirements, noting that WMATA recognized that the loss of the Q Street detour was a change from the traffic control plan shown in the contract drawings.  SAF No. 510.  Mr. Leech further instructed M/P as follows:

> 1.  Review and adopt your construction sequencing and maintenance of traffic schemes to suit [the new traffic plan].
>
> 2.  Provide to this office the maintenance of traffic drawing schemes that [Department of Transportation] will permit.
>
> 3. Furnish to [WMATA] a proposal for additional costs, if any, with justification caused by this change.
>
> Upon receipt of items 2) and 3) [WMATA] will review and may issue a PCO based on the change.

---

[19] On November 6, 1985, M/P notified WMATA of its inability to work on the E-5 electrical line because of the DPW's disapproval of the traffic plan.  SAF No. 509.1.

SAF No. 510.1 (first alteration in original).  M/P submitted a revised traffic plan for approval on

November 13, 1985, which would keep four lanes of traffic -- two eastbound lanes and two

westbound lanes -- on Rhode Island Avenue during all construction operations under Contract

1E0012.  SAF No. 511.  The DPW approved this plan on January 9, 1986.

     M/P informed WMATA that the traffic changes would cause delays and additional direct

costs.  Specifically, M/P's Shaw Project Manager Thomas Goedjen sent a letter to Mr. Leech on

April 23, 1986 stating that, while it would submit a cost proposal for CPN 002 only when the full

impact was documented, at a minimum the affected activities included the E-5 electrical duct, the

W-2 16-inch water line, the S-3 sewer, the T-2 two-way duct, soldier piles, caps, decking, and

additional traffic protection devices and traffic pattern switches.  Pl. Ex. 55.

     M/P and WMATA did not reach agreement on the valuation of CPN 002 despite

continued discussions about traffic plan changes and the value of the 7th Street closure.

M/P refused to acknowledge a linkage between the Q Street detour and the 7th Street closure.  Pl.

Ex. 58.  On October 6, 1986, WMATA unilaterally submitted Contract Modification Number 7

("Mod 7"), which provided for a no-cost/no-time extension adjustment to the contract reflecting

the Rhode Island Avenue traffic change offset by the 7th Street closure cost and time savings.

SAF No. 602.

     M/P did not submit a cost proposal for CPN 002 until November 20, 1986, requesting a

contract price adjustment of almost $1.12 million and a 92-day time extension.  Def. Ex. 240.  In

that proposal, M/P claimed $192,246 in inefficiency costs (non-direct), Def. Ex. 62, at 47, which

M/P described as "costs which arose from working in the smaller work areas necessary to

maintain 4 lanes of traffic in Rhode Island Avenue."  SAF No. 607.  These included

inefficiencies in installing soldier piles and decking and relocating the S-3 sewer, the W-2 and W-4 watermains, and the E-5, E-4, and E-2 electrical ductbanks.  Def. Ex. 62, at 52.  M/P also claimed almost $60,153 in direct costs of maintenance of traffic activities associated with additional traffic switches under Rhode Island Avenue.  Id. at 48.  Notably, M/P did not -- as of the claim submission in November 1986 -- assert claims for acceleration and administration impacts on work in the station area.[20]

Neither WMATA nor M/P prepared any cost proposals regarding the benefits from the 7th Street closure at any time during 1986 and 1987.  Indeed, WMATA did not prepare a detailed cost estimate until after it had terminated M/P as contractor for default.  SAF No. 611.  Further, WMATA's did not issue a final decision on CPN 002 until May 10, 1990 -- the day before termination.  M/P claims that these delays in processing the CPN 002 claim breached the contract, and justified its delays in performing the Shaw Station project.

The start of utility work under Rhode Island Avenue was delayed; however, once excavation had proceeded to Level B struts, subsurface operations could proceed entirely from below the surface without hindrance from street-level traffic.  By November 6, 1986, subsurface excavation and utility activities under Rhode Island Avenue could proceed regardless of street level traffic activities.  Retr. 10/16/2001, at 2683-84; Retr. 9/19/2001, at 680; Retr. 9/21/2001, at 793.  Further, based on a second independent review of the entire record, trial testimony, and credibility of the witnesses, the Court agrees with Judge Revercomb's findings with respect to M/P's claimed delays regarding the following particular items of early work:

---

[20] An "acceleration" claim amounts to a claim that the government entity has directed the contractor to meet a deadline not required by the contract.  For more details about the claim M/P did make, see SAF Nos. 605-10.

The E-5 Electrical Line:  M/P's original Part I CPM Schedule shows that work on PEPCO's E-5 electrical line was to commence the week beginning November 6, 1985, with a "late finish" date of November 19 for the section between manholes 5 and 8 in Rhode Island Avenue and an overall late finish date of February 10, 1986. Pl. Ex. 16.  M/P planned to begin this work at the south end of the Project in the intersection of Rhode Island Avenue and 7th Street and proceed northward up 7th Street.  In fact, the Resident Engineer's diary discloses that M/P began excavating the E-5 line as early as October 11, 1985, albeit at a different point along 7th Street than originally planned.  See RE Diary (Shaw), 10/11/85.  This work was performed under the guidelines set forth in a PEPCO permit, which generally limited the work to specific areas and only during off-peak traffic hours.  Work on the E-5 line did not commence on Rhode Island Avenue until January 16, 1986, 70 calendar days later than the scheduled start. See Periodic Progress Review Meeting Minutes, 2/19/86, App. B. Completion of the section between manholes 5 and 8 was delayed until June 26, 1986.  See Periodic Progress Review Meeting Minutes, 7/22/86, App. B.  The delay in completion appears to have been cause in part by the need to complete work first on the S-3 sewer line in the immediate vicinity of the E-5 line.

The S-3 Sewer Line:  The Part I CPM indicates that M/P was to begin installation of the new 60-inch S-3 sewer line beginning December 17, 1985, with a "late start" date of January 23, 1986.  See Pls.' Ex. 16.  According to the claim narrative submitted by M/P in November, 1986, work on the S-3 sewer line commenced on March 17, 1986.  See Def.'s Ex. 240, at 15.  This statement is at odds with M/P's own as-built schedule update, which the Court finds a more reliable source, showing that installation of the S-3 line began on February 21, 1986, the S-3 sewer was activated on June 13, 1986, and was completed at the transition chamber on June 26, 1993.  See Pls.' Ex. 17.

Soldier Piles:  M/P's original Phase I plan called for installation of soldier piles in the Rhode Island Avenue area once the early utility work was completed there, as part of the support of excavation system for the South Service Area/Vent Shaft.  See Pls.' Ex. 16.  This work was to begin in the vicinity of the South Vent Shaft on the north side of Rhode Island Avenue on May 13, 1986, on the west side of Sta. 50+25 to Sta. 51+00 on June 2, on the east side of Sta. 50+25 to Sta. 51+00 on June 9, and at the South Bulkhead on June 20.  See Pls.' Ex. 16.  M/P's own as-built schedule (Pls.' Ex. 17) and its schedule updates attached to Periodic Progress Review Meeting minutes show that M/P actually began work on the soldier piles as early as March 21, 1986, in the vicinity of the South Vent Shaft on the north side of Rhode Island Avenue, well ahead of schedule.  The soldier piles for the east side of Sta. 50+25 to Sta. 51+00 were started on April 23, 1986, but not completed until June 27.  See Pls.' Ex. 17;  Periodic Progress Review Meeting Minutes, 7/22/86, App. F.  Although M/P complains that its piling activities were

31

interrupted and non-sequential, see Def.'s Ex. 240, it is evident that the net delay was only 7 calendar days.

Revercomb at *26-27.

As to the administration and valuation of M/P's CPN 002, the Court finds that M/P's claim was inadequately documented or unsupported, M/P frequently revised and updated its claims resulting in the need for further audit and review by WMATA, and M/P refused to address offsetting credits and the benefit of the 7th Street closure. Def. FOF ¶¶ 319-25. The Court also finds that WMATA followed its internal procedures and the contract requirements in processing CPN 002, although these internal procedures may have contributed to some delay in processing the claims. Id. ¶¶ 340-43. Thus, the Court rejects M/P's contentions that the delay in processing the claim was a breach of contract or excused it from delay and nonperformance on the Shaw Station contract.

The Court also finds that, between January and August 1987, M/P and WMATA attempted to negotiate a settlement of CPN 002 and other issues as part of Memorandum of Agreement Number 1 ("MOA 1").[21] This agreement recognized a bona fide dispute regarding CPN 002, but nonetheless attempted to revise milestone dates and settle many of the claims associated with CPN 002. Ultimately, WMATA did not sign MOA 1, but it did implement all of its provisions except that of the 100-day time extension. By letter dated August 11, 1988, Charles Mergentime gave the WMATA Contracting Officer John McElhenny an additional 30

____

[21] Parties have stipulated as to most of the facts surrounding the negotiation on claims and MOA 1. See SAF Nos. 580-82, 587, 598-602, 605-11, 613-14, 616, 618-20, 627-29, 633-43, 645-47, 649-50, 655.

days to sign MOA 1 with its 100-day time extension.  Pl. Ex. 99.[22]

In addition, successful efforts to mitigate the effects of the delay did occur.  Starting with a meeting on November 5, 1985, Mr. Leech and M/P's management, Mr. Miner and Tom Goedjen, began to develop plans to mitigate the effect of the change in traffic patterns on Rhode Island Avenue.  Def. Ex. 1521, at 29-30; Tr. 1/13/1992, at 14-15.  Their plan would squeeze four lanes of traffic into what previously had been three lanes, and using the median and parts of the sidewalks to accommodate traffic.  In addition, M/P was no longer required to maintain a left turn lane east of Rhode Island Avenue.  The Court finds that these measures minimized the effects of requiring M/P to maintain four lanes of traffic during peak hours on Rhode Island Avenue.  Tr. 1/13/1992, at 15-16, 19-20.[23]

The DPW's denial of the Q Street detour did constrain the working space available to M/P under Rhode Island Avenue and 7th Street for utility work, and required some additional maintenance of traffic activities in that area.  Def. Ex. 1364; SAF Nos. 645-55.  The Court finds

---

[22] M/P argues that WMATA's failure to grant timely extensions for CPN 002 and the June 2, 1986 and October 29, 1986 letters from Leech to M/P's Goedjen, which indicated concern over missed deadlines, constituted acceleration.  Def. Exs. 145, 226.  The "acceleration" contention is address later in this opinion.  It suffices here to state that the letters and M/P's own schedule narratives show that, in late 1986, M/P was as much as 79 days behind on the Shaw Project.  See Revercomb Op. at *36-37; Def. Ex. 1511 (Periodic Progress Review Meeting ("PPRM") Minutes Nos. 12 app. D, 13 app. D, 14 app. D), creating significant delays for tunneling operations in the South Tunnels.

[23] Under the contract plans, M/P would have had 45 feet of space on Rhode Island Avenue closed off and available as a working area.  Under the revised traffic plan, M/P lost only eight feet, and still had thirty-seven feet available.  Def. Ex. 968; Tr. 12/16/1992, at 23-24.  In addition, the number of major traffic switches actually performed by the contractor was the same number that the contract required M/P to perform, i.e., two switches (four lanes on the south side of Rhode Island Avenue and four lanes on the north side).  Tr. 1/13/1992, at 33; SAF Nos. 510, 510.1, 511.  There may have been one additional traffic switch, however, the Court finds this difference immaterial given the mitigation to the overall delays and inefficiencies.

33

that WMATA's failure to inform M/P of its superior knowledge about the DPW's position for six months, including as M/P prepared its permit request was unjustified.  Further, WMATA did contribute to the delays in resolving CPN 002 -- indeed, the WMATA Contracting Officer did not issue a final decision on CPN 002 until May 10, 1990, the day before termination.

However, the impact of the change ceased in November 1986, when M/P had excavated to a level that allowed M/P to continue excavation and utility work from under the decking, without regard to street traffic above.  Def. Ex. 1135; Tr. 1/17/1992, at 93-94; Retr. 10/16/2001, at 2684.  Further, the costs incurred by M/P as a result of the Rhode Island Avenue traffic change were offset in large part by the cost savings achieved as a result of the allowance of full closure of 7th Street during station construction and beyond.  The Court finds that this alternate traffic maintenance plan increased the efficiency of several operations along 7th Street, including support of excavation, deck beam installation, maintenance of traffic, excavation, and concrete operations during 1986-89.[24]  The full closure of 7th Street during the work week was a change to the contract, from which M/P clearly benefitted as its Project Manager Goedjen admitted.  Retr. 9/19/2001, at 664-65.  The estimated savings, proposed by WMATA (although prepared after termination) and credited by the Court, totaled $912,379.  The Court notes that M/P never offered evidence as to the value of those benefits.  Def. FOF ¶¶ 33-37, 912-26.

The Court agrees that the Rhode Island Avenue traffic change delayed excavation under

----

[24] Def. Ex. 968; Tr. 12/16/1992, at 40-42; Retr. 10/18/2001, at 2991-95; see also Revercomb Op. at *27-28.  The Court finds that this change benefitted M/P by enlarging its work space during the early support of excavation and the actual excavation operation, and permitting those operations to proceed unimpeded by traffic.  The closure also permitted expedited concrete operations because M/P did not have to shift traffic during peak hours, enabling the contractor to use the decked-over area on 7th Street for material staging while M/P was building the Station underneath.  See Revercomb Op. at *29.

Rhode Island Avenue, which in turn contributed to the delays in starting the South Tunnels from October 16, 1986 to January 23, 1987. Def. Ex. 1271. However, a cost-saving change designed and proposed by M/P, Contractor Proposal Number 005 ("CPN 005"), also contributed to the delayed excavation under R Street until a sewer line was completed and supported in that area. This delay, discussed infra, in turn inhibited the installation of muck cars and trailing gear for the TBM.[25] Thus, M/P's change proposal also contributed to the South Tunnels delay. Tr. 1/17/1992, at 88-89; Tr. 1/21/1992, at 148-50; Retr. 10/16/2001, at 2678-82; Def. Exs. 1599, 1600; Retr. 9/21/2001, at 812-13.

Regarding its acceleration claims, M/P argues that WMATA's failure to grant timely extensions of time for CPN 002 and the June 2, 1986 and October 29, 1986 letters from Leech to M/P's Goedjen, which indicated concern over missed deadlines, constituted acceleration. Def. Exs. 145, 226. The letters show that by October 1986, WMATA had determined that M/P was behind on the Shaw Station project. See Revercomb Op. at *36. At most, the two letters only ask M/P to submit a plan for recovering lost time on the contract. The Court finds no directive to accelerate performance. Rather, the letters inform M/P that, if an acceptable plan is not submitted, WMATA may invoke contract provisions to direct extra shifts or added manpower to make up lost time. Def. Ex. 1, at 22; Tr. 11/4/1992, at 60-62. Not surprisingly, despite the

---

[25] M/P started the South Tunnel excavation in January 1987 and completed the work in March 1987, finishing the work in 35 fewer days than scheduled. Pl. Ex. 506. M/P was concurrently working on excavating the station area in preparation for station concrete operations and the start of the North Tunnels. Def. Ex. 1612AA; Retr. 10/16/2001, at 2696-700. M/P mobilized the TBM from the South Tunnels to the North Tunnels in May 1987, and began excavation of the North Inbound Tunnel in June 1987. Def. Ex. 1607. M/P completed excavation of the North Inbound Tunnel in October 1987, commenced excavation of the North Outbound Tunnel roughly two weeks later, and completed excavation of the North Outbound Tunnel in early February 1988. Def. Ex. 1362.

35

contracts' requirement to notify WMATA if an order was deemed a directive to accelerate,[26] M/P

gave no such notice regarding these letters in its response or otherwise.  Instead of claiming or

even complaining of acceleration, M/P's response denied that it was 64 days behind schedule.

Def. Ex. 151; Retr. 9/21/2001, at 809.  Indeed, as Mr. Miner testified, M/P never discussed or

prepared a plan for accelerating the work and never presented such a plan to WMATA.[27]

        In any event, the Court notes that M/P's own schedule narratives show that it was behind

schedule 64 workdays as of September 15, 1986, behind 77 workdays as of October 15, 1986,

and behind 79 workdays as of November 15, 1986.  See Def. Ex. 1511 (PPRM Minutes Nos. 12

app. D, 13 app. D, 14 app. D).  Thus, despite the focus of efforts and "skipping" over work

during the period from June 1986 to January 1987 when M/P was focused on getting started with

tunneling operations in the South Bulkhead, M/P did not begin tunneling until January 23, 1987,

or 99 days later than scheduled in the Part II CPM.  Rather, according to its own schedule

submissions, M/P lost time on the schedule during the alleged "acceleration" period between July

and December 1986.[28]

_____

        [26]  The Contracting Officer could, by written order designated or indicated to be a change
order, make any change in the work including a direction to accelerate performance.  Any order
causing such change would be treated as a change order if M/P gave "the Contracting Officer
written notice stating the date, circumstances, and source of the order and that the Contractor
regards the order as a change order."  Def. Ex. 1, at 6.

        [27]  Tr. 11/7/1992, at 45; Tr. 1/13/1992, at 43-44.  At retrial, Mr. Goedjen replaced Mr.
Miner, testifying that M/P submitted acceleration plans during a September 19, 1986 periodic
progress review meeting under the heading of "corrective measures".  Retr. 9/19/2001, at 678-81.
However, the Court does not find Mr. Goedjen's testimony compelling given the contradiction
with Mr. Miner's testimony and other evidence.

        [28]  Def. Ex. 1511.  While M/P claims it added shifts to recover time on the schedule, the
Court notes that M/P's performance plan included the use of multiple shifts for many activities.
E.g., Pl. Ex. 16, at 6 (planned schedule showing triple shifts during tunneling).  Indeed, because

In summary, WMATA did fail to inform M/P of the DPW's position.  However, the mitigating circumstances, as well as the factors contributing to the delay attributable to M/P, ultimately limit the effect of CPN 002 on the Shaw Station project.  In addition, the record reveals that WMATA did not order acceleration, nor did such acceleration occur.  Thus, the Court finds that the Rhode Island Avenue traffic changes were mitigated, and the delays and acceleration problems as to the early utility relocation were not as severe as claimed by M/P.

### 2. Utility Relocation on R Street (CPN 005)

Another controversy involves CPN 005 -- M/P's proposal to realign utilities under R Street.  During Phase I, M/P planned to relocate and support utility lines under R Street as preparatory work for the excavation under R Street needed before the South Tunnels tunneling operations could begin.  SAF No. 534.  M/P requested the change to make the utilities easier to install.  Tr. 1/13/1992, at 34-35.  The parties strongly disagree over the extent to which this these delays affected the South Tunnels efforts.

The contract drawings show the original location of the utilities under R Street -- from west of 8th Street to Rhode Island Avenue -- at the time of the bidding.  The utilities relevant to the parties' dispute were the W-6 48-inch water line, which the drawings show running along R Street, and the S-5 102-inch sewer line, which is shown running near the north curb of R Street about 30 feet below the surface.  SAF No. 536.  These drawings also show the required relocation of these utilities under R Street.  The W-6 water line was to be relocated closer to the R Street south curb line than its preconstruction location.  The S-5 sewer line "was to be

_____

multiple shifts allowed for certain cost savings and increased efficiency, M/P used them for its own convenience and benefit.  Retr. 10/18/2001, at 3005-08.

relocated, via a curve to the south, under the existing T-300 telephone line, then to run parallel to

and between the new 48-inch water line and the existing T-300 line, sloping in an easterly

direction from transition chamber S5-1 to transition chamber S5-2 on R Street east of 7th Street."

SAF No. 537.

M/P proposed to move the sewer and water lines northward and straighten them out.  To

do so, M/P would excavate into the top of the existing 102-inch sewer, install corrugated metal

flume pipes to carry away sewage flows during the construction, demolish the 102-inch sewer in

sections, and install a new sewer.  Pl. Ex. 68; SAF Nos. 542-43.  M/P made the initial proposal to

change the alignment of the utilities at a meeting with WMATA and DPW in September 1985,

and formally submitted the proposal as a Value Engineering Change Proposal ("VECP") in

October 1985.  Pl. Ex. 66; SAF No. 552-53.  The proposal was approved in December 1985 and

memorialized in a February 1986 agreement, referred to as "CPN 005."  Specifically, WMATA

agreed to a change in construction methods for which there would be no change in the contract,

and M/P agreed to complete all work on the utility realignment by the end of April 1986 and

perform in multiple shifts to decrease exposure to potential spring flooding.  Pl. Ex. 71a; SAF

No. 556.

Thus, the CPN 005 agreement between WMATA and M/P required that all the work on

the realigned 102-inch sewer be completed by the end of April 1986.  M/P witness Ralph

Bradford admitted that work on the 102-inch sewer was completed long after this deadline,

claiming that the completion occurred in the first or second week of October 1986.  Tr.

11/4/1991, at 71.  Indeed, the job records appear to indicate that the fluming for the 102-inch

sewer was completed on June 26, 1986, that support of the 102-inch sewer started on July 25,

38

1986, and that the support of the 102-inch sewer was not completed until November 12, 1986.[29]
Further, the excavation to subgrade under R Street was completed on December 30, 1986, later
than excavation under Rhode Island Avenue.

The key issue is whether the delays associated with CPN 005, including the S-5 sewer,
had a controlling or concurrent impact on tunneling delays.  The parties dispute whether the
utility work at the intersection of 7th and R Streets was on the critical path for excavation of the
station area to mobilize the TBM and begin mining the South Tunnels.  WMATA contends that,
by July 1986, the critical path ran through these CPN 005 activities, and that the CPN 005 delays
had a controlling impact on tunneling delays, or an impact concurrent with the delay in obtaining
a traffic permit for Rhode Island Avenue (CPN 002).  Specifically, excavation had to be
completed to subgrade along 7th Street under R Street so that the TBM muck cars and tail tracks
could be installed, which could not begin until the work on the S-5 sewer was completed.
Retr. 9/21/2001, at 812-13.  In contrast, M/P insists that CPN 005 activities had only an
incidental impact and were never on the critical path.  As such, M/P argues that CPN 002
controlled the delay in commencing excavation of the South Tunnels.

WMATA's scheduling experts, Messrs. Milano and O'Brien, concluded that the delay
caused by M/P's utility realignment was a longer delay than the delay caused by the Rhode Island
Avenue traffic change (CPN 002) and that the CPN 005 delay thus controlled the start of TBM
mining in the South Tunnels.  Retr. 10/16/2001, at 2680; Tr. 1/17/1992, at 88-89; Tr. 1/21/1992,
at 148-150; Def. Exs. 1599, 1600.  M/P contends, however, that excavation under the 102-inch

---

[29] Retr. 10/16/2001, at 2779-81; Def. Ex. 1599; Tr. 1/17/1992, at 85-87; Def. Ex. 1511
(PPRM  Minutes No. 14).

S-5 sewer did not delay installation of the critical elements for the TBM because the excavation under the sewer was on a small scale and could have been completed in a couple of days to avoid any delay.  Tr. 11/7/1991, at 97; Tr. 1/23/1992, at 86-88.  At the retrial, M/P contended further that it had deferred excavation under R Street because it was not on the critical path, in order to concentrate its efforts on readying the TBM for tunneling, which was on the critical path. Retr. 9/26/2001, at 1248-49.

The Court finds that the premise of M/P's contention -- that excavation under R Street was not on the critical path -- is contradicted by M/P's own schedule narratives.  Every narrative between September 16, 1986 and December 15, 1986 states that the critical path ran through the excavation under the relevant portion of R Street.  Def. Ex. 1511 (PPRM Minutes Nos. 13, 14 15).  Thus, readying the TBM and excavating under R Street were both on the critical path, and both were necessary to commence tunneling.

M/P's contentions are also contradicted by the testimony of both its Project Manager Goedjen and WMATA's Resident Engineer Leech.  These gentlemen testified that completion of the 102-inch sewer restrained excavation to grade under R Street, thereby restraining the installation of the tail tracks and muck cars for the TBM.  Retr. 9/21/2001, at 812-13; Tr. 1/13/1992, at 38-39.  The South Tunnels excavation had to wait on the completion of excavation to subgrade beneath the 102-inch sewer that ran across 7th Street under R Street.  The 102-inch sewer was not supported for its full length until November 12, 1986, and the excavation to subgrade and mudmat under R Street to Unit E-524 were not completed until January 16, 1987.[30] Therefore, the work on the realigned utilities under R Street caused a longer delay to the start of

---

[30] Def. Exs. 1599, 1612 AA; Tr. 1/22/1992, at 110.

the South  Tunnels excavation than the change in the traffic plans for Rhode Island Avenue.

Retr. 10/16/2001, at 2678-82; Tr. 1/17/1992, at 86-89; Tr. 1/21/1992, at 149-50; Def. Ex. 1600.

Thus, the Court finds that the delay caused by the Rhode Island Avenue traffic change is

concurrent with the CPN 005 delay, which resulted from M/P's own proposed changes to the R

Street utilities relocation.

As an alternative basis for explaining away the effect of CPN 005, M/P argued at the first

trial that its proposal was needed to correct a design conflict for which WMATA is responsible.

M/P's witnesses during the 1991 trial before Judge Revercomb contended that the realignment of

utilities was necessitated by an alleged design conflict between the supports (carrier beams) for

the 48-inch water line under R Street and the north upper level end wall of the South Service

Area.  Tr. 10/22/1991, at 79-80; Tr. 11/5/1991, at 105.  These witnesses testified that either the

water line itself physically interfered with the roof of the South Service Area, or the independent

support system for the water line so conflicted with the roof.  SAF No. 545.

The Court finds this alternative contention also unsupported by the evidence.  None of the

correspondence, meeting minutes, and other job records between September 3, 1985 and

February 26, 1986 provides any indication that M/P considered the existing design of the R Street

utilities to contain a design error or conflict.  By proposing the realignment of utilities as a VECP

-- a cost-saving proposal -- in his letter of October 30, 1985, Mr. Miner in effect annunciated a

purpose of providing an "improvement" of the existing utility layout.  Pl. Ex. 66.  Indeed, design

of the support systems for the utilities was the responsibility of M/P.  Tr. 1/2/1992, at 80-81, 83-

84; Pl. Ex. 3, at 78 ("Responsibilities [include] maintain[ing] and protect[ing] facilities,

including building service connections.").  Neither Mr. Leech, the Resident Engineer at the time,

nor Mr. Mehta, the WMATA Office Engineer, recalled M/P contending that the 48-inch line

faced a design conflict.  Tr. 1/14/1992, at 6-7, 9-10; Tr. 1/13/1992, at 98-101; Tr. 1/2/1992,

at 87-88; SAF Nos. 535-40, 552, 553, 556.  In addition, Ralph Jordan, the DPW representative

who attended utility meetings with M/P, could not recall M/P ever stating that redesign of the R

Street utilities was necessitated by conflicts.  As Judge Revercomb rightly explained:

> M/P can point to no contemporaneous correspondence or other document between
> September 3, 1985 and February 26, 1986, when the proposed realignment of the
> R Street utilities was finally approved, indicating that M/P considered the existing
> design of these utilities to contain a design error or conflict.  In other words, while
> M/P was not shy about alerting WMATA to defects or inaccuracies in the contract
> specifications and drawings, as the history of CPN 002 shows, it apparently made
> no such claim about the R Street utilities at the time it proposed realigning them.

Revercomb Op. at *31 (citations omitted).

In any event, the Court finds that no such design conflict existed.  Al Kolodne,

WMATA's Resident Engineer, testified that there was no conflict between the support for the

48-inch water main and the end wall of the station.  Tr. 12/18/1991, at 38.  While M/P contends

that it could not install a carrier beam under the 48-inch line because the beam would conflict

with the wall, M/P could have supported the water line in a variety of different ways, including

methods that would not have involved installing a carrier beam under the pipe.  Tr. 12/19/1991,

at 10-13.[31]  Further, even if there had been insufficient space to construct the particular support

apparatus that M/P planned to use, there were no requirements on the specific method of

independent support M/P was to use.  Pl. Ex. 1(b); Tr. 12/19/1991, at 13.  Thus, because the

Court finds no credible evidence to show that M/P's method was the only feasible method from

---

[31] Mr. Jordan, the Chief of the Inspection Branch of the DPW Water and Sewer
Administration, explained that utilities can be supported by straps hung from beams above the
pipe.  Tr. 1/14/1992, at 10, 12-13, 53-54; Def. Exs. 1940, 1941; see also Revercomb Op. at *31.

an engineering or cost standpoint, M/P's design conflict argument is doomed from the outset.

### 3. Part II CPM and Modification No. 1 to Contract 1E0012

The contract required M/P to submit its CPM Schedule for the Shaw Station project to WMATA for approval 120 days after the NTP on Part I, which M/P did on January 26, 1986. M/P's schedule could not reflect events as they stood on September 3, 1985 because WMATA had not issued any modifications reflecting those changes.

The contract required WMATA to issue the NTP for Part II by March 4, 1986. However, by early February of that year, WMATA had not yet obtained the funding needed to issue the NTP for Part II work. SAF No. 578. As a result, WMATA's Mr. McElhenny asked M/P's Mr. Miner for a 60-day extension for this NTP on February 4, 1986. Mr. Miner responded with a proposal to have certain work from Part I exchanged with critical aspects of Part II to allow that Part II work to begin in a timely fashion, which led to negotiations between the parties. These critical items included support of excavation for the south vent structure. SAF No. 579-80.

The parties ultimately settled on changes embodied by Modification No. 1 to the contract ("Mod 1"), which was executed by WMATA on February 25, 1986 and by M/P on March 3, 1986. By this agreement, the parties agreed to extend the date for issuance of the Part II NTP by 60 days. In addition, Mod 1 stipulated that M/P could make "no claims . . . as a direct result of the changes included in this Modification." Pl. Ex. 74; SAF No. 581. The items of work exchanged between Part I and Part II in Mod 1 were as follows:

A. Part I activities redesignated as Part II requirements:

   1. Standard Concrete Work, Units E574 -- E585
   2. Waterproof Roofs, Units E519 -- E585
   3. Backfill, Units E519 -- E585

    4.  Final Utilities, Units E519 -- E585
    5.  Restoration, Units E519 -- E585
    6.  North entranceway Structural Concrete, Backfill, and Restoration

B.  Part II activities redesignated as Part I requirements:

    1.  Support of Excavation, Utility Support, and Decking, including all Submittals, Units E504 -- E514
    2.  Traffic Control for Item B.1 above
    3.  Waterline W-2, Sta 46+57 to 51+21
    4.  Submittal for Tunnel Boring Machine
    5.  Submittals for Dewatering, Units E504 -- E514
    6.  Submittals for Slurry Wall, Sta 46+70 to 50+40
    7.  Submittals for Instrumentation Part II
    8.  Submittals for Liner Details
    9.  Temporary Power Substation
    10.  Delivery of materials for items above

Pl. Ex. 74.; SAF No. 582.  M/P received the NTP for Part II on April 4, 1986.  SAF No. 581.

As a result of Mod 1, M/P was able to work in areas that had previously been designated as Part II work.  This enabled M/P to try to catch up on the delays it had experienced due to the utility realignment and the traffic pattern changes.  Despite its efforts, M/P was continually unable to meet deadlines that WMATA deemed critical, and the disagreements over scheduling became more frequent as the project fell further behind.[32]

After Mod 1 was issued, M/P focused on mobilizing the TBM in the South Bulkhead to start tunneling.  As a result, M/P deferred work that would have otherwise been performed during this period.  While M/P claims to have saved time with this approach, it did not commence excavation of the South Tunnels until January 23, 1987 -- 99 days later than the scheduled start date of October 16, 1986 according to the approved Part II CPM schedule.  SAF No. 598.

---

[32] M/P alleges that during this period letters from the Resident Engineer Mr. Leech dated on June 2, 1986 and October 29, 1986 resulted in "acceleration" of the Shaw project work. As described above, such notice does not constitute "acceleration" under the contract.

The parties dispute the cause of the delay and the responsible party.  M/P believes that the traffic changes delayed in mobilizing the TBM and commencing excavation of the South Tunnels, largely by delaying excavation in the Rhode Island Avenue area, and that WMATA is contractually responsible for this delay.  As set forth above, the Court has found that CPN 002 does not excuse these delays.

### 4.  Other Early Performance Problems

While M/P satisfactorily executed and completed some of the early work, the station cut-and-cover work below 7th Street and the station areas' concrete work progressed slowly. Tr. 12/13/1991, at 60.  The project suffered from poor performance by M/P and its subcontractors,[33] equipment shortages and breakdowns, and inadequate safety maintenance.  In addition, M/P experienced financial problems that impacted both this project and the U Street Station project, as described later in this opinion.  While M/P argues that WMATA's inspectors were overzealous and unreasonable, the Court finds that such characterizations, even if true, cannot explain away the deficiencies and problems that M/P was experiencing in the prosecution of the Shaw Station project.[34]

The Court finds that, as the project progressed, M/P experienced delays and inefficiencies due to untimely and deficient performance by itself and its subcontractors and suppliers.

---

[33] For example, some of M/P's early utility work was problematic.  In one instance, M/P's failure to maintain a sewer resulted in a raw sewage leakage into the work site.  Def. Exs. 187, 189; Tr. 1/13/1992, at 36-37.

[34] See Def. Ex. 1581 (O'Brien-Kreitzberg database describing hundreds of instances where M/P's work was delayed or disrupted by M/P's own safety problems, lack of planning, deficient work, corrective work, poor rebar installation, and other problems that were assignable to M/P).

WMATA claims that these delays were caused by poor quality control, insufficient manpower, inadequate equipment, and M/P's constant bickering with its subcontractors.  Tr. 12/13/1991, at 61; see also Revercomb Op. at *45.  Further, WMATA contends that these deficiencies affected the work activities that M/P claims were impacted by the traffic claims of CPN 002 described above and the North Tunnel claims described below, Contractor Proposal Number 139 ("CPN 139"), including early utility work, concrete operations, station excavation, and the North Tunnel drive.

The Court finds that WMATA's contentions have merit.  For example, M/P experienced delays and inefficiencies throughout the Shaw Station construction project caused by untimely and deficient performance by its subcontractors and suppliers, often resulting from M/P's failure to provide them with timely payments.[35]  Indeed, the Court finds that, early in the project, Mergentime adopted a practice of delaying payments to subcontractors for its own convenience. In response to an April 17, 1987 letter from Perini's Comptroller Patrick Monea inquiring about, inter alia, the "large increase" in accounts payable in late 1986, Def. Ex. 313,  Mergentime's Tom Whalen explained that payments to vendors had been deferred to "increase the year-end cash balance."  Def. Ex. 321.  Accordingly, numerous subcontractors complained about slow and delinquent payments from Mergentime from early on.  Def. Exs. 350, 400, 1765, 1772, 1773, 1782.  These subcontractors repeatedly pleaded for payments, explained their own financial hardship caused by the nonpayments, and threatened to stop work, often to no avail.  Indeed, when M/P's rebar subcontractor threatened to stop its work, it called M/P's payments

---

[35] E.g., Def. Exs. 201, 302, 350, 400, 482, 490, 1765, 1772, 1773, 1782; Tr. 12/13/1991, at 61; see also Revercomb Op. at *47-48.

"delinquent" and "lackadaisical."  Def. Ex. 350.

M/P claims it held back payments to the subcontractors due to poor performance; however, the Court finds that, in many instances, M/P's concern for its own financial welfare was the root cause of the nonpayments.  In any event, M/P was responsible for the performance of its own subcontractors, and the delays caused by whatever poor performance may have occurred is still not WMATA's fault.  As M/P's Project Manager Stephen Mergentime testified, WMATA was not responsible for any of the delay to the project caused by the problems in meeting completion dates due to unavailable labor, materials, or equipment or by the failure of M/P's various subcontractors to perform.  Tr. 11/7/1991, at 154-55.

For example, M/P suffered frequent turnover and poor performance on the part of its subcontractors and suppliers of reinforcing steel bars ("rebar") for the concrete work on the Shaw station.  Def. Ex. 1581 ("Reinforcing" section).  Rebar installation is a critical component of most construction projects given that it must be completed prior to concrete being poured in an area.  Tr. 12/13/1991, at 61.  In August 1987, Mr. Miner complained to its rebar subcontractor Paul Lee about "poor production rate, deficient workmanship, and constant change in project supervisors," which Mr. Miner said were causing "devastating effects to the project."  Def. Ex. 403.  Accordingly, Mr. Miner threatened to terminate Paul Lee.  Id.  Later complaints centered on defective installation of rebar for the lower and upper arches in the Shaw station.  Def. Exs. 429, 440.  Indeed, Paul Lee's poor performance also caused delay and damage to the lower arch and upper arch concrete work in the station, as he often took two to three times as long as it should have been necessary to install the same ton of rebar because of the need to

47

repeatedly perform remedial work.[36]  Eventually, Paul Lee left the project in a dispute with

Mergentime, Tr. 11/5/1991, at 65-67, and the successor Liberty Steel abandoned the project

because of its inability to meet payroll.[37]

The need to repair or rework deficient concrete installations also impeded M/P's

performance.  Dennis Hammond of Perini told WMATA's Mr. Kolodne that the concrete work

was "the worst . . . he ha[d] ever seen."  Tr. 12/17/1991, at 126.  Problems arose with M/P's

concrete suppliers as well.  E.g., Tr. 11/7/1991, at 147-48; Tr. 12/18/1991, at 27; see Revercomb

Op. at *48.  The Court finds that these problems, along with the rebar problems, were both M/P's

responsibility and caused significant delays to the Shaw Station project.

The Court finds that another factor in M/P's delays was its own staff.  M/P changed

project managers, superintendents, and other critical managers several times during the course of

the Shaw project.  Six different men served as project manager on the Shaw project.  Def.

---

[36] Tr. 11/5/1991, at 66-67; see, e.g., Def. Exs. 393, 1876; Revercomb Op. at *47.  As Mr. Kolodne testified, M/P experienced considerable problems including improperly bonded rebar throughout the job and improperly located rebar.  Retr. 10/3/1991, at 1968-69.  The Court finds that the rebar crews required three times the planned duration to complete working on the inverts, Tr. 1/22 (O'Brien) 13-14, as the contemporaneous record reflects a repeating pattern throughout 1987-89 of delays and disruptions resulting from supply shortages, missing rebar, and other deficiencies in the performance of the rebar installers.  Def. Ex. 1581; Revercomb Op. at *48.

[37] Def. Ex. 910; Tr. 11/7/1991, at 155.  During the retrial, for the first time, M/P contended that the problems with Paul Lee's work were insignificant, notwithstanding Mr. Miner's contemporaneous statement that such work had "devastating effects" on the project. While Mr. Goedjen testified that the backcharges listed in Defendant's Exhibit 1876 tabulated the problems M/P had with Paul Lee's rebar work, Retr. 9/21/2001, at 776, that only listed backcharges totaling roughly $35,000, Def. Ex. 1876, the Court finds that this list likely not a complete list of backcharges.  Retr. 9/21/2001, at 824-25.  Indeed, numerous rebar problems did come to light until later in the job, requiring considerable remedial work that caused delays and increased costs.  Thus, this backcharge list does not include all of the numerous rebar deficiencies identified by WMATA's inspectors.  Def. Ex. 1581 ("Reinforcing" section).

Ex. 1442.  The Court agrees with WMATA's Director of Construction, Walter A. Mergelsberg, who  testified that frequent changes in project managers and other supervisory personnel were a disruptive force and detracted from the continuity of the projects.  Tr. 12/13/1991, at 66-68.  Further, the Project Managers lacked effective authority to restore the timeliness of the project, leading WMATA's Contracting Officer Theodore Gay to institute periodic meetings with Mr. Mergentime, the Chief Operating Officer, to discuss the status of the project and means for getting the project back on schedule.[38]

M/P's equipment problems also affected the project, as performance was repeatedly delayed and disrupted by shortages and breakdowns.  Tr. 12/13/1991, at 61, 71-73; Def. Ex. 1988, at 58-62.  Because it was performing five different jobs in the Washington, D.C. area for WMATA, M/P attempted to share critical pieces of equipment, such as cranes and concrete pumps, among the various projects.  Tr. 11/7/1991, at 166-67; Def. Ex. 1988, at 60-61; Def. Ex. 1985, at 105-06.  For example, M/P had only two concrete truck pumps and one trailer-mounted pump for all of its Washington-area jobs.  Def. Ex. 1985, at 101-102.  The availability of these pumps controlled the timing of critical concrete pours on the projects.  Tr. 12/17/1991, at 11-12; Def. Ex. 1985, at 72-74; Def. Ex. 1988, at 61-62.  In addition, M/P's Superintendent at Shaw Station William Ray Rigsby admitted that the various pieces of equipment were frequently out of service.  Tr. 11/5/1991, at 156-57.  Even the TBM -- perhaps the most critical piece of equipment -- suffered from repeated breakdowns that caused delays on the North Tunnel drive.

---

[38] Tr. 11/25/1991, at 145, 149.  Mr. Gay testified that he instituted these meetings with Mr. Mergentime because the Project Manager at the time, Donald Miner, had no authority to make any decisions regarding improvement of performance on the projects.  Indeed, Mr. Gay did not hold such meetings with any other contractors during his tenure as Assistant General Manager for Design and Construction at WMATA.  Id. at 150-51.

Retr. 10/16/2001, at 2711-12; Def. Exs. 1515, 1581, 1607.

Also, M/P failed in its responsibility to control dangerous safety conditions. As described above, the contract required M/P to take measures to ensure that the work site was safe both for its workforce and the public.[39] However, M/P continually failed to comply with its contractual requirements regarding safety, resulting in working conditions that Donald Lahr, WMATA's Safety Director, described as the worst he had seen in his 25 years in the construction industry. Tr. 1/3/1992, at 47, 124-25; see Tr. 12/4/1991, at 17. These problems included a persistent lack of site cleanup resulting in unsafe conditions for the workforce and community, id.; Tr. 12/13/1991, at 75-76, inadequate housekeeping practices, Def. Ex. 162, 175, and improper sewage utilities maintenance, Def. Exs. 187, 189; Tr. 1/14/1992, at 14-15; Tr. 1/3/1992, at 48, 71-72.

### 5.  Resequencing Claims

As discussed above, during the early months of 1987, M/P and WMATA began discussing plans to reorganize the work and negotiate a formal time extension to get the project back on schedule. These were the negotiations concerning MOA 1 and a settlement of CPN 002. The parties also negotiated other resequencing alternatives including changing the direction of the TBM tunnel drives and dropping specific claims. Pl. Exs. 80, 82; Retr. 9/20/2001, at 707-10.

M/P now contends that three major changes in sequence were WMATA's responsibility: the change in sequence of (a) south tunneling operations, (b) the north tunneling operations, and

---

[39] Among other things, M/P was required to appoint a Safety Superintendent to oversee the safety program and to comply with "the most stringent provisions" of the federal and local regulations regarding working conditions such as use of handrails, set-up and maintenance of heavy equipment, safety walks, lighting, storage and disposal of hazardous materials, and site cleanup. Def. Ex. 1.

©) station invert and arch pours.  Tr. 1/23/1992, at 91.  However, the Court finds that these

sequencing changes were elected by M/P and for its benefit.

Regarding the south tunneling operations, the contract called for excavation from the

station area up to the interface with the E-la contract, for the TBM's skin to be abandoned in

place, for the TBM to be dismantled and remobilized in the station area, and for the second South

Tunnel to be driven in the same direction to the interface with E-la.  Def. Ex. 7.  M/P, however,

changed the sequence by turning the TBM around at the interface with the E-1a project, and

tunneling the second tunnel in the reverse direction.  Tr. 11/7/1992, at 38-40.

While Mr. Warner, M/P's scheduling expert, testified that this change was in "response to

[WMATA's alleged] directives to gain back lost time,"  Tr. 1/23/1992, at 97, Mr. Miner testified

that M/P had planned this change before bidding.  Tr. 11/7/1991, at 38-40; Def. Ex. 293.  The

Court finds that this arrangement saved the time and expense of dismantling and remobilizing the

TBM a second time, as well as the cost of the TBM skin that would have been abandoned in the

E-la interface.  Retr. 9/21/2001, at 819-20; 11/7/1991, at 38-40; Def. Ex. 293; SAF Nos. 628-29.

Indeed, WMATA approved this change in sequence as a timesaving measure to benefit M/P.

Tr. 11/4/1991, at 86; Retr. 9/21/2001, at 820 (finding change in tunneling sequence unrelated to

Rhode Island change or Mr. Leech's June 1986 letter); see also Revercomb Op. at *45.

For the north tunneling, the contract originally called for M/P to drive the outbound

tunnel first from the north end of the Shaw Station open cut to the crossover, retrieve the TBM

and remobilize it in the station area open cut, then drive the inbound tunnel from the station area

to the crossover at the north end.  After U Street Station Contract was awarded to M/P, it

proposed to turn the TBM around at the crossover between the Shaw and U Street Projects to

51

save the time and expense of dismantling, removing, and remobilizing the TBM.  The Court

finds that this proposal was intended to benefit M/P.

However, the North Tunnel turnaround instead led to a 120-day delay because of the need

to keep the inbound track open for mucking operations instead of doing cleanup and invert

concrete work immediately after completion of the inbound tunnel.  Mr. Warner again testified

that this change was due to a desire to regain lost time as a result of CPN 002, Tr. 1/23/92,

at 98-99, but the Court finds this analysis unpersuasive (especially given the delay caused by this

change).  Indeed, M/P offered no contemporaneous evidence that this change had anything to do

with CPN 002.

As for the resequencing of station concrete, M/P has only identified an impact on station

invert and arch pours.  M/P planned to start with the E-539 invert and proceed north, then pour

the station arches from north to south starting at unit E-579.  Retr. 9/17/2001, at 1299; Retr.

10/16/2001, at 2689-90; Def. Ex. 1603.  After pouring invert E-539 first on February 27, 1987,

Def. Ex. 1511; Retr. 9/27/2001, at 1303-04; Retr. 10/16/2001, at 2691-92, M/P poured inverts in

a "skip and fill" manner, rather than sequentially.  Retr. 9/21/2001, at 816-27; Retr. 10/16/2001,

at 2690; Def. Ex. 1604.

M/P claims that it had deferred station excavation work in order to accelerate its efforts to

ready the south bulkhead for the TBM to start tunneling, causing the station excavation to have

not progressed enough to permit the planned sequence of invert and arch pours.  However, the

Court finds that nothing prohibited the planned sequence, and that its decision to adopt a "skip

and fill" procedure had nothing to do with CPN 002.  When it poured its first invert on February

27, 1987, M/P had already excavated and poured the mud mats for three units 150 feet to the

north.[40]  M/P's plan was to have excavated two units ahead of each invert pour.  Retr. 9/27

(Sublett) 1304; Def. Ex. 1271.  With the excavation completed three units ahead of invert E-539

and two units ahead of E-544, the progress of the excavation did not prevent M/P from pouring

inverts in sequence to the north.  Indeed, the station excavation thereafter proceeded apace and

was completed by April 3, 1987.  Def. Ex. 1612AA.  Given M/P's failure to bring forth any

contemporaneous exhibit to the contrary, the Court finds that M/P could have proceeded with

concrete work in a sequential, south-to-north manner as originally planned.  See, e.g., Revercomb

Op. at *44-45.  In fact, M/P decided for its own convenience to change the sequence of the invert

and arch pours.

        Thus, the Court disagrees with M/P's arguments that the tunneling or concrete work

resequencing events were driven by an interest in gaining lost time due to delays associated with

CPN 002, nor will it credit M/P's attempt to cast responsibility for the resequencing on

WMATA.  Although the resequencing was "negotiated" with WMATA, the requests to do so

were at the request of M/P and for M/P's benefit.

### 5.  North Tunnel Claims (CPN 139)

        Both WMATA and M/P were aware the soil conditions in the North Tunnels presented

difficulties for stabilizing the ground.  Retr. 9/14/2001, at 295; Def. Ex. 10.  The contract

contains detailed information regarding geological conditions in the E-lc tunnel and measures

potentially required to control ground loss and to support utilities, including extensive

specifications defining M/P's responsibility for maintaining the ground during the tunneling

---

        [40] Def. Ex. 1511; Retr. 9/27/2001, at 1303-05; Retr. 10/16/2001, at 2691-92; Tr.
1/13/1992, at 46-47; Tr. 1/17/1992, at 100-01; Tr. 1/23/1992, at 102; Def. Exs. 1516, 1521, 1602.

operation.  The parties have stipulated that these potential methods were "void fill" and "chemical grouting."  The former consists of pumping a mixture of flyash and bentonite through grout pipes into voids that develop in the tunnel as the TBM passes.  Chemical grouting uses a sodium silicate mixture that is pumped into the ground in advance of the TBM to stabilize the ground before the TBM passes through.  SAF No. 785-86.

M/P's compliance with WMATA's directives regarding grout filling led to Contractor Proposal Number 139 ("CPN 139"), under which M/P claims that WMATA owes it direct costs and delay and inefficiency costs resulting from grouting performed during the construction of the Shaw Station's North Tunnels.  The key issues associated with CPN 139 do not relate to whether there was a change.[41]  Rather, this Court must determine (a) the scope of grouting actually performed in comparison to the grouting directed by WMATA, (b) the extra costs M/P incurred as a result of the directed grouting, ©) the delays M/P experienced in the North Tunnel excavation, and (d) the extent to which these delays were caused by directed grouting as opposed to equipment breakdowns, boulder removal, and other factors within M/P's responsibility.

### a.  The Contract

M/P claims that WMATA is responsible for M/P's failure to support the soil while tunneling.  However, while WMATA was responsible for directing M/P's soil stabilization methods in specific areas that it designated, this Court finds that the contract specifications require M/P to support the ground, especially under utilities and other critical structures.  Tr. 1/13/1992, at 49-50; Tr. 12/13/1991, at 85-104; Tr. 11/25/1991, at 27-28.  The specifications

---

[41] WMATA issued three Pending Change Orders directing grouting in certain areas and later issued several modifications adjusting the contract price to cover directed grouting.  Def. Exs. 450, 537, 553.

warn of unstable ground and flowing material with virtually no stand-up time.  SAF No. 796; Tr.

1/13/1992, at 50.  After completing the South Tunnels, M/P specifically refurbished the TBM to

prepare it for the soil conditions in the North Tunnel area.  Retr. 9/14/2001, at 295.

Specific provisions of the contract defined M/P's obligation to support the ground.  For

example, the contract imposed a duty on M/P to maintain the integrity of existing utilities,

D. Ex. 1, and required that the utilities be maintained in place while completing the work.  Pl.

Ex. 3.  In addition, M/P is required to prevent subsidence of surface structures and utilities.  Id.

This performance specification leaves M/P to determine the means of achieving that end.

Tr. 12/13/1991, at 91.  Further, the contract requires M/P to use chemical grouting as required to

stabilize materials in the heading and/or to control ground water and to control loss of ground

and surface subsidence, Def. Ex. 7; Tr. 11/4/1991, at 99, and to provide chemical grouting

equipment on the site before starting the E-lc tunnels.  Def. Ex. 7; SAF No. 796.

Finally, the contract contains detailed, information regarding geological conditions in the

E-lc tunnel and measures that may be required to control ground loss and to support utilities.  In

general, the North Tunnels would be in a "mixed face" material, with the upper half of the tunnel

in unstable "T" materials and the bottom half in "P" materials.  Def. Ex. 7; Tr. 11/4/1991, at 91.

Further, the contract warns of three to four feet boulders, the potential for settlement and

difficulties of holding the ground, and flowing sand in the tunnel if proper measures are not taken

to control the ground.  Def. Ex. 7; Tr. 11/4/1991, at 94.  Regardless, settlement under the streets

had to be controlled by M/P.  Def. Ex. 7.  Several alternatives for controlling ground loss are

listed, including chemical grouting, id., and chemical grouting is referred to as a way of

minimizing settlement under sewers that run across the tunnel alignment.

### b.  M/P's awareness of potential grouting issues

As Judge Revercomb noted, at the time of the bid, M/P had planned to control ground loss by dewatering in advance of tunneling, using a closed face TBM for excavation to provide continuous ground support with the least amount of ground loss, and using precast tunnel liner with void filling grout pumped from within the TBM.  M/P did not anticipate using either chemical or void filling grouting from the surface for the North Tunnel drives, and thus did not include the costs in its bid.  Tr. 12/4/1991, at 126-129; Tr. 11/5/1991, at 128-149; Def. Ex. 13; see also Revercomb Op. at *58.

M/P argues that the soil conditions in the North Tunnel drive were a differing site condition, making WMATA responsible for all grouting that it performed to support the soil.  However, the Court finds that M/P was aware of these soil conditions and the possibility that grouting would be needed.  Indeed, Mr. Mergentime himself testified that he was aware these soil conditions would be different from, and more challenging than, soil conditions in the South Tunnels.  Accordingly, M/P refitted the TBM to adapt to the different soil conditions.  Retr. 9/14/2001, at 289-90, 295.  Further, Mergentime received a report from Dr. Edward Cording on February 20, 1985 regarding anticipated geological conditions in the North Tunnels.  The report indicated that, given the potential for flowing sand, chemical grouting could be required in parts of the North Tunnels.  Def. Ex. 10; see also Def. Ex. 1969, at 82-83.

After M/P submitted its initial submission of pre-award data on the Shaw Station contract, Mr. Mergelsberg noted a lack of adequate information regarding the use of chemical grouting.  Tr. 12/13/1991, at 110-11; Def. Ex. 16.  When these concerns were raised with M/P, Mr. Whalen responded in a July 15, 1985 letter providing supplemental pre-award information:

> As per Specifications Section 228, we will have onsite chemical grouting equipment before commencing E-lc tunneling work. *Chemical grouting will be used if necessary to supplement dewatering and to prevent undesirable settlements . . . .*  The methods, material and equipment would be as per project specification and subject to Engineer[']s Approval.

Def. Ex. 1903 (emphasis added).

### c.  Grouting plans

On March 3, 1987, Mr. Leech -- WMATA's Resident Engineer -- directed M/P to submit

a soil stabilization plan before tunneling started for the North Tunnels that would include

provisions for chemical grouting if unstable ground conditions were encountered.  Pl. Ex. 122;

Tr. 10/30/1991, at 25-26; Tr. 1/13/1992, at 50-51, 54; Tr. 12/13/1991, at 113-14; Def. Ex. 1511

(PPRM No. 17).  The request, which was a change to the contract, led to internal discussion at

Mergentime regarding the contract requirements for soil stabilization, including an April 6, 1987

memorandum from Mr. Sterrett "outlin[ing] a plan for soil stabilization" for Mr. Goedjen, which

noted that the contract's provisions on chemical grout

> use[s] wording such as "if," "as required," and "if necessary," which [he] interpret[ed]  to mean that this could be a secondary means of controlling ground movement and *they could make you initiate this plan if some other plan failed or was not adequate.*

Def. Ex. 309 (emphasis added); <u>see also</u> Def. Ex. 1969, at 122.

Mergentime initially planned to use void fill grouting for soil stabilization and no

chemical grouting.  Tr. 12/13/1991, at 114; Tr. 1/13/1992, at 54-55; Pl. Ex. 126.  This soil

stabilization plan was submitted by M/P on April 8, 1987, after Mr. Leech's request.  However,

on May 1, 1987, WMATA rejected this soil stabilization plan and requested chemical grouting as

specified in the contract documents.  Def. Ex. 319.

After negotiations, M/P resubmitted a soil stabilization plan on May 19, 1987, following

WMATA's directive to include chemical grouting that required M/P to perform the tunneling and grouting operations for the first 300 feet of the inbound North Tunnel, which was south of Peoples Drug Store. This plan required M/P to first install pipes every 10 feet along the centerline of the inbound North Tunnel from the surface to approximately five feet above the crown or top of the tunnel. These pipes would be installed in advance of the tunneling operation. Next, M/P would stop tunnel operations as soon as the front of TBM (the "shield") passed the tip of each grout pipe. M/P would then pump grout at a low pressure into the grout pipe until the grout pipes would back up and grout spilled out at the surface. Subsequently, M/P would resume tunneling operations until the shield reached the tip of the next grout pipe, and repeat the cycle. Tr. 10/30/1991, at 28-33; Pl. Exs. 136, 139, 224.

M/P made clear that WMATA's directive for a comprehensive chemical grouting plan, rather than a limited supplement to dewatering, was not contemplated in the original contract documents. Pl. Ex. 136. M/P specifically requested a PCO for what it deemed extra work and included a cost proposal. Id.; SAF No. 1017. However, upon approving this plan on May 26, 1987 for the first 300 feet of the inbound North Tunnel operation, WMATA deemed it "a no-cost substitution for chemical grouting installation requirements of the contract in this limited area" with "additional evaluation [to] be made on the necessity for modification of the plan beyond the initial section." Pl. Ex. 139; see also SAF No. 1018. M/P rejected the Contracting Officer's no-cost assessment and claimed the approved soil stabilization plan was a betterment to the contract. Pl. Ex. 142; SAF No. 1019.

### d.  Grouting performance and contemporary communications

Almost immediately after the TBM began tunneling in the inbound tunnel in June 1987, M/P began experiencing significant subsidence and "sink holes" at several locations along the inbound tunnel.  As chronicled in Resident Engineer Leech's diary, these "sink holes" occurred at various different locations between the station bulkhead and the 8th Street fan shaft.  Tr. 1/13/1992, at 56-59.

Further, some of the grouting in the tunnels was for stabilizing the ground underneath the newly-constructed Peoples Drug Store at 7th and T Streets, N.W.  WMATA acknowledged that grouting to stabilize the drug store constituted extra work and accordingly issued "Pending Change Orders" ("PCOs") for that work.  Tr. 12/13/1992, at 91.  As a result of the subsidence at various locations in the inbound tunnel between the station bulkhead and the 8th Street fan shaft, WMATA wrote several letters expressing concern about protecting the ground during tunneling operations.  E.g., Def. Ex. 347.

In addition, delays occurred during M/P's performance.  M/P claims that the requirement for it to begin grouting from the surface as soon as the shield passes the tip of each pipe caused void filling grout to flow in front of the TBM into the "face" or "heading" of the tunnel.  As a result, much of the void fill grout pumped around the TBM was excavated along with the earth, right back through the TBM.  M/P claims that this result caused excessive wear due to the grout's abrasive nature, thus causing the TBM to experience lost time for repairs to the conveyor belts that moved dirt excavated from in front of the TBM behind the machine.  Pl. FOF at 291.  Despite the conflicting evidence on these issues, the Court finds that the TBM's excessive down

time was not caused by the grouting operations.[42]

As tunneling progressed, M/P's soil stabilization efforts were failing, and the parties engaged in numerous discussions of methods of soil stabilization.  As a result, on July 13, 1987, WMATA authorized a change order, agreeing to pay the extra grouting costs in the vicinity of Peoples Drug Store to ensure that the store would not be damaged.  P. Ex. 146.  Nevertheless, M/P damaged approximately 1000 square feet of the store when it pumped excessive quantities of grout into the soil, which burst through the drug store floor.  Retr. 9/21/2001, at 824.  On September 21, 1987, WMATA issued PCO 031 to cover the added grouting costs in the vicinity of Peoples Drug in the inbound tunnel.  Def. Ex. 450.

M/P's failure to support the soil alarmed the DPW, which wrote a letter to Mr. Leech on August 4, 1987 complaining about "uncontrolled settlement" during the inbound tunneling operation.  Def. Ex. 386.  The letter noted that uncontrolled settlement had caused the 18-inch public sewer in the vicinity of T Street, N.W., and 7th Street to fail on July 24, 1987, and that other indications of massive ground loss were evident.  Further, the DPW warned that "[s]ettlement of this magnitude anywhere over the outbound tunnel or over either tunnel west of the fan shaft at 8th Street would be unacceptable . . . due to the risk of damage to critical water and sewer facilities in the area."  Id.  WMATA forwarded this letter to M/P on August 7, 1987.

M/P's ineffective grouting program in the first section of the inbound tunnel was also noted by Mr. Mergelsberg in WMATA's Office of Construction and by WMATA's Department

---

[42] E.g., Tr. 11/4/1991, at 117; Retr. 10/16/2001, at 2710-17.  However, the Court does find that the new grouting plan prevented M/P from operating the TBM on a continuous basis -- three shifts per weekday -- because tunneling had to stop while the void filling grout operation proceeded.  This delay and extra manpower caused increased costs and lower productivity that were not anticipated by M/P.  E.g., Pl. Ex. 224 (Attach. B).

of Engineering.  Tr. 12/13/1991, at 114-16 (explaining that initial grouting program "did not

work").  In a memorandum to Contracting Officer McElhenny dated August 3, 1987, the Head of

WMATA's Field Engineering Branch referenced various problematic incidents resulting from

over-grouting, including six incidents of voids progressing to the street surface, several incidents

of material run-in endangering workers, and structurally damaging "heav[ing]" of the floor slab

in Peoples Drug Store.  Def. Ex. 376.  After WMATA officials considered measures to

strengthen the soil, Def. Ex. 314; Tr. 12/13/1991, at 116-17, Mr. McElhenny wrote Mr. Miner on

August 5, 1987 about the ineffectiveness of void fill grouting, directing its discontinuance until

further notice because "[t]he results recorded to date indicate that [M/P had] neither met the

performance requirements for ground control specified in the contract nor the intent of [its] soil

stabilization program."  Def. Ex. 382; see also Tr. 12/13/1991, at 119.  WMATA also directed

M/P to submit a revised plan and included several recommendations, including that M/P consider

using chemical grout for controlling ground loss.  Def. Ex. 382; SAF No. 1041-43.

A series of sometimes heated communications between M/P and WMATA ensued during

that month that included demands that WMATA submit a change order ordering full

compensation for what M/P considered was work beyond the contract's requirements.  See SAF

No. 1044; Pl. Exs. 151, 155; see also Revercomb Op. at *68-69.  On August 20, 1987, M/P

submitted a revised plan that was accepted by WMATA eight days later, which provided for a

combination of void fill and chemical grouting.[43]  Based on this plan, M/P began tunneling from

_____

[43] Pl. Ex. 154.  That same week, M/P also made cost proposals for the chemical and void
fill grouting programs in the inbound North Tunnels from 9th Street to the crossover.  SAF No.
1049-50.  M/P also submitted a cost proposal on September 1, 1987 and a time extension request
of 46 calendar days for void fill grouting in the inbound North Tunnels from the North Bulkhead
to the 8th Street Fan Structure.  The proposal, identified as CPN 079, incorporated the claim for

the 8th Street fan shaft; however, M/P experienced significant ground loss within a short

distance.  As a result, M/P then adopted an effective plan that used soil pre-treatment with

chemical grout.  Pl. Ex. 165.

In August and September 1987, senior management from WMATA (including Messrs.

McElhenny and Mergelsberg) and Mergentime (including Mr. Mergentime) discussed ways to

stabilize the ground above the tunnels in the critical section between 9th Street and the Shaw/U

Street crossover, a location with a heavy concentration of utilities.  After some communication

regarding the plans of operation in this area given the past inability to support the ground,

WMATA and M/P agreed to share the cost of chemical grouting in certain areas where utilities

were concentrated to ensure their support.  Further, WMATA agreed to share in the cost of

chemical grouting to ensure that the integrity of the utilities was maintained, and because

directing chemical grouting took from the contractor his option to stabilize the ground by other

means.  Tr. 12/13/1991, at 122-24; <u>see</u> Revercomb Op. at *70.

In addition, the Court finds that M/P during this time determined that chemical grouting

was cost efficient and faster than other soil stabilization methods.  For example, M/P's Mr.

Miner wrote a memorandum to Mergentime outside counsel Stanley Sher on September 16, 1987

regarding the relative merits of a soil stabilization program emphasizing void fill ("replacement")

grouting versus a program of chemical grouting.  His analysis indicated that use of chemical

grouting throughout the remaining tunnel lengths would increase tunneling production and cost

less than void fill grouting.  Mr. Miner concluded "that the chemical grouting program (Part II)

[would be] the more cost effective way to complete the project."  Def. Ex. 437; Tr. 11/4/1991,

grouting under Peoples Drug Store.  SAF No. 1057.

at 107; see also Revercomb Op. at *70.

On September 14, 1987, M/P submitted another revised soil stabilization plan for this section of the tunnel near a heavy concentration of utilities. Def. Ex. 1362. A week after M/P submitted this plan, Mr. McElhenny wrote to Mr. Miner on September 21, 1987 regarding these management-level discussions about soil stabilization. In this letter, he explained that, these discussions reflected a mutual technical agreement that more soil stabilization was needed through the use of chemical grouting before tunneling; however, concerns remained about contractual issues regarding the liability and the extent of a performance related soil stabilization plan. Mr. McElhenny stressed the importance of obtaining chemical grouting capability for use in the remainder of the E-l©) tunnel drive. Def. Ex. 449; see also Revercomb Op. at *70-71.

M/P responded with a letter dated two days later, which signaled its intentions to perform chemical grouting where significant protection of structures and/or utilities was required per M/P's determination unless there was written direction to the contrary and to hold WMATA responsible for the costs. The letter also requested again a change order for this work. Def. Ex. 458; SAF Nos. 1083-84; see also Revercomb Op. at *71. Indeed, M/P personal confirmed that grouting did occur on M/P's own initiative in the last 150 feet of the outbound tunnel. Pl. Ex. 219; Tr. 11/4/1991, at 111.

WMATA issued PCO 033 to cover the parties' agreement for chemical grouting between 9th Street and the crossover. Def. Ex. 553. M/P agreed to bear a minimum of $200,000 of the cost of this chemical grouting, while WMATA agreed to pay the balance, not to exceed $900,000. In a letter confirming this agreement dated October 2, 1987, Mr. Leech reminded M/P that WMATA's "participation in the cost of chemical grouting is limited to those specific areas

63

that [it] identif[ied]." Def. Ex. 469.  This letter touched off communication between the parties

disputing whether M/P could interpret Mr. Leech's letter to constitute a NTP on chemical

grouting with cost sharing.  SAF Nos. 1093-94.

Through the rest of 1987, M/P proceeded with tunneling operations, which included

chemical and void fill grouting work.[44]  While this work continued, the parties continued to argue

regarding the responsibilities for the costs of the soil stabilization program.  For example, in

conjunction with several revised cost proposals for soil stabilization changes for different

portions of the North Tunnel submitted in late October and early November, M/P reiterated to

WMATA that it considered the entire grouting program a change to the contract, thus making

WMATA responsible for the costs in a letter dated October 30, 1987:

> Concerning the chemical grouting program from the surface, in advance of
> tunneling, the Mergentime/Perini position has always been that this effort, in its
> entirety, is a change in scope.  This type of program is not required by the
> Specifications, and we have consistently held that all costs (direct and indirect) to
> implement and carryout this program would be the responsibility of [WMATA].

Pl. Ex. 187.  However, Mr. Leech sent a series of letters to M/P in November 1997 insisting that

chemical grouting outside such areas identified by WMATA was within M/P's contractual

responsibilities to support the soil and to M/P's account.  See, e.g., Def. Exs. 510, 517, 1904.

By this time, M/P was reporting that it was 74 days behind schedule for the contract

completion date.  Def. Ex. 1511.  The early utility work, station excavation, the South Tunnels,

and the station inverts in the south vent and service area and the station and platform area had

---

[44] During this time, delays cropped up for various reasons.  For instance, the
unavailability of the U Street east entranceway for mucking operations caused some delays.  SAF
Nos. 1099, 1011-03.  In addition, M/P repeatedly faced oversized boulders that were not
contemplated by the contract.  Pl. Exs. 173, 208, 214; SAF Nos. 1063, 1138.  WMATA
acknowledged these boulder claims, and assigned claims to track the costs.  Pl. Ex. 170.

been completed.  Retr. 10/3/2001, at 1394-940; Def. Ex. 1604.  Thus, with the South Tunnels

work completed, M/P was required to then focus on the work it had deferred to complete the

tunnels.  At the time, M/P was continuing to mine the North Tunnels, and was still working on

pouring upper and lower station arches and walls in the southernmost portions of the stations.

Def. Exs. 1511, 1604.  Further, M/P had yet to start construction on the station walls or inverts in

the station's northernmost portion or the North Tunnel concrete work.  Further, very little

backfill and restoration activities had been performed.  Retr. 10/3/2001, at 1394-940.

On December 2 and 3, 1987, M/P's Business Manager Ralph Bradford and WMATA's

William Linde and Robert Zaepfel met to negotiate M/P's PCO 031/CPN 035 claim for grouting

under Peoples Drug Store on the inbound North Tunnel drive.  According to meeting minutes,

Mr. Zaepfel "pointed out that WMATA did not envision impact, inefficiency, time, or extended

performance costs in this change to the contract, and that WMATA's position on this PCO was

for far less" than the costs and time extension proposed by M/P.  Pl. Ex. 200; SAF No. 1128.

Nevertheless, the negotiations settled on direct costs for the claim.  Tr. 11/25/1991, at 83-86.  On

December 4, 1987, as M/P continued mining the outbound tunnel, WMATA issued PCO 035 for

grouting under the drug store in the outbound tunnel.  Def. Ex. 537; SAF No. 1037.

As M/P tunneled closer to Peoples Drug Store, WMATA issued additional grouting

directives required by the differing site condition the store represented.  After informing that a

PCO would be issued for soil stabilization work beyond the scope of the contract, WMATA

acknowledged that Peoples Drug Store was not shown on the contract documents and that the

existing parking lot was replaced by a new parking lot.  In addition, WMATA noted that M/P

was "responsible to stabilize the soil in public and private lands while tunneling to limit ground

subsidence and to leave the ground in a consolidated state."  Pl. Ex. 203; SAF No. 1133.  This

new soil stabilization plan for Peoples Drug Store involved chemical grouting, void fill grouting

the store's perimeter, and other void filling as needed.  On December 10, 1987, WMATA

advised M/P of the approval from Peoples Drug Store for void fill and chemical grout operations

in the area to commence.  Pl. Ex. 206; SAF Nos. 1134-35.  On the same day, M/P submitted its

PCO 035/CPN 105 cost proposal and requested WMATA to begin negotiations for this change.

Pl. Ex. 207; SAF No. 1136-37.

On December 15, 1987, WMATA directed M/P to employ chemical and/or void fill

grouting to stabilize the soil for the remainder of the outbound tunnel, from Peoples Drug Store

to the North Bulkheads.  Pl. Ex. 209.  A few weeks later, WMATA issued Modification No. 015,

Part I to the Shaw Contract on December 29, 1987.  The modification called for "non-toxic

chemical grout in advance of tunnel excavation to stabilize the soil above the tunnel alignment to

avoid the risk of significant damage to utilities."  Def. Ex. 553.  Further, WMATA increased the

contract price by $500,000 for grouting covered by PCO 033.[45]

M/P signed and returned the Part I Modification No. 15 on January 5, 1988, reserving the

right to claim further reimbursement for the other soil stabilization grouting that WMATA

directed.  Pl. Exs. 216.

Between December 1987 and February 1988, tunneling and grouting operation

commenced.  On various occasions, ground subsidence occurred that damaged utility lines under

---

[45] Pl. Ex. 213.  This modification expressly noted that, as Part I of a two-part
modification, it was "tentative for added work required and that a Part II [would] be issued at a
later date establishing the final quantities of additional work and the overall equitable
adjustment."  Id.

Peoples Drug Store.  SAF Nos. 1140, 1143.  Regarding an occurrence in January 1988, WMATA

directed M/P to undertake the necessary repairs with the costs covered by insurance as part of

PCO 035, SAF No. 1143, and M/P responded that it would adjust its claim under PCO 035 for

any received insurance payments.  Pl. Ex. 223.

M/P completed the void fill grouting, chemical grouting, and tunneling of the outbound

tunnels to the North Bulkhead between February 1, 1988 and February 9, 1988.  SAF No. 1144.

Subsequently, M/P dismantled the TBM, removed the tunnel support equipment, and cleaned up

the two North Tunnels in preparation for tunnel invert concrete work through April 1988.  Pl.

Ex. 17.  M/P also began the North Service Area concrete inverts, which had been delayed by the

North Tunnels drive.[46]

### e.  Post-completion claims communications

On March 22, 1988, M/P forwarded its PCO 035/CPN 105 claim for the cost of the soil

stabilization program while driving the outbound North Tunnel under Peoples Drug Store.  SAF

No. 1148.  Several months later, on May 11, 1988, M/P consolidated its many claims on the

North Tunnels into one comprehensive proposal in the amount of $6,176,271, with a comparable

time extension of 103 calendar days to cover all extra costs incurred due to the changes on the

inbound and outbound tunnel drives.  This consolidated claim was designated CPN 139.  Pl. Ex.

224; SAF No. 1149.

On July 5, 1988, the Contracting Officer issued Modification No. 16, which covered only

PCO 031/CPN 035 for the grouting under Peoples Drug Store during the inbound tunneling

_____

[46] As described previously, because the mucking operation and supporting equipment
occupied the North Service Area during tunneling, M/P could not pour the northern concrete
inverts until the area was free.  SAF No. 1147.

operations.  Pl. Ex. 225.  While this modification acknowledged a change in the contract in the

amount of $183,256, it did not change the contract time.  Despite the January 1988 agreement

between M/P Business Manager Mr. Bradford and WMATA negotiators that M/P would reserve

the right to claim additional costs due to impact, inefficiency, time, and extended performance,

the modification included language that stated that the terms "constitute a full accord and

satisfaction for all costs and time of performance."  Id.  The Court finds that WMATA was

taking advantage of M/P's weak financial position, as Mr. Zaepfel testified that WMATA

"understood that [M/P] needed money on the job and had agreed to the dollars so the

mod[ification] was prepared with accord and satisfaction language in it as a negotiation ploy, a

strategem if you like."  Tr. 11/25/1991, at 88.  M/P returned Modification No. 16 unsigned and

requested that WMATA issue a final decision on the increased costs for inefficiency, impact,

times, and extended performance reserved in the January 1988 Summary Record of Negotiations.

Pl. Ex. 226.

Though negotiations on CPN 139 would continue,[47] the parties were at an impasse.

Contracting Officer John McElhenny issued his final decision on this claim on May 10, 1990,

which was one day before termination.  This decision largely denied M/P's claim and disallowed

any recovery for the costs beyond those related to Peoples Drug Store.  This decision found that,

including the payments made during the negotiations with Mr. Egbert, M/P had been paid almost

$6,837,000 for this claim.  Pl. Ex. 679.

---

[47] For example, in a September 26, 1988 letter, Mr. Mergentime called on John Egbert, WMATA's Deputy General Manager, to have him personally intervene to jumpstart negotiations. Pl. Ex. 103.  Mr. Mergentime criticized WMATA's lack of response to M/P's negotiation correspondence and requests, forcing M/P to finance millions in extra work for years without compensation.

### e.  Evaluation of claims

M/P has claimed that WMATA directed the following efforts during the construction of

the North Tunnels that were beyond the contractual requirements:

1.  For the inbound North Tunnel Drive, void filling grout placed from the surface in advance of tunnel boring operations for the first 300 feet of the inbound tunnel from the North Bulkhead to the south side of Peoples Drug Store by the use of 3-inch diameter grout pipe placed every 10 feet along the center line of the tunnel (CPN 079).

2.  For the inbound North Tunnel Drive, void filling grout placed from the surface in advance of tunnel operations from the south side of Peoples Drug Store to the east side of 8th Street (PCO 031/CPN 035, Modification 15, Part I).

3.  For the inbound North Tunnel Drive, void filling grout placed from the surface in advance of tunneling from the 8th Street Fan Shaft Structure to 9th Street (CPN 096 -- later included in CPN 079).

4.  For the inbound North Tunnel Drive, chemical grouting and void filling grout from the surface in advance of tunneling operations from 9th Street to the Crossover at Vermont and U Streets for the inbound tunnel (CPN 088, CPN 089, Modification 16, Part I).

5.  For the outbound North Tunnel Drive, chemical grout and void filling grout from the crossover at U Street to the 8th Street Fan Structure (CPN 102, CPN 103, Modification 16, Part I).

6.  For the outbound North Tunnel Drive, chemical and void filling grout from 8th Street to the north side of Peoples Drug Store (CPN 096).

7.  For the outbound North Tunnel Drive, chemical and void filling grout from the north side of Peoples Drug Store to the south side of Peoples Drug Store (CPN 105/PCO 0350).

8.  For the outbound North Tunnel Drive, chemical grout from the south side of Peoples Drug Store to the North Bulkhead (CPN 123).

9.  Dewatering and boulder removal, including WMATA's directed changes in piezometer locations that allegedly forced M/P to perform additional dewatering in an attempt to lower the water table below elevation 47 (CPN 081) and other changed conditions included oversized boulders allegedly causing delays and increased costs.

10.  Soil Stabilization Plan, including WMATA alleged requirement that M/P submit a soil stabilization plan beyond the scope of the contract, which resulted in delay and

expense.

M/P's CPN 139 was a compilation of the CPN/PCO's caused by the above changes.[48]

M/P's original CPN 139 (as of May 11, 1988) claimed 103 days of delay; however, the revised CPN 139 claim submitted after many negotiations in March 1990 asserted a total of 113 calendar days. Pl. Ex. 506, at 87-90. As noted above, the original CPN 139 claimed $6,176,271. The North Tunnel Drive represented the second largest element of M/P's bid cost of $6,483,297. The actual cost was $10,560,164, which included the cost of the unanticipated grouting. Therefore, the North Tunnels cost overran by 64%. Pl. Exs. 18, 506, 736; see also Revercomb Op. at *79.

Generally, the Court finds that, in light of its determination that chemical grouting was superior to other methods of soil stabilization (as represented in Mr. Miner's memorandum to Mr. Sher), M/P used extensive chemical grouting in areas other than the key utilities and structures in a successful attempt to improve productivity. Indeed, M/P admitted to having grouted on its own initiative in portions of the outbound tunnel. Pl. Ex. 219; Tr. 11/4/1991, at 111; see also Revercomb Op. at *74. Accordingly, the Court finds that WMATA is not

---

[48] The CPNs include 035 (Soil Stabilization under Peoples Drug), 079 (Costs to Implement the Soil Stabilization Plan), 081 (Additional Dewatering), 082 (Chemical Grout Plant Equipment), 088 (Chemical Grouting for 9th Street to Crossover in the inbound North Tunnel), 089 (Void Filling Grouting for 9th Street to Crossover in the inbound North Tunnel), 095 (Clean-up and repair of T Street sewer and Peoples Drug damage), 096 (Soil Stabilization from the Fan Shaft to 9th Street Inbound North Tunnel), 098 (Repair of Peoples Drug Parking Lot), 099 (Boulder removal), 102 (Void Filling Grout Program over the outbound North Tunnel), 103 (Chemical Grouting Program over the outbound North Tunnel), 115 (Boulder removal), 118 (Boulder removal), 123 (Chemical Grouting Program over a portion of the outbound North Tunnel). Pl. Ex. 224 (Attach. A).

responsible for such areas where M/P used chemical grouting.[49]

While WMATA acknowledged that grouting to stabilize the drug store constituted extra work and accordingly issued PCOs for that work, much of the chemical grouting was to M/P's own account. WMATA also agreed to pay for a portion of the costs of grouting between 9th Street and the Crossover, and directed void fill and/or chemical grouting in various areas.[50] As described above regarding PCO 033, M/P agreed to shoulder a minimum of $200,000 of these costs for chemical grouting in the area between 9th Street and the crossover, while WMATA agreed to pay the balance not exceeding $900,000. The Court finds that WMATA's participation in the cost of chemical grouting was limited to those specific areas that it identified. Def. Ex. 469; SAF No. 1093.

## IV. U Street Station Project Provisions and Early Performance

The U Street Station contract called for M/P to excavate a large trench approximately 1830 feet long in U Street in the Vermont Avenue area. SAF Nos. 830-31. As with the Shaw Station, this contract called for excavation by the "cut-and-cover" method. SAF No. 832. M/P was to construct a structure of reinforced concrete, comprising the U Street Station itself, the two station entrances and service areas, one at each end of the station, and two sections of concrete box tunnels. Afterward, M/P was required to place dirt or "backfill" over it to bury the entire structure while replacing utility lines, and performing surface restoration once the backfill

---

[49] Def. Ex. 517, 1904. These areas include the portion of the tunnel from 9th Street to beyond the North Fan Shaft and south of Peoples Drug Store in the outbound tunnel station.

[50] Those areas included the inbound and outbound stations areas relating to Peoples Drug Store and PCO 031 and the inbound and outbound stations areas relating to the 9th Street/crossover area and PCO 033. Def. Exs. 1508, 1606.

reached ground level.  Pl. Ex. 394.  Unlike the Shaw Station job, the U Street Station project

involved no machine-bored tunnels.  The parties agree on many of the material facts surrounding

the U Street contract, and the Court adopts those stipulations and the corresponding findings of

Judge Revercomb while finding as follows.

### A.  U Street Station Contract Provisions

Along with the contract provisions described above, the U Street Station job was also

governed by various provisions unique to the project, which set forth construction sequence and

deadlines, among other things.

### 1.  Sequencing

As with M/P's other job, the U Street Station contract was divided into two parts due to

funding limitations.  Funds for Part II were expected to be available within 180 to 240 days from

the NTP for Part I.  SAF No. 833.2.  The two parts were divided on a geographical basis, with

Part I including (1) the relocation of utilities and surface preparation work on the east side of the

project; (2) the installation of soldier piles and slurry walls and the excavation of the main station

trench; and (3) the construction of the East Vent Shaft, the East Entrance and East Service Area

and U Street Station.  Part II work included (1) the same relocation and surface preparation work

for the west side of the station; (2) the installation of soldier piles and slurry walls and excavation

of the open cut trench for the West Entrance and West Service Area, the West Line Section, and

the West Interim Fan Shaft; (3) the construction of the West Entrance and West Service Area, the

West Line Section, and the West Interim Fan Shaft; and (4) conducting all surface restoration.[51]

---

[51] Pl. Ex. 2(a); SAF No. 833.3, 834.  As the contract stated, M/P would "construct [the] station, east structure, traction power substation and service rooms" under Part I and would "construct[ the] station platform, mezzanine, entrances east and west structures, line and interim

Further, the contract set forth a construction sequence for M/P to follow.  As described above, the project was split into two parts, which would total 39 months.  The Part I term would occur over the first 33 months of the project, while the Part II term would occur between the 7th and 39th months.  SAF No. 837.  During the first 12 months, work that was needed for both Part I and Part II work included the following: mobilization and preparatory work; engineers facility; set piles and construct slurry walls for support of excavation; replacement of gas lines by Washington Gas Light Company ("WGL"); and constructing temporary sewers, replacement of water, and electrical utilities prior to decking installation.  Work specific to Part I included decking installation and utility support, U Street Station and East Structure construction (including excavation and ground support), the beginning of "button-up" (if required), and streetcar track removal (to be completed before September 1, 1986).  Part II-specific work, if this work was undertaken, during this 12-month period would include excavation and ground support and preaugering and setting piles on the line.  Id.

During the second year of the project (the 13th-24th months), the Part I work and Part II work (if undertaken) would continue.  Part I work would be on the U Street Station (including slab on grade, lower arch, and upper arches), the East Structure (including slab on grade, walls, roof, columns, and suspended slabs), and backfill over structures to utility levels.  The Part II work would be completion of the slurry wall and soldier beam and lagging, completion of replacement of utilities, completion of decking installation and utility support, completion of

---

fan structure."  SAF No. 837.  Both parts involved setting up detours; installing soldier beams and lagging, temporary sewers, decking and utility supports, support of excavation system, and sewer and drainage systems; constructing slurry walls; replacing designated utilities; excavating; backfilling to level of utilities and restoring utilities; removing decking; completing backfill; and restoring the street.  Id.

excavation and ground support, constructions of the station (including platform, mezzanine, and safety walk work), construction of the East and West Structure (including slab on grade, walls, roof, floating slab, mechanical, and electrical piping), and construction of the line (including preaugering piles, excavating, lagging, and starting slab on grade).  Id.

During the third year (25th to 39th month), Part I work would be completed by the 33rd month of the project.  The remaining Part I work would be station construction work including completion of upper arch and dome relief vents, restorations of supported utilities, removal of decking, completing of backfill operation, and street restoration.  If required, the "button-up" of Part I construction would occur, including site grading; street and sidewalk restoration; work on storm sewers and water distribution system, ducts, and manholes; and construction of watertight bulkheads.  Part II, if undertaken, would encompass the entire third year. This work included completion of the following items: platform, mezzanine, safety walk and remaining structural concrete work; backfill above structures to utilities level; sewer and drainage system installation; support utilities restoration; decking removal and backfill operations; street restoration; finish work on all sections; architectural items; and mechanical and electrical equipment installation. In addition, M/P was to perform equipment testing.  Id.

## 2.  Deadlines

In addition, the contract established interim and final completion dates for portions of the job.  The inbound and outbound trackways were to be completed in 940 days after receiving the NTP on Part I, or November 25, 1988.  Work for the permanent power and all branch circuits, the traction power substation, the train control and communications room, escalator wellways, elevator hoistways and machine rooms, and the kiosk area was to be completed in 1035 days

74

after receiving the NTP (February 28, 1989).  Regarding final work completion, M/P was

required to complete Part I in 1000 days (January 24, 1989) and Part II in 1190 days (August 2,

1989) after the NTP.  The contract also set forth provisions for liquidated damages allowed for

each calendar day of delay.  SAF Nos. 834.1, 835.

### B.  M/P's Planned Performance

On April 30, 1986,  M/P received the NTP for the project.  The contract period for the

work was 1190 calendar days, making the original contract completion date August 2, 1989.  The

contract also established interim milestone dates for certain identifiable portions of the work.

Notably, just as with the Shaw Contract, the contract required M/P to use this NTP date of April

30, 1986 as the date for its original Part I and Part II schedule submittals.  Thus, M/P could not

take into account any events occurring after April 30, 1986 but before the date that the schedule

was actually submitted to WMATA for approval.  SAF No. 840.

M/P would work from the east end of the project toward the west end, performing the

following nine major construction operations called for by the contract in the following general

sequence:

a.  *Surface preparation:* relocate or replace various utilities, including temporary
sewer lines, water lines, PEPCO electrical lines, telephone line, etc., to allow
follow-on excavation work to begin as the utility work proceeded west along
U Street;

b.  *Support of excavation:* installing either soldier piles and/or slurry walls around
the area to be excavated, in preparation for decking;

c.  *Decking:* installing cap beams, deck beams and decking on top of the soldier
piles and/or slurry walls, and excavating down about 15' so that work under
U Street could proceed w[h]ile traffic was being maintained above;

d.  *Excavation:* "mass" excavation under the decking down to subgrade 60' below

U Street, with addition of wales and struts to the support of excavation system, as excavation progressed downward;

e. *Concrete work:* once excavation was down to grade, M/P would perform the concrete work; inverts, lower and upper arches, as well as the East and West Entranceway/Service Rooms, again moving east to west;

f. *Backfill up to utility level:* upon completion of the concrete upper arches, M/P planned to start backfilling and restoring permanent utilities, beginning at Vermont Avenue and working west to 14th Street;

g. *Installation of permanent utilities;*

h. *Backfill to surface:* following installation of the permanent utilities, M/P would remove the deck beams, allowing the backfill to be completed;

I. *Surface restoration:* complete the surface restoration, again moving from Vermont Avenue west to 14th Street.

SAF No. 844.

The approved Part II CPM Schedule divided contract performance into three major

phases:

a. *Phase One:* From the Notice-to-Proceed on April 30, 1986 to March 4, 1987, M/P planned to perform the surface preparation, support of excavation, decking and excavation operations to a point where concrete work could begin. The key targeted event during the period was the start of concrete work.

b. *Phase Two:* From March 4, 1987 to February 27, 1989, M/P expected to complete concrete operations, and electrical, mechanical and architectural work leading to the interim completion dates. The important targeted events during this period were the interim completion dates specified in the contract.

c. *Phase Three:* From February 27, 1989 to August 2, 1989, M/P planned to complete backfilling, utility installation and surface restoration.

SAF No. 844.1. Given that the work west of U Street Station was the Part II work, M/P planned

to begin at the east end of the project and move west to the Interim Fan Shaft on 14th Street.

SAF No. 845.

76

In addition, this plan would also allow M/P to complete the concrete work on time, which was the most time-consuming part of construction operation and on the critical path to the interim and final completion dates.  Indeed, M/P had estimated that the major concrete work would take 18 months to complete.  By starting at the east end, M/P could complete this 18-month activity in time to meet the Interim Completion Milestones for Escalators, the Train Control Room and Communications Room and the Traction Power Substation in the East Service Area.  Only upon completion of this concrete work could M/P perform the electrical, mechanical, and architectural work remaining to meet the interim completion dates.  Thus, timely completion was dependent upon an orderly and efficient performance of the concrete work, which in turn required M/P to start in the east.  SAF No. 845-47.

## C.  U Street Station Performance

The actual construction sequence closely followed the planned sequence outlined above.[52] M/P mobilized its forces, obtained permits, performed utility relocation work between Vermont Avenue and 13th Street, and performed certain preliminary work at the project's west end in 1986.  The next year brought support of excavation work, which began at the east end and progressed toward the west end.  In addition, M/P completed the east end's excavation work and started the structural work at both the east and west ends of the project.  In 1988, M/P completed

---

[52] Retr. 10/11/2001, at 2389-92; Retr. 10/15/2001, at 2592-95; Tr. 12/19/1991, at 61-64; Tr. 1/16/1992, at 133-34.  Two deviations from the planned sequence of construction were done for M/P's convenience.  M/P delayed pouring inverts E-743 and E-749 at the crossover between the Shaw Station and U Street Station jobs to provide a staging area for the turnaround of the TBM at Shaw Station and to provide space for the mucking operation the TBM required.  M/P also began excavation work in the west end box section after receiving early notice to proceed on Part II of the contract, as a method of generating revenue.  Retr. 10/11/2001, at 2390-92; Retr. 10/15/2001, at 2595-96; Tr. 11/7/1991, at 11; Def. Ex. 1594.  The deviations from the planned sequence are discussed more fully in WMATA's findings of fact.  Def. FOF ¶¶ 972-77.

most of the station arch work, finished the lower structure in the east service area, and laid a portion of the foundation slab.  In 1'989, M/P completed the lower structural work, the twin box tunnels at the west end, and the floating slab work.  By the time WMATA terminated M/P in May 1990, and M/P had completed the structure at the east end, but finish work was still underway in the station and the west service area.  SAF No. 850.

### 1. PCO 001 (Changes to PEPCO Manholes and Ductbanks)

PCO 001 refers to the changes involving the electrical utilities, including the layout and size of many of the concrete manholes for the project, Def. Ex. 133, which M/P argues caused major disruptions to its CPM schedule and performance of the contract.  Revercomb Op. at *91 (detailing M/P's claims).  The history of this particular claim began on May 1, 1986, the day after M/P received the NTP on Part I, with WMATA's letter to M/P regarding these utilities changes.  Def. Ex. 133.

In this letter issuing PCO 001, WMATA Resident Engineer Eric Schmidt noted that a "narrative description of the changes . . . [was] attached for [M/P's] use in planning utility and excavation support work."  Pl. Ex. 258.  The Court finds that these changes, as described by Mr. Schmidt, "resiz[ed] several utility drawings in order to get them to . . . comply or coincide with the P[EPCO] permit drawings that had been submitted."  Retr. 10/11/2001, at 2364.  Further, most of these changes were minor adjustments in the location or configuration of manholes, while the number of manholes remained the same.  Id. at 2366.  The only significant change was to move manholes and an electrical duct bank between 12th and 13th Streets, on the west end of the job, from the sidewalk into the open cut area.  Def. Ex. 133; Tr. 12/19/1991, at 66-69.  The remaining changes to the manholes were merely adjustments made to the drawings before any

78

work had been performed.  Id.

While PCO 001 was formally issued in September 1986, M/P began the manhole work on July 3, 1986.  Retr. 10/11/2001, at 2368; Tr. 12/19/1991, at 69.  Indeed, the utility work occurred on the east end of the project between July 1986 until January 1987.  Def. Ex. 1920; Tr. 12/19/1991, at 71-76.  The key milestone in the utility work was completion of the sewer flume and utility tie-ins on the north side of U Street, which were completed in early January 1987, id. at 71-76, which allowed excavation support activities to begin with the first slurry walls in mid-January 1987.  Retr. 10/11/2001, at 2388-89; Tr. 12/19/1992, at 71-76.

WMATA later recognized that PCO 001 and other utility changes affecting electrical utilities caused a delay of 59 calendar days.  Retr. 10/11/2001, at 2368-72; Tr. 12/19/1991, at 76. The impact of PCO 001 ended with the start of the support of excavation work, at the time the first slurry panel was installed between January 9-13, 1987.  After that point, all delays to the support of excavation and excavation activities were under M/P's control.[53]  No M/P witness, in either trial before this Court, rebutted the WMATA testimony that the impact of PCO 001 ended at this time.  Thus, the Court agrees that the impact of PCO 001 ended in early January 1987.[54]

M/P did not submit its first cost proposal on PCO 001 until August 11, 1989, requesting $843,400 in compensation and a 110-day time extension.  Def. Ex. 967.  On August 24, 1989,

---

[53] Retr. 10/11/2001, at 2388-89, 2393; Retr. 10/15/2001, at 2584-99; Retr. 10/18/2001, at 2987; Tr. 12/19/1991, at 76; Tr. 1/16/1992, at 125-30, 137; Def. Ex. 1522; Def. Exs. 1589-A, 1589-B, 1593-A, 1593-B.

[54] The Court does not agree that PCO 001 had the devastating effects claimed by M/P. For example, M/P claims that utility changes required revisions to its traffic maintenance plans, leaving it with less work areas to place the revised utilities.  Further, M/P claims that slurry walls work was impacted due to the placement of duct banks and manholes into the street.  Pl. Ex. 271; Retr. 10/15/2001, at 2549-50.  These claims are not adequately supported by the evidence.

WMATA issued modifications totaling over $400,000 relating to PCO 001 based on its estimate of the extra costs.  Def. Ex. 1410.  Indeed, M/P was entitled to this compensation and the 59-day time extension.  M/P claims support for more compensation by pointing to WMATA's own internal audit of PCO 001 and the testimony of WMATA's expert witness Mr. Ramos.  Pl. FOF at 346.  The Court finds that M/P's arguments are misplaced for various reason, including the fact that the audit did not examine the request for time and Mr. Ramos had been discussing additional issues.

### 2.  PCO 004  (Sewer Flume Conflict)

PCO 004 involved a conflict between a sewer flume and a high-voltage power line. Specifically, the power line was lower than shown on drawings, thereby interfering with the top of the sewer.  Retr. 10/11/2001, at 2376.  M/P discovered this conflict on June 30, 1986, while digging a trench for a temporary sewer line between 11th Street and 12th Street.  This differing subsurface condition interfered with the planned location of the temporary sewer line.  Pl. Exs. 263, 268.  M/P offered a resolution to the conflict by inserting an elliptical section of sewer flume to fit below the electrical line.  Retr. 10/11/2001, at 2376.  The work on this continued until mid-September 1986.  Pl. Ex. 394.

After notifying WMATA about the new conflict and resulting delay on July 2, 1986, M/P submitted its PCO 004 cost proposal on July 19, 1986.  This proposal was supplemented on August 6th and covered the cost of fabricating and installing a transition chamber to correct the problem, while indicating that a request for extended overhead and a time extension would be submitted in the future.  Pl. Ex. 268.

Exactly a year later on April 6, 1987, M/P submitted a time delay analysis for PCO 004

that noted a delay of 77 calendar days to the critical path.  Pl. Ex. 312.  On January 22, 1988, after a later analysis of the as-built schedule, M/P noted a 98-calendar day delay when compared against the as-planned schedule.  Pl. Ex. 337.  On June 30, 1988, WMATA denied M/P's request for a time extension and time related costs because the work affected by the conflict was not on the critical path at the time the conflict was being corrected.  Def. Ex. 667.

M/P and WMATA were unable to finally resolve the difference.  On August 3, 1988, M/P returned Modification No. 17 to WMATA unsigned and requested its issuance on a unilateral basis to provide for direct costs of the work.  Ultimately, this modification was issued for $10,968 with no extended performance time.  Def. Ex. 682.

The Court finds that M/P has not substantiated its claim for delay and costs as to PCO 004.  There clearly was a delay to flume work while the elliptical sewer section was being fabricated.  Retr. 10/11/2001, at 2376-77.  However, because the work affected by the conflict was not on the critical path at the time the conflict was being corrected, Def. Ex. 667; Retr. 10/11/2001, at 2377, M/P is not due any time or related costs.[55]  Thus, the Court finds that M/P was only entitled to $10,968.00 for the work on PCO 004, and there was no resulting significant delay to M/P during the early stages of the project.

### 3. CPN 002 (Gas Company Strike Delay Claim)

On May 6, 1986, the parties to the contract met with WGL to coordinate its replacement of gas lines around Vermont Avenue and 10th to 11th Streets.  At this meeting, the parties confirmed that WGL would perform the actual relocation of the gas lines in that area as

---

[55] The Court credits the testimony of Mr. Schmidt on this issue.  Retr. 10/11/2001, at 2377; Tr. 12/19/1991, at 78-79.

contemplated by the contract.  For its part, WGL claimed it would complete its activities so that

M/P could begin its work in these areas.  SAF No. 860.  Specifically, WGL stated it would finish

relocating the 8-foot gas line between Vermont Avenue and 11th Street sometime between June 1

and June 15, 1986.  This two-week window was needed due to the uncertainty involved in

removing abandoned street car tracks on 11th Street.  SAF No. 861.

Several weeks later, a strike by WGL's workers prevented it from meeting those dates.

Id.  M/P assigned CPN 002 to cover the resulting extra costs on June 23, 1986, notifying

WMATA of a delay to the project resulting from this strike that prevented the timely relocation

of gas lines.  The ongoing strike and corresponding delay in completing the gas line relocation

had slowed M/P's effort to set up its maintenance of a traffic program, conduct test pitting

operations to locate utilities, and proceed with sewer installation.  Pl. Ex. 260.

WMATA expressed that it found M/P's claim without merit through a June 25, 1986

letter from Mr. Schmidt.  Def. Ex. 1414.  WGL did not actually finish the gas line until on or

about July 12, 1986.  A few days later, M/P requested a "Contracting Officer's Final Decision"

regarding CPN 002 on July 16, 1986, while disclosing the 25-calendar day delay to the work.  Pl.

Ex. 265.  WMATA responded two months later on September 15, 1986 that the request was still

being reviewed.  Pl. Exs. 284.  On April 6, 1987, M/P provided additional supporting information

to WMATA, including an analysis showing that the strike ultimately delayed completion of the

gas line work by 27 days and caused a delay of 10 calendar days to the critical path of contract

work.  Pl. Ex. 311.  WMATA conducted another time analysis of the claim as of May 1987 and

recommended no change in time, and Mr. Schmidt again denied the request in July 1987.

The Court agrees with the reasons for denying the claim as stated by Mr. Schmidt.

The Resident Engineer concluded that the strike did not delay M/P's work for three reasons.

First, the U Street Station work was conducted by a gas company contractor, whose workforce

was not involved in the strike.  Second, the sewer flumes, the material for the utility work M/P

claimed was delayed, were not onsite at the time M/P claimed a delay.  Third, the flume work

was not on the critical path.  Mr. Schmidt found that M/P completed the traffic control set up

days before the scheduled July 2, 1986 late-finish date, and began work on the sewer flume.

Retr. 10/11/2001, at 2372-74; Tr. 12/19/1991, at 77-78; Tr. 12/20/1991, at 141-42; Def. Exs. 156,

366, 1414.  M/P claims that WMATA failed to consider that WGL did not actually finish the gas

line until July 12, 1986; however, the final completion date does not change the underlying

reasons for the initial dismissal.  The Court finds that M/P is not entitled to a compensable time

extension for CPN 002 for this project.

### 4.  CPN 008 (Revision of Water Utilities)

CPN 008 also involved a claimed delay on the early utility work on the U Street Station

project.  On August 8, 1986, M/P asserted that problems had occurred with its attempt to acquire

waterline installation permits.  Pl. Ex. 269.  M/P claimed that delays in processing the permits

caused delays to its waterline work because of alleged unreasonable resubmittal requirements and

extensive or excessive review times for M/P's waterline permits.  Retr. 10/11/2001, at 2374.

WMATA denied M/P's request for a time extension.  As Mr. Schmidt explained at the

retrial:

> [T]he time period mentioned in the contract for submittal reviews is not a
> maximum time.  It is a minimum time.  So there's no guarantee that [M/P will]
> get anything back in the 21 days[] that [M/P] was saying was the limit.

Id. at 2375.  Further, both WMATA and the DPW concluded that any delays in approval of

M/P's water line drawings were attributed to the need for M/P to make three resubmittals of its drawings in light of a failure to check for interferences with other utilities when modifying the water main plan, the omission of profiles for some water main segments, and the submission of virtually illegible markups of poor quality.  Id. at 2375; Tr. 12/19/1991, at 79-81; Def. Exs. 181, 260.  The Court finds credence in the contemporaneous letters by WMATA and the DPW respecting this issue, Def. Exs. 181, 260, and finds that this claimed delay is not warranted.

### 5.  PCO 012/CPN 005 (Power Line Conflict)

On May 19, 1986, M/P discovered that an existing 138 Kilovolt power line interfered with the support of the excavation system for the east entranceway of the station.  Because M/P could not safely proceed with the design of the slurry wall for this entranceway until this conflict between the power line and the support system was resolved, M/P could not begin its planned work in that area of the project and delays resulted.  Pl. Ex. 264.

WMATA and M/P first discussed the conflict at the June 1986 periodic progress review meeting.  Retr. 10/11/2001, at 2379.  On or about July 30, 1986, M/P sent a letter advising that "the impact of this problem is a continueing [sic] delay to [M/P's] design schedule and field activities," and accordingly asked that WMATA assign CPN 005.  Pl. Ex. 264.  WMATA provided a solution to the conflict days later.  Def. Ex. 1922.

On September 10, 1986 M/P advised that it still had questions regarding the new designs and informed WMATA of the affected items of work:

1) Additional guidewall in the vicinity of the 138 KV lines.
2) Additional support angles and lagging under and around the 138 KV lines.
3) A new location must be found for the 8" watermain.
4) Additional support to strut the gap in the slurry wall.
5) Increased decking and deck support.

6) Additional support for the 138 KV line.
7) Additional excavation and backfill.  This is in addition to the ongoing delay of [M/P's] design and may entail additional delays with the other affected activities.

Pl. Ex. 280.  On October 9, 1986, WMATA issued PCO 012, which was titled "East Entrance Slurry Wall Relocation."  Pl. Ex. 294.  The actual work did not occur until March 1987.  Retr. 10/11/2001, at 2379.

On March 15, 1988, M/P submitted its time analysis stating that this added work delayed the project an additional 36 calendar days.  Pl. Ex. 340.  About a month later, WMATA responded indicating that the time analysis lacked proper foundation.  Pl. Ex. 345.  On June 30, 1988, WMATA informed M/P that it had concluded its time analysis on this matter, which found that M/P was entitled only to a one day time extension to the final project completion date.  Pl. Ex. 351; see also Retr. 10/11/2001, at 2379-80; Pl. Ex. 345; Tr. 12/19/1991, at 82.  WMATA paid M/P $44,000 in direct costs.  Retr. 10/11/2001, at 2380; Pl. Ex. 723.

At the retrial, M/P attempted to demonstrate that PCO 012 caused extensive delay to the schedule after January 1987.  Retr. 10/15/2001, at 2603-49.  However, the Court finds the testimony of John Ramos of O'Brien-Kreitzberg on this point credible.  Mr. Ramos testified that PCO 012 did not cause any delay in 1987 because the work for PCO 012 after January 1987 did not affect the critical path.  Indeed, Mr. Ramos testified that certain work related to PCO 012 coincided with the soldier pile work necessary for the installation of the deckbeams, and that the soldier pile work -- not the PCO 012 changes -- drove the start of deck beam one, which was on the critical path.[56]  M/P argues that the utility work changes had impact beyond January 1987 and

---

[56] Retr. 10/15/2001, at 2649-51.  Specifically Mr. Ramos testified that:

The electrical changes in PCO-1 which were initiated day one of the job, PCO-4,

that there were additional excusable delays until October 1987 with the pouring of the first concrete invert.  Pl. FOF at 357.  Despite the fact that some of the activities associated with the utility work changes may have continued beyond January 13, 1987, the delay to these activities does not necessarily result in a delay to the project.  The Court finds that M/P's claim that PCO 012 caused extensive delay to the schedule after January 1987 is not supported by the evidence offered.  Retr. 10/11/2001, at 2379-80; Retr. 10/15/2001, at 2603-51.

### 6. CPN 010 (Delay in Approval Process for Manholes)

CPN 010 concerns the same electrical utility manholes as PCO 001.  M/P alleges extra costs and delays due to the need to install cast-in-place manholes, rather than less expensive precast manholes, which became necessary because of alleged delays by WMATA and PEPCO in approving M/P's drawings for the precast manholes.

M/P claims that it started work with the cast-in-place manholes on July 3, 1986.

_____

which was the sewer issue with the elliptical section of pipe, the gas company relocating gas lines in and about the June '86 period, and the alleged delay of the water main submittal, all were occurring prior to the start of the slurry panels.

Id. at 2585.  That the PCO 012 changes did not begin until March 1987 does not alter this conclusion.  Mr. Ramos testified that the work on PCO 012 "didn't impact the start of the slurry panels," id. at 2606, nor did it affect any of the later activities on the critical path.  Id. at 2649-51. Mr. Schmidt agreed, testifying that, other than delaying the start of slurry wall work, the utilities changes did not affect any of the activities that occurred after January 1987.  Retr. 10/11/2001, at 2389.  John Ramos testified that there was a maximum of an 80 day delay caused by the utilities changes:

Looking at the as-planned schedule, the start of slurry panels was supposed to start . . . in about November, and the actual start of the slurry panels was January 13, I believe.  So the total difference between the plan and the actual was 80 calendar days.

Retr. 10/15/2001, at 2584-85.

86

WMATA and PEPCO allegedly did not approve its precast manhole drawings until mid-September 1986, at which time M/P had already installed 19 out of 27 manholes.  As such, M/P claims that, at that point, efficiency dictated that it complete the work with the more expensive cast-in-place manholes.  Tr. 10/30/2001, at 135-36.  M/P blames these delays on WMATA's Section Designer for failing to coordinate its designs with PEPCO, causing extra costs and delays for the installation of the cast-in-place manholes.

The Court finds that the delay in approving the precast manholes resulted from M/P's late submittal of manhole drawings.  M/P did not submit the drawings until six weeks after notice to proceed (June 1986) and only two weeks before manhole work started in the field.  Further, its manhole fabricator prepared the drawings based upon M/P's verbal information, and because M/P never provided copies of the contract drawings to the fabricator, M/P's initial submittals did not conform to contract requirements.  Tr. 12/19/1991, at 82-84; Tr. 12/20/1991, at 154-56; Pl. Ex. 278.

The Court is not persuaded by M/P's argument that the initial submission of drawings was delayed because it was only informed of the manholes changes on May 1, 1986 -- one day after the NTP.  WMATA found that M/P's initial submittal on June 27, 1986 "failed to recognize the WMATA design requirements and to compare them with those of P[EPCO], incorrectly assuming that a design approved for one contract would automatically meet the requirements of the other contract."  Pl. Ex. 316, at 3.  M/P is solely responsible for this flawed submission.  Id.

WMATA initially denied the claim, subject to M/P's response to the Contracting Officer's analysis of the claim, id., but later re-evaluated the claim to find limited merit in the modification issued in connection with PCO 001.  Tr. 12/19/1991, at 84.  M/P incorporated both

CPNs 010, 016, and 018 with its August 11, 1989 cost proposal.  Def. Ex. 967.  As found above,

the Court recognizes the $401,000 compensation and the 59-calendar day time extension due

M/P for PCO 001, but finds that CPN 010 did not contribute to the "devastating" delays claimed

by M/P in the early performance of the U Street Station project.

### 7. CPN 025 (Garnett Patterson Junior High School)

M/P contends that there were subsidence problems at Garnett Patterson Junior High

School ("GPJHS") which required emergency measures to shore up the South East corner of the

gymnasium, which ultimately affected the sequencing of soldier piling at the East End of the

project.  GPJHS sits at the Northwest corner of Vermont and U Streets.

On February 18, 1987, GPJHS was evacuated as the M/P crews noticed cracking on the

front wall of the gymnasium near the southeast corner apparently due to foundation settlement.

Pl. Ex. 753, at U302264-66.  Mr. Schmidt's diary records indicate that, after meeting with Dick

Carr and Deh Ho of M/P to discuss the situation, an agreement was formed "to stabilize all

ground in the vicinity as quickly as possible . . . and working [overtime] to complete placement

of slurry panel PN-3, which may have contributed to ground movement away from [the] building

foundation."  Id. at U302265.

Through the rest of February and much of March, M/P performed extra work to stabilize

the school's gymnasium.  WMATA agreed that M/P was not to blame for the conditions

involving GPJHS, and that the claim would be submitted to WMATA's insurance carrier to pay

the incurred costs.  Id. at U302270.  However, M/P's Ralph Bradford testified at the first trial that

payment for this claim, filed under CPN 025, remained outstanding.  Further, he noted that the

matter was "a straightforward insurance claim covered under the wrap-up insurance."  Tr.

88

12/12/91 (Bradford) 106-07.

While nothing in the record refutes the claim that M/P was not paid by WMATA's insurance company for this straightforward claim, the Court does not agree that this situation caused the resequencing of the soldier piles in the vicinity of GPJHS.  M/P has presented no contemporaneous claim or testimony to support this argument.  Notably, it does not appear to the Court that there is any delay claim associated with CPN 025.

### 8.  Claims Submission and Usefulness of Approved CPM

As required by the contract, the U Street Station project's Part I Schedule was submitted at the start of the project and covered the first six months pending the preparation and approval of a more extensive schedule.  M/P submitted its Part I schedule to WMATA in 1986.  SAF No. 842.  After an initial rejection, M/P revised and submitted a second proposed Part II schedule in late November 1986, which WMATA approved the next month.  Id.  However, this approved plan did not address any events which occurred between April 30 and December 18, 1985.  SAF No. 843.

M/P claims that the Part II CPM for U Street as approved on December 18, 1986 was rendered almost immediately useless and obsolete due to the many early utility changes.  M/P claims that this forced it to resequence the performance of the entire project.  Instead of working in an orderly fashion, east to west, M/P had to proceed wherever it could.  E.g., Tr. 10/31/1991, at 115-117.  However, given the terms of the contract, each CPM modification required the administrative review process.  While many early utility changes occurred, WMATA found that the majority of these did not significantly impact the critical path and, thus, merit any time

extensions.[57]  Given that M/P submitted the proposals months and years after many of the early utility changes, WMATA could not completely resolve these claims in time to have the modifications incorporated in the Part II CPM under the contract terms.

The Part II CPM served as a baseline, and some fault lies with both parties for not promptly incorporating logical changes and administering change request.  WMATA did not always promptly administer requests, thus making it responsible for some issues with the CPM.  However, the Court finds that M/P is largely responsible given its repeated slow responses to WMATA's requests for additional substantiation of the claims.  E.g., Def. Ex. 817.

### 9.  Resequencing Claims

M/P argues that it was forced to resequence the entire U Street Station project as a result of changes -- specifically the early utility changes.  According to its claim, the acceleration manifested itself in performing multiple operations at the same time rather than in sequence, postponing scheduled work, and adding a second and/or third shift to planned single shift operations.  Pl. Ex. 394, at 50.  These "accelerations" allegedly caused inefficiency and extra costs, which resulted in M/P's claimed cost overruns.  The record shows that there is no basis for these claims.

M/P could only identify departures from the planned sequence of work in two respects, neither of which was requested nor mandated by WMATA.  The only significant departure from the planned sequence of work resulted from M/P's decision to delay pouring the two, eastern most inverts (E-743 and E-749) at the crossover between the two station projects.  M/P delayed

---

[57] As discussed above, one exception is PCO 001, where WMATA determined that M/P was due a 59-day extension.  This determination was belated, due at least in part to M/P's late cost and delay submission.

pouring inverts E-743 and E-749 "for its own purposes" – to coordinate with the tunneling operations at the adjacent Shaw contract by, first, providing a staging area for turn around of the TBM, and second, providing space for the TBM's mucking operation.  See supra note 54.

M/P also deviated from the planned sequence of construction by beginning early excavation work in the west end of the site after receiving notice to proceed on Part II of the contract in the summer of 1986.  Id.  Under the contract, this work was scheduled to start as early as November 1986.  Indeed, WMATA gave notice to proceed for the work at the west end in July 1986, or four months earlier than indicated in the contract.  Tr. 12/19/ 1991, at 86.  Once receiving the NTP, M/P indicated that it could begin working on this area of the U Street Station job.  Id. (describing Mr. Miner's "favorable reaction" as being "quite surprised, and [saying] good, here's another area [they could] get to work in.").  M/P used the west end initially for stockpiling materials, and demolition and relocation of utilities commenced in mid-October at the west end as a method for generating revenue.  Id. at 86-87; Tr. 11/7/1991, at 11.

M/P witnesses admitted that the work in the U Street station area proceeded as planned from east to west.  Tr. 11/6/1991, at 110; Tr. 11/5/1991, at 22-23.  Peter Scott, Mergentime's Project Engineer for much of both projects, admitted that M/P planned to start concrete pours at Unit 759 in the east service area and proceed west through the station to the west service area, and that the work in fact proceeded in that manner.  Def. Ex. 1976, at 786.  Mr. Scott also admitted that the planned sequence of those pours from east to west posed no problems, which was the most efficient way to prosecute the concrete work in the U Street station.  Id. at 786-87.  The Court agrees with Mr. Schmidt's testimony that, "[e]ssentially, the planned sequence was followed."  Tr. 12/19/1991, at 61-64; see 1/16/1992, at 133-34.

The Court also agrees with Mr. Ramos's assertion that resequencing at the U Street Station project had not occurred because once M/P "started the deckbeams, the sequence of construction generally went exactly as it was indicated in the baseline schedule." Retr. 10/15/2001, at 2599. Thus, the Court finds that, by and large, no significant resequencing occurred. Indeed, while some resequences occurred in two areas, at least one instance was based on M/P's own request to accommodate the Shaw Station project. In light of M/P's resequencing and working in the western part of the site after receiving the Part II NTP earlier than expected and the testimony of M/P's project manager that it was seeking areas to generate revenue, the Court finds that, to the extent any meaningful resequencing occurred, these changes were based on M/P's preference.

### 9.  M/P's 1987 Performance

Although M/P presents some credible evidence that work was progressing on the project during 1987, the contract completion date continued to slip even after the impact of the early utility changes ended in January. This trend, which was noticed by WMATA as early as March 1987,[58] led to M/P's inability to keep its scheduled contract durations. Mr. Schmidt described this problem in his testimony at the retrial: "They had equipment problems with the slurry wall. They had a lot of downtime. They had slow production and breakdown of equipment on tieback installation at the east service area." Retr. 10/11/2001, at 2393. He also recounted M/P's many "mistakes in the structure where [it] had to do a lot of remedial work." Id. at 2393-96. The Court

---

[58] Pl. Ex. 324. During a period of months through mid-1987, long after the 1986 utility changes had already occurred, M/P fell four more months behind. Accordingly, WMATA engaged in a series of correspondence requesting revised schedules to recover lost time, Def. Ex. 456, and accurately reflect the work progress. Pl. Ex. 331. After its first schedule was rejected, M/P eventually submitted a schedule in late 1987 approved by WMATA.

finds that these delays were not caused by WMATA.  Id.

The Court finds that M/P is responsible for the continued slippage in the schedule during 1987.  Although M/P had fewer problems with its U Street Station job than it had at the Shaw Station project, many problems still existed in prosecuting the work on the U Street Station contract for which only M/P can be held responsible.  For example, the project was fraught with dangerous safety conditions, the breakdown and unavailability of equipment (often due to its use for the Shaw Station project or other jobs), and delays.  Id. at 2393-99; Tr. 1/3/1992, at 47-49.  The Court finds, based on a review of the record, that these problems contributed to the continued project slippage.[59]

By November 1987, M/P was 212 days behind schedule on the U Street Station project, as the projected contract completion date was March 2, 1990 (compared to the scheduled completion date of August 2, 1989).  Def. Ex. 1500T (PPRM Minutes No. 19).  M/P had completed utility work, support of excavation, and station excavation through Unit E785, and had poured invert Units E759 and E759D.  Def. Ex. 1593A.  At most, 80 days of the delay were attributable to the early utility changes.  Retr. 10/15/2001, at 2578, 2584-85.  Thus, this Court agrees with Judge Revercomb's finding that "M/P's own actions or the actions of its subcontractors and suppliers were a substantial cause of its performance difficulties on the U Street project."  Revercomb Op. at *94.

---

[59] While there may have been some excusable delay during the summer of 1987 due to rain, the Court will make no findings regarding the number of days of excusable delay and the impact on specific activities given the lack of any corresponding specific CPN identified to the Court.  The Court notes that in July 1987, the number of excusable days due to rain, as identified by M/P, would have been -- at most -- five days.

## V.  M/P's Financial Difficulties

In this year, M/P's financial difficulties grew significant.  Indeed, the record makes clear that M/P began facing growing financial problems and severe cash shortages.  M/P argues that its dire financial situation was caused by delays and changes for which WMATA was responsible and by WMATA's failure to timely process M/P's claims.  However, the Court finds that there were other more significant causes of M/P's cash shortage, regardless of the claims process. Most significant was the financial management of the Joint Venture projects by Mergentime and the resulting split between Mergentime and Perini.

To understand these financial problems, an analysis of the contracts' funding mechanisms is required.  The approved CPM schedule was a cost-loaded schedule, i.e., dollars were assigned to each activity on the schedule and payments were made by WMATA in accordance with the schedule as activities were completed.  Def. Ex. 7.  M/P's schedule for the Shaw Stations contract was "front loaded," meaning that M/P assigned higher values to work early in the job by adding M/P's estimated overhead and profit to those activities.  Def. Ex. 435.  Indeed, as Mr. Mergentime testified, front-loading involved up-front payments for "costs that haven't become costs yet."  Tr. 12/5/1991, at 115.  As WMATA has explained, "work performed for activities assigned to earlier phases of the contracts were, in effect, overfunded while work at the end of the job was underfunded."  Def. FOF ¶ 109; see also Retr. 10/3/2001, at 1957-58.  Such a funding mechanism caused M/P to receive, for example, 80% of the revenue even though only 65-70% of the work had been completed by the end of the Shaw Station contract's North Tunnel work in February 1988.  Def. Ex. 1271.  In other words, $10 million in revenue remained to be earned on

94

the Shaw contract, but the amount of work left to be performed was valued at $15 to

17.5 million.  Retr. 10/18/2001, at 3001-02.

This "front-end loading" meant that activities later in the job were underfunded relative to

early activities, thus contributing to the cash flow problems that M/P experienced later in the job.

Tr. 12/13 (Mergelsberg) 76-78.  As revealed in M/P's March 30, 1990 claim, "the cost loaded

schedule . . . was unbalanced," and "revenue being generated . . . in early stages masked" the

losses allegedly suffered.  Def. Ex. 1271.

The initial capital for the Joint Venture was provided by its partners.  Charles Mergentime

testified that one of the main purposes of the joint venture agreement between Mergentime and

Perini was to share the requirements for capital to perform the work.  SAF No. 715-16.  As

described above, this agreement allocated 60% of required capital contributions to Mergentime

and the remaining 40% to Perini.  Mergentime's Financial Vice President Thomas Whalen

determined that the initial cash contribution needed from the partners of the Joint Venture to

meet the cash needs for the first two months was $1 million, meaning that Mergentime would

contribute $600,000 and Perini would contribute $400,000.  SAF No. 718.

Further, Mr. Whalen anticipated that if M/P's two construction projects posed unforeseen

financial situations, additional requirements for capital contributions from the partners ("cash

calls") would be required, Tr. 11/12/1991, at 138, 142, and the Joint Venture Agreement reflected

as much.  Def. Ex. 12; Tr. 11/12/1991, at 139-42.  Mr. Mergentime testified that a purpose of

cash calls to Joint Venture partners was to finance performance of the work if a shortfall occurs.[60]

_____

[60]  Tr. 12/5/1991, at 18-19; Retr. 9/17/2001, at 382-83.  In 1987, Mr. Whalen discussed
the possibility of additional cash calls with Perini's Mr. Monea.  Tr. 11/18/1991, at 4-5.  In a
letter to Perini dated March 18, 1987, Mr. Whalen raised the possibility of making additional

Mergentime reported to Perini throughout 1987 that both M/P projects were profitable. For example, in a March 18, 1987 letter to Perini, Mr. Whalen projected a positive cumulative cash flow through June of 1987 of $3,747,000 on the projects.  Def. Ex. 300.  Reports in July 1987 indicated a profit to date of over $2 million for the Shaw Station project and between $600,000 and $745,000 for the U Street Station project.  Def. Exs. 362, 371.  These reports also forecasted final job profits of over $4 million for the Shaw Station job and over $3.5 million for the U Street Station project.[61]

In the spring of 1987, Perini began expressing its concerns about Mergentime's management, cost accounting, and cost projections for the projects.  E.g., Def. Exs. 293, 343. Indeed, Perini President Mr. Dailey testified about his "concern about the execution of work in the field -- sequencing, scheduling, and so forth -- that [he and others] thought may have been part of the problem in terms of production costs."  Def. Ex. 1986, at 28.  Mr. Dailey also noted that, because Perini had engineers working at a separate construction project adjacent to M/P's site, it would use Perini engineers "to sort of keep an eye on the Shaw [Station] and U [Street Station] work."  Id. at 20.  By "visiting the site, looking at the amount of work yet to complete,

---

cash calls.  Def. Ex. 300.  The possibility of such cash calls was coincident with Perini's observations, discussed below, that the contracts were likely to experience substantial overruns.

[61] Notably, these rosy reports contrasted with the current "cost-of-capital" claim that M/P presented in this action, which was premised on the contention that M/P began suffering deficits from the very beginning of the Shaw project in September 1985.  Pl. Ex. 740.  M/P asserts a cumulative deficit on its projects of $818,000 as of June 1987 and $3.8 million as of July 1987. See id.; Tr. 11/18/1991, at 45.  While the information used for these cost-of-capital claims was available in 1987, Mergentime continued to report profits on the jobs to Perini.  Id. at 47.  In addition, Mergentime reported these profits in 1987 despite the alleged delays and extra costs that it had incurred in 1986 as a result of the Rhode Island traffic change, CPN 002.  See Revercomb Op. at *50.

comparing what [Perini] estimated to be the production that would be required to complete that work, and putting the associated labor cost on [the estimate]" Perini recognized that the "cost numbers . . . exceeded the revenue for the jobs." Id. at 19-20.  Accordingly, in a memo to Mr. Dailey dated March 4, 1987, Perini Vice President George Fryklund described the job progress as "erratic" and found that the "[c]orporate direction and relationship . . . [had] gone from poor to intolerable."  Def. Ex. 293, at 1.  Project "management and direction [was] not perfect," but with "proper guidance [it] would be acceptable."  Id.  Noting the extreme cost overruns, Mr. Fryklund recommended "very close monitoring" of the jobs by his division, an immediate company audit, and assigning an accountant to ensure that payroll and other costs charged to the projects were properly slated for the Joint Venture.  Id. at 3.  He advocated immediate action on these measures, and noted that his request for monthly meetings of the partners was "refused" by Mr. Mergentime who had "made his decision . . . on the subject."  Id.

Mergentime and Perini did have had a Joint Venture meeting on May 29, 1987, which included Mergentime's Messrs. Mergentime, Whalen, and Miner and Perini's Irv Huie, George Fryklund, and Pat Monea.  Mr. Huie requested that Perini be allowed to audit the Joint Venture records pursuant to their agreement, and expressed concern about Mergentime's $4.1 million profit projection for the Shaw Station project.  In addition, Mr. Fryklund noted the usefulness of monthly meetings for allowing Perini to participate in the management of the projects.  Mr. Mergentime rejected the request for an audit and the notion of monthly meetings.  Def. Ex. 343; Def. Ex. 1992, at 102-03; see Revercomb Op. at *51.

On June 23, 1987, in a meeting between Messrs. Dailey, Huie, and Mergentime, Perini's representatives asked whether Mergentime was operating its various Washington, D.C.-area jobs

separately without commingling workers or equipment.  They also aired their concerns regarding timely and accurate quarterly cost projections.  Def. Ex. 353.  Though he rejected their concerns, Def. Ex. 1986, at 18, Mr. Mergentime did agree to provide them with quarterly job forecasts. Def. Exs. 353, 387.

However, when Mr. Monea traveled to Mergentime's headquarters to obtain financial data a month later, he faced similar problems with information sharing and access to data needed to project final costs that had been previously encountered at the job sites.  Def. Ex. 1986, at 57-58; see also Def. Ex. 370, 388.  Nevertheless, he used the limited information he had received to develop alternative cost projections to those being provided by Mergentime, findings that its "forecasted profit of $4.2 million . . . should be reduced to a loss of $2.9 million" for the Shaw Station project and that the U Street Station project was also suffering from similar financial problems.  Def. Ex. 388, at 1, 7.

Accordingly, Mr. Dailey forwarded these cost projections to Mr. Mergentime on August 7, 1987, noting his company's "concern over the projected final cost of the projects and for the accuracy and timeliness of the cost reporting and accounting systems being utilized for the work."  Def. Ex. 387, at 1.  After describing the "alarming" cost projections from Mr. Monea and the discrepancy with Mergentime's reporting, including a "total negative swing for both projects of nearly $10 million" between the two sets of projections, id., Mr. Dailey requested a full examination of the projects' books of account before September 30, 1987.  Id. at 2.

In response to this letter, the Court finds that in a telephone conversation Mr. Mergentime made an offer to buy out Perini's interest in the projects while indemnifying Perini in a manner that would not be reported to WMATA or require its approval.  When Mr. Daily explained the

need for a formal indemnification including a written release and consent from the surety in such

a situation, Mr. Mergentime reportedly "waffled" on this suggestion.  Def. Ex. 391.  Given the

informal nature of this offer, Mr. Dailey confirmed the offer in a letter to Mr. Mergentime dated

August 18, 1987, which stated in relevant part:

> This will acknowledge our telephone [conversation] on August 11, 1987 in
> response to my letter to you dated August 7, 1987 requesting a full examination of
> the joint venture books of account on the Shaw [Station] and U Street [Station]
> projects in Washington, D.C.
>
> You stated that rather than conducting this audit and continuing the joint venture
> relationship, your preference would be to buyout Perini's interest, indemnify [it]
> against any losses the joint venture may incur and to terminate [its] participation
> in the ventures.
>
> While we are at a loss to understand your refusal to divulge complete financial
> information and to allow [Perini] to participate in a joint effort to produce a final
> cost projection for the projects, we are willing to consider terminating [its] interest
> in the joint ventures . . . .

Def. Ex. 399.[62]

After another exchange of letters,[63] another Joint Venture meeting was held on September

_____

[62] In his testimony, Mr. Mergentime did not deny that he proposed this buy-out in lieu of
an audit, though he could not remember making that comment. Tr. 12/5/1991, at 39-40.
However, the Court finds the references to this comment in Mr. Dailey's subsequent letter of
August 18, 1987 to be credible.

[63] In one letter, Mr. Mergentime stated his company would consider purchasing Perini's
interest based on Perini's numbers and to hold it harmless from future losses.  In the same letter,
he admonished Mr. Dailey not to "write [him] letters which serve no real purpose" because
"[t]his business is tough enough without writing CYA [("cover your ass")] letters to [one
another.]"  Def. Ex. 405.  Mr. Dailey responded in a letter that his correspondence in this matter
were not "to engage in CYA tactics" but rather "came from a sincere concern over the status of
[the] joint venture work and a sense of frustration from not being able to get real answers and
real numbers from [Mergentime's] people."  Def. Ex. 414.

23, 1987.[64]  Mergentime was represented by Mr. Mergentime, Mr. Miner, Mr. Goedjen, Shaw

Station Project Manager Dil Robertson, and U Street Station Project Manager Deh Ho.  Perini's

Chairman and CEO David Perini and Messrs. Dailey, Monea, and Fryklund.[65]  Mr. Robertson

presented the Shaw Station project's status and schedule, noting that this schedule would meet

the contract's completion requirements.  Def. Ex. 463, at 2-3.  In response to a suggestion

that 200 carpenters were needed to complete the concrete work on time, Mr. Robertson stated

that, on top of the current crew of fifty carpenters, he would have access to enough carpenters to

finish the project.  Id. at 3.  Further, Mr. Mergentime expressed his confidence that the schedule

was achievable and all milestone dates would be met.  Id. at 4.  Perini's representatives raised

questions about the U Street Station project as well.  Id. at 8-9.

Regarding profit projections, Mergentime reiterated its projection that the Shaw Station

project would generate a profit of $4,165,000, but Perini's representatives again questioned those

projections in light of the cost projections and the substantial cost overruns on indirect costs and

overhead.  In response, Mr. Mergentime claimed that some of this overrun would be recovered in

the claims submitted to WMATA.  Id. at 5.  The meeting concluded with Mr. Mergentime

expressing his unwillingness to change his projections or schedule unless Perini was able to

prove that Mergentime was in error.  Def. Ex. 463, at 11.

Mr. Monea returned to Mergentime's corporate offices on October 5-6, 1987.  As

memorialized in a subsequent report, he raised several concerns regarding the cost accounting for

---

[64] During the preceding exchange of letters, Mr. Dailey forwarded questions for the
September 23, 1987 meeting, Def. Ex. 426; however, Perini never received the information it had
requested.  Def. Ex. 1986, at 77-78.

[65] Perini's Mr. Monea composed the meeting's minutes.  Def. Ex. 463.

the projects.  Regarding Mergentime's cash management, Mr. Monea explained that it "uses joint

venture cash as if it were part of their own operation" and routinely transfers money between

itself and the Joint Venture,[66] which was occurring without Perini's knowledge according to Mr.

Dailey's testimony.  Def. Ex. 1986, at 84-86.  Mr. Monea also voiced concerns regarding "related

party transactions" between Mergentime and the Joint Venture, questioning the reasonableness of

rates charged by Mergentime to the Joint Venture for equipment usage and materials and charges

to the projects for Mergentime's regional office.  Def. Ex. 478, at 2-3.  For example, he noted

that repair costs for equipment shipped in from previous Mergentime projects had been charged

to the Joint Venture, including a charge for repair of an excavator that had previously been used

by Mergentime at its Croton, New York project.  Id. at 4.  While Mr. Monea recommended that a

team of auditors should be sent to review all Joint Venture transactions if the Joint Venture

continued in light of his findings, he stressed his belief that Perini should remove itself from this

Joint Venture given the "serious disagreements with project schedules, projections and now the

weak financial system and number of discrepancies Perini discovered in [its] limited review."  Id.

at 4-5.

　　　　Unable to ever reconcile their conflicting projections,[67] and given Mergentime's

---

[66] Def. Ex. 478, at 1; see also Def. Ex. 1987, at 17.  Indeed, Mergentime often
commingled the funds of the Joint Venture and its other corporate accounts.  Tr. 11/18/1991,
at 26; Def. Ex. 265.  As M/P's Mr. Whalen testified, when the corporate account lacked
sufficient funds to cover the payments made against it, Mergentime would transfer in funds from
the Joint Venture's accounts.  Id. at 27.  Sometimes, money was transferred back the other way.
Tr. 11/18/91 (Whalen) 28.  Mergentime also transferred funds from the Joint Venture account to
other Mergentime joint venture accounts.  For example, on May 11, 1987, $19,000 was
transferred from the Joint Venture account to a joint venture with Loran.  Id. at 33-34.

[67] A final meeting between Mergentime and Perini personnel on October 14, 1987 proved
unsuccessful in reconciling their disparate cost projections.  Def. Ex. 485.  Mergentime and

continued reluctance to share financial information with its partner,[68] the two firms executed a

Supplemental Agreement on November 24, 1987 (also referred to as the "Perini divorce").  Def.

Ex. 529.  Under this agreement, Perini removed itself from responsibility for the Joint Venture, as

Mergentime indemnified Perini for any losses it would suffer in connection with the projects.

Mergentime would buy out Perini's interest in the Joint Venture by returning Perini's capital

contributions of $600,000 and paying Perini's invoices for equipment and materials being used in

the projects, with a total buy out cost of approximately $1,466,000.  Def. Ex. 627.  Perini agreed

to relinquish any interest in the profits or losses of the Joint Venture,[69] and in return Mergentime

and the Joint Venture released Perini from any claims and indemnified Perini against any

liability, loss, damage, costs, or expenses relating to the Joint Venture Agreement, the contracts,

the projects, and the bonds.  Def. Ex. 529, at 1-2.  Finally, the Supplemental Agreement made

clear that, despite Perini's departure, "the [b]onds and, as between all parties other than

Mergentime and Perini, the Joint Venture Agreements, the [c]ontracts and the [p]rojects, [would]

continue in full force and effect for all purposes according to their terms."  Id. at 1-2.  As required

under their severance agreement, the Joint Venture returned Perini's $600,000 capital

contribution and paid its invoices, thus effectively returning Perini its capital investment for the

projects.  Tr. 12/5/1991, at 82-83; Tr. 11/18/1991, at 7, 8.

---

Perini were never able to come to a meeting of minds regarding their different costs projections
for the Shaw Project.  See Tr. 11/18/1991, at 49; Def. Ex. 1986, at 22-23.

[68] According to Mr. Dailey, Mergentime continued to refuse to provide Perini with
financial information on the Projects, Def. Ex. 1986, at 66, while Mr. Mergentime maintained the
contrary.  Def. Ex. 405.  This Court concurs with Mr. Dailey's testimony.

[69] Mergentime did agree to pay $95,000 to Perini once the projects were completed if they
had yielded a profit to Mergentime.  Def. Ex. 529, at 1.

True to its desire to keep the divorce quite,[70] Mergentime provided no notice of the

Supplemental Agreement to WMATA or INA immediately after the agreement was executed.

Tr. 12/10/1991, at 69.  Indeed, WMATA did not obtain a copy of the Supplemental Agreement

until after August 25, 1989.  Tr. 11/18/1991, at 11-12.  Executives from both Mergentime and

Perini have claimed that the Supplemental Agreement does not alter the Perini's relationship with

WMATA, meaning that nothing had changed as far as WMATA was concerned.  Def. Ex. 1995,

at 27; Tr. 11/18/1991, at 10.

The Perini divorce substantially worsened M/P's financial ability to continue performance

on the projects in early 1988, as revealed in Mergentime's first disclosure to Perini regarding its

cash flow problems on the projects.  On May 23, 1988, Charles Mergentime sent Mr. Dailey a

letter acknowledging an outstanding balance under the Supplemental Agreement but noting that

at the present time, Mergentime faced "a severe cash flow problem on these two jobs and

regrettably [would] not be able to send [Perini] the balance due until this problem was

corrected."[71]  Def. Ex. 627.  Indeed, as described above, M/P was experiencing difficulty in

obtaining materials from its suppliers and retaining its subcontractors in early 1988 due to

delinquent payments.  Tr. 11/18/1991, at 14.  Compounding this problem, the financial

difficulties also led Mergentime to cut back on resources and manpower for the projects during

---

[70] As noted above, Mr. Mergentime had told Mr. Dailey on August 11, 1987 that if the buy out occurred, he did not want to notify WMATA or do anything with the Joint Venture agreement that would require its approval.  Def. Ex. 391.  He later advised his son, a project manager and engineer involved in both projects, about the buy-out agreement and told him to "keep it quiet," which his son did.  Tr. 11/7/1991, at 178-79.

[71] In the letter, Mergentime acknowledged that it had paid Perini $1,174,722 -- leaving an outstanding balance of $291,551.  Def. Ex. 627; Tr. 12/5/91, at 81.

this time period, e.g., Retr. 9/28/2001, at 1502-03, causing insufficient resources for completing the projects and further delays.  However, during discussions regarding these cutbacks by Mergentime management, no consideration was given to asking Perini for additional capital contributions.  Tr. 11/18/1991, at 23-24.

Mr. Diehl, who was tasked in the spring of 1988 to oversee Mergentime's Washington-area projects, became frustrated by the inability to obtain resources necessary to perform the jobs properly.  Def. Ex. 1988, at 10, 65-66.  Mr. Diehl recommended that Mr. Mergentime seek contributions from Perini to alleviate these problems.  However, Mr. Mergentime "felt he couldn't do that,"  id. at 138, in light of his belief that Perini no longer had obligations to make capital contributions and was thus no longer available as a source of additional funding.  Tr. 12/5/1991, at 77-78.

In the spring of 1988, Mergentime sponsored a different joint venture with HT Construction, Inc., which became the successful bidder on a $48 million WMATA project for the Fort Totten Station and line.  In its pre-award submission to WMATA, Mergentime provided a letter from Provident National Bank dated April 8, 1988 stating that Mergentime had a $25 million line of credit from the Bank.  Def. Ex. 1892.  In discussions with WMATA Auditor James C. Stewart, Mr. Mergentime "assured [WMATA] that the company's financial condition improved in the 1988 first quarter." Id. at 2.  On the basis of this assurance, and Mergentime's other pre-award submissions, Mr. Stewart concluded that the Mergentime joint venture had "adequate resources available to perform the subject contract."  Id.

However, during this period, Mergentime management was actively trying to cut costs on the Shaw Station and U Street Station jobs in the first quarter of 1988.  Tr. 11/18/1991, at 15.  As

104

a May 4, 1988 memorandum to M/P's management personnel in the Washington, D.C. area directed, "[n]o extra or change work of any kind will be done unless a Modification to the Contract has been issued enabling [M/P] to receive prompt payment for the work." Def. Ex. 618, at 2. This need for a modification was paramount, as "[t]he dollar amount involved, whether [M/P had] a notice to proceed, or whether [M/P had] received promises to make payment, [did] not matter." Id. Without a modification, "[t]he work [was] simply not to be done." Id. Thus, M/P management decided to pursue only work where the cost of performance was less than the revenue received for the work based on the cost-loaded CPM. Tr. 11/18/1991, at 12-13. These financial problems continued into 1989. Tr. 11/18/1991, at 22.

Having considered the above evidence submitted on this matter, the Court finds that the Perini divorce directly and substantially contributed to the worsening of M/P's financial position in 1988, including its cash-flow problems. The Court heard no credible testimony or other evidence from M/P to the contrary, and M/P's attempts to downplay the financial significance of the Perini divorce, Pl. FOF at 176-80, are not persuasive.

## VI.  M/P Performance from Early 1988 to 1989

The financial crisis facing the Joint Venture diminished M/P's performance on both projects in 1988. For example, for the Shaw Station project alone, costs were outpacing revenue by almost $8.7 million by April 1988. Compare Pl. Ex. 736, at 23-24, with Pl. Ex. 738, at 4. As such, during this time period, M/P slashed resources and manpower for the projects, e.g., Retr. 9/28/2001, at 1502-03, to a point that was insufficient for completion. In addition, as seen in the earlier performance problems at the Shaw Station job, M/P suffered problems with management turnover, late and deficient subcontractor performance, equipment breakdowns, and dangerous

105

safety conditions at both sites, which caused delays for both jobs.[72]  Further, while equipment

sharing between the two jobs could have resulted in an efficient use of resources, M/P instead

suffered further problems and delays due to difficulties coordinating between the jobs with

equipment shortages and breakdowns.  E.g., Def. Ex. 1988, at 60-62; Tr. 12/17/1991, at 12.

        As of April 1988, WMATA had not signed MOA 1.  In addition, no payments had been

made for CPN 002 for the Shaw Station project and other related extra work and no adjustments

had been made to the "approved" schedule to reflect a single day of extension for these major

delays.[73]  With M/P and WMATA unable to resolve the claims for delay and costs, see SAF No.

1185-86, the financial and scheduling deficits continued to grow.  Compare Pl. Ex. 736, with Pl.

Ex. 738.

        In a letter to the Shaw Station job's Project Manager dated June 13, 1988, Resident

Engineer Alan Kolodne noted "a continual decline" in M/P's workforce and activities over the

previous several months.  Def. Ex. 642, at 1.  Despite the need for a work force of over 100

---

[72] On January 14, 1988, work at the west end of the U Street Station project ceased
entirely when a 100-ton crane operated by Mergentime crashed through a deck beam near 13th
and U Streets.  Retr. 10/11/2001, at 2415-23. The physical damage caused by the collapse
included a complete street closure and major damage to utilities and equipment.
        The damaged structures required months of repair and rework, id. at 2415-19, causing
prolonged delays attributable only to M/P.  For instance, M/P sued the supplier of the deck beam
for negligence and possible liquidated damages.  Tr. 12/12/1991, at 162-64.  Further, the Court
agrees with the observations of WMATA's Resident Engineer Eric Schmidt, who determined
that the deck beam failed at a point where the beam had been spliced using a cover plate that had
also been spliced.  Retr. 10/11/2001, at 2419-20.  In addition, based on a contemporaneous
investigation, WMATA concluded that Mergentime had operated the 100-ton crane in an area of
the decking that the contractor's own design drawings designated only for vehicular traffic, not
for operation of heavy construction equipment.  Id. at 2420-23; Def. Ex. 564, at 3.

[73] The March 1988 CPM Schedule update showed the Shaw Station job behind by 128
work days (179 calendar days).  Under CPN 002 and its grouting claims, M/P had requested over
200 days of extension.  Revercomb Op. at *80.

workers, he complained that M/P only averaged 34 workers in the previous week.  Id. at 2.  Mr.

Kolodne also noted the effects of the slowdown on the schedule, based on M/P's own records,

which showed that six of the seven specified completion areas were suffering from between 100

to 200 days of delays.  Id. at 1.

On July 5, 1988, Contracting Officer McElhenny wrote to Mr. Mergentime regarding

M/P's reduction in workforce.  He complained that M/P's use of 25 to 30 workers on the Shaw

Station job was inadequate and jeopardized timely contract completion and that work at both

sites was either slow or virtually nonexistent.  Def. Ex. at 671.  Mr. McElhenny blamed this

productivity problem on M/P's "corporate decisions on labor management and subcontractor

management" in light of the "pattern of layoffs including laying-off on one project and then

hiring only a portion of the crew on another project" and "scheduling subcontractors based upon

revenue."  Id. at 2.

Mr. McElhenny continued this line of communication with additional letters the

following month.  First, in a July 15, 1988 letter, he expressed skepticism of M/P's ability to

meet the approved schedule's dates for both projects and requesting a submission detailing

operational changes to correct this problem.  Pl. Ex. 94b.  A few days later, Mr. McElhenny

wrote another letter on July 28, 1988 specifically regarding the lack of progress at the Shaw

Project.  Pl. Ex. 96.  He stressed the decreasing workforce levels that tracked the drop in monthly

earnings from progress payments -- dropping from an average of 85 workers in January 1988 to

an average of 35 workers at that time -- which were causing M/P's lack of progress.[74]  Thus,

---

[74] The minutes of the Periodic Progress Review Meetings during 1988 corroborate these concerns over workforce and corresponding delays.  These minutes show consistent monthly schedule slippages and workforce reductions.  Def. Ex. 1511 (PPRM Minutes Nos. 33, 36).

McElhenny warned of "stronger actions to insure timely completion." Id. at 2; SAF No. 1188-89. M/P responded by claiming that no "approved schedule" existed in any functional sense on any of these projects, given WMATA's requirement of considerable extra work without formally granting time extensions and schedule adjustments. Pl. Ex. 95(a); SAF No. 1190. As Judge Revercomb noted, "[t]he correspondence between Mr. Mergentime and WMATA continued in this vein through August and September of 1988, and reveals a hardening of positions."[75]

The parties continued to track and monitor the progress of the Shaw Station project in relation to the approved Part II CPM Schedule, and M/P used the schedule to make requests for progress payments throughout the project. Retr. 9/21/2001, at 825-26. In addition, the CPM Schedule appears to have been regularly updated, as shown in the appendixes to the periodic progress meeting minutes. Def. Ex. 1511; Tr. 1/2/1992, at 93-99. However, WMATA apparently disregarded these updates in calculating M/P's progress toward milestone and completion dates, insisting that M/P had a duty to perform under the existing, approved schedule. Revisions to the schedule that created a more realistic view of the job progress were dependent on WMATA's processing of change orders and issuance of contract modifications.[76] This Court agrees with Judge Revercomb that the "[d]elays in issuing [such modifications] had a direct

---

[75] SAF No. 1191. Mr. Mergentime argued that WMATA contradicted agreements negotiated by staff, failed to resolve claims pending for years or sign the MOA 1, and demanded a schedule that did not account for both negotiated time extensions and extensions required due to contract changes, while WMATA claimed that M/P's performance suffered due to its inadequate manpower, equipment failures, and subcontractor problems that required specific measures to regain lost time. SAF No. 1191-93.

[76] M/P could extend the schedule's milestone or completion dates only in accordance with approved contract modifications. For potential delays it identified that were not the subject of a contract modification, M/P could insert an activity in the schedule with a duration of zero work days, which would be adjusted later when and if WMATA granted the time extension.

impact on obtaining a meaningful yardstick to measure job progress." Revercomb Op. at *82.

Still holding M/P responsible for the Shaw Station project's unadjusted CPM Schedule, WMATA's Resident Engineer Mr. Kolodne wrote a letter on September 16, 1988 claiming that M/P's failure to meet this schedule would lead to "an increase in monies withheld [to] be included in the retainage calculation to protect [WMATA] against associated expenses." Pl. Ex. 101. In turn, M/P protested in letters to Mr. Mergelsberg and Mr. McElhenny. Pl. Exs. 105, 106. M/P also complained about the claims process, see supra note 49 (regarding Mr. Mergentime's letter to Mr. Egbert), and about the project becoming very different from the originally proposed job without any compensation for extensive change order work and associated impact costs. SAF No. 819.

In early December 1988, more than 18 months after M/P had signed and returned MOA 1, WMATA proposed a redraft of MOA 1 ("MOA 2"). SAF No. 820. The parties discussed a noncompensable time extension in return for M/P's withdrawal of time-related claims.[77] While a tentative agreement was reached along these lines, the negotiations collapsed when M/P proposed new MOAs providing payments by WMATA against M/P's Shaw Station and U Street Station claims, instead of noncompensable time extensions and a release of claims as previously negotiated. SAF No. 821. Thus, even though M/P's deficit continued to balloon as of this month,[78] WMATA had provided no time extensions, no final execution of MOA 1 or the revised

---

[77] SAF No. 820. Such a time extension was not based upon an evaluation of M/P's pending claims under CPN 002 and CPN 139. Instead, these discussions were an attempt to project when M/P realistically could finish the Shaw Station job. Id.

[78] The deficit for Shaw Station job alone was over $11.7 million, and coupled with the U Street Station project's $9.15 million deficit, compare Pl. Ex. 736, at 24, with Pl. Ex. 738, at 4. M/P's deficit exceeded $21 million for the two projects.

MOA 2, and little payment for the CPN 002 and CPN 139 claims.  Pl. Ex. 501c; see Revercomb Op. at *83.

As a result of the performance problems, the financial difficulties, and the failed negotiations, M/P was over 440 days behind schedule on the Shaw Station project by July 1989 based on the original unadjusted Part II CPM and 532 days behind on the U Street Station job. Def. Exs. 2230, 2232; Retr. 10/3/2001, at 1972-74.  The total time extension claimed by M/P at that time was 463 calendar days.  Further, M/P's deficit on this project at Shaw Station had become approximately $1 million higher since December 1988, though M/P covered this deficit by applying a May 1989 settlement of a previous contract (Eld) to the Shaw Station Project.  See Revercomb Op. at *83.  Further, M/P admits that contemporaneous records show its job performance suffering severely between May 1988 and July 1989.  Tr. 11/18/1991, at 20-22.  The Court finds that these financial and performance deficiencies cannot be blamed entirely on WMATA's delays in resolving claims or adjusting the schedule to accommodate work changes. Rather, M/P's situation was largely due to Mergentime's decision to buy out Perini and other financial decisions, its problems with resources and manpower, and other factors described above solely attributable to M/P.

### VII.   Activity Leading Up to the August 1989 Agreement

M/P's two largest claims on the Shaw Station project became the focal point of negotiations during 1988 and 1989.  The largest claim, CPN 139 was valued at over $6 million by M/P for the extra work required in constructing the Shaw Station's North Tunnels.  CPN 002, the other large claim for the Shaw Station project, was valued over $1 million for the extra work in developing, soliciting approvals, and implementing alternative maintenance of traffic plans at

Rhode Island Avenue.  The Court finds that, while both parties had bona fide disputes about the

claims, M/P submitted claims that were largely inadequately documented or supported,

frequently revised and updated its claims (requiring further audit and review by WMATA), and

refused to negotiate its position on issues including offsetting credits (e.g., 7th Street closure

benefits).[79]

On CPN 139, WMATA provided a series of detailed analyses of its merits, Def. Exs. 709,

827, 941, 952, and sought to negotiate meritorious elements of the claim.  Tr. 12/16/1991, at 6;

however, Mr. Mergentime, preferred to pursue a "global settlement" of all of CPN 139.  Tr.

12/5/1991, at 139-40; SAF No. 877.  However, the Court finds that M/P's CPN 139 claim (dated

May 11, 1988) lacked sufficient information to support the asserted entitlement.  Retr.

10/17/2001, at 2820-23; Tr. 11/20/1991, at 38-39.

As WMATA noted at the time, M/P's CPN 139 proposal sought to impose all

responsibility for chemical grouting on WMATA. ignoring M/P's basic obligation described

above of ground control while tunneling and the agreement to limit WMATA's cost-sharing

commitment to $900,000.  E.g., Def. Ex. 665.  Regardless, the parties agreed that they would first

attempt to settle a different Mergentime joint venture contract (the "E-1d Contract"), and then

address the Shaw Station project's claims followed by the claims for the U Street Station job.

Retr. 9/27/2001, at 1341-42; Tr. 10/31/1991, at 23-24; SAF Nos. 882-83.

On CPN 002 for the Shaw Station project, WMATA hired a consulting firm in January

1989 to perform an independent engineering analysis of M/P's claim.  SAF No. 878.  In July, the

---

[79] As discussed above, the claims administration process was not the primary source of delay in resolving the claims.  While the process may have caused some delay, M/P largely caused the delay with its repeatedly revised and poorly documented claims.

firm produced a written report, concluding that the claim could not be resolved based on the record then before WMATA given the claim's incompleteness and lack of documentation.[80]  In addition, the firm recommended that M/P be required to resubmit the claim, with direction to include appropriate support for its requests for additional cost and time and to account for the cost and time benefit from the street closings.  The Court sympathizes with Mr. Egbert, who testified that, as a Contracting Officer, he would have had great difficulty resolving the claim in light of this report.  Tr. 11/21/1991, at 106.  Indeed, had M/P demanded a final decision on its CPN 002 claim, the report would have resulted in its denial.  Tr. 11/22/1991, at 164.

As of April 1989, M/P's CPN 002 claim totaled $1,116,447, with the direct costs amounting to less than $252,400 of that total.  Pl. Ex. 62, at 1, 47-48.  The CPN 139 claim totaled $6,176,271, of which $1,183,151 was for direct costs.  Def. Ex. 624, at 1, 33.  M/P claimed to have received $215,371 in payments against CPN 139 by that time, leaving the balance at $5,960,900,  Def. Ex. 1742G, at 4, but this list of payments did not include WMATA's December 1987 agreement -- Modification 15, Part I -- to pay another $500,000 for extra grouting costs under PCO 033.  Pl. Ex. 213.

Despite M/P's claims to the contrary, the record indicates that WMATA was indeed negotiating with M/P on its claims during 1988.  In addition to conducting the multiple audits on CPN 139 and hiring an outside consultant to address CPN 002, Mr. Mergentime agreed with

---

[80] Def. Ex. 968.  The shortcomings identified by the report included the lack of drawings of planned versus actual work activities, the failure to establish the causal relationship between the Rhode Island traffic change and the inefficiency costs claimed, and the lack of actual cost records (e.g., timesheets and equipment usage records).  Id. at 23, 28-29, 30-32, 33, 35.  Further, the report stressed the failure to address the benefits of the 7th Street closure, which included increased efficiency in support of excavation, deck beam installation, maintenance of traffic, excavation, and concrete operations.  Id. at 24-25.

WMATA's Mr. Egbert to defer resolving the Shaw Station job disputes while they negotiated the E-1d Contract claims.  SAF No. 409.  Further, as described above, the parties were actively trying to resolve CPN 002 with the negotiation of MOA 1 during the period of January to August 1987, which reflected the parties' agreement on many terms implemented by WMATA that year regardless of the failure by WMATA to execute the agreement.

Despite these negotiations, M/P filed the present lawsuit on April 18, 1989.  M/P's complaint alleged that WMATA had materially breached the Shaw Station contract by failing to take action to resolve over $7 million in claims and the requests to extend the schedule for the subject construction contract.  With regard to CPN 002 on Shaw, M/P alleged that WMATA never negotiated with M/P over the costs asserted in that claim for which all additional work and costs were incurred between November 1985 and June 1986.  On CPN 139, M/P alleged that no negotiations had been scheduled.  Based on these alleged breaches by WMATA, M/P claimed the right to stop work on the Shaw Station contract and sought direct and consequential damages of $18.5 million, even though it had submitted only $7 million in claims.  M/P made no allegations of breach with respect to WMATA's processing of claims for the U Street Station job.

The parties settled their dispute on the E-1d contract in May 1989, and negotiations on the principle Shaw Station contract claims resumed that month as an alternative to the lawsuit, which the parties agreed to suspend for 45 days.  SAF Nos. 1203-04.  The parties agreed to certain ground rules for the negotiations, including an agreement that the existence of negotiations, substance of any negotiations, and settlement discussions between the parties would be inadmissible in any later litigation.  SAF No. 1205.  Negotiations focused on CPN 139, but were broken off by Mr. Mergentime because he was advised by Mr. Whalen that "the effort was

fruitless."  SAF No. 1211; see also Revercomb Op. at *96.

WMATA issued several contract modifications before and during August 1989.  Two modifications for PCOs associated with CPN 139 totaled $683,256 in December 1987 and July 1988.  Def. Ex. 553, Pl. Ex. 225.  WMATA issued another modification for CPN 139 in August 1989 totaling $341,000.  Def. Ex. 1410.  Thus, prior to August 25, 1989, WMATA had issued modifications for at least $1 million for PCOs associated with CPN 139.

 With pressure on WMATA rising in the Summer of 1989 regarding the opening of these stations in an economically depressed area, SAF Nos. 1217-19, 1223, its representatives attempted again to renew negotiations and restore the work on the projects.  A series of meetings occurred in August 1989 that culminated in the execution of a third Memorandum of Agreement (the "August 1989 Agreement").  SAF No. 1224.  The parties have stipulated to most of the facts surrounding these negotiations as found by Judge Revercomb.  SAF Nos. 1226-1306.  The Court will now highlight the most relevant points of these negotiations for the sake of context.

Teams from WMATA and M/P met on August 1, 1989, where Mr. Egbert discussed providing a cash infusion that would allow the jobs to proceed and creating a combined plan for the projects that would introduce a revised schedule that would allow for timely completion.  He also stressed WMATA's sense of urgency.  For its part, M/P disclosed its accounts payable ledgers and made representations indicating that large outstanding sums were owed to subcontractors and suppliers and that a cash shortage plagued the projects.  As such, Mr. Mergentime advised WMATA that M/P needed at least $2.5 million.  Notes from the meeting record Mr. Egbert's response:

From claims, mods, payments due, we can come up with about $1.7 m[illion].

114

> Additionally $1 m[illion] retainage (keyed to milestone date achievement) to be released.  "Net of $2.7 m[illion] for starters" "Probably more in U St" Worked on items that can be concluded quickly.

SAF No. 1230.  Further, WMATA distributed a list of desired target dates by which it wanted various aspects of both jobs completed.

The parties met again on August 11, 1989.[81]  M/P explained that, while it could not meet WMATA's desired target on August 1st, it had developed an aggressive combined schedule to achieve completion as soon as possible.  M/P did not consider resource restraints in creating this schedule, but stressed that the plan was contingent on various conditions, including the receipt of a significant advance payment.[82]  M/P promised to provide WMATA at the next meeting its plans for how the funds would be used.

At the next meetings on August 16 and 18, 1989, the parties continued their discussions on and revisions to the revised schedule.  M/P's Mr. Diehl reviewed each milestone date for achievability, approving a final set of milestone dates.  Mr. Bradford also distributed a disbursement plan at the August 18th meeting, which included the installment dates for the $4.3 million payment and identified what portions of the installments would be allocated by M/P to payroll, equipment, suppliers, subcontractors, debt service, and other items.  The plan also

---

[81] On the same day M/P submitted its first proposal for a PCO 001 claim for the U Street Station job -- over three years after WMATA provided notice of those utility changes.  Pl. Ex. 395.  M/P requested compensation of $843,400 and a 110-day time extension.  Less than two weeks later, WMATA issued Modification No. 36, Part I relating to PCO 001 on August 24, 1989, which granted an increase in the contract price of $341,000 based on WMATA's estimates but granted no time extension.  Def. Ex. 1410.

[82] The conditions were to pay $4,320,825 in three installments between August 18, 1989 and September 15, 1989, combine the two projects into one consolidated project for all remaining work, and reorganize the staff into one Project Staff to be located at the U Street Project Office Building.

115

anticipated that the first full payment for work performed under the new schedule would be received by October 1, 1989, at which time regular contract payments would cover the cost of the remaining work, augmented by periodic additional payments as past claims and proposals are resolved.

According to Mr. Bradford, after the August 18 meeting, he redid the restoration schedule and began to cost load the schedule.  Also, the parties began exchanging drafts of an agreement. During this exchange, M/P counsel's proposed language that would commit WMATA to using its "best efforts to settle, as promptly as possible, all outstanding claims" on the projects to assure funding for project completion.  SAF No. 1261.  During this time, WMATA staff also reviewed CPN 002 and CPN 139 and relevant consultant studies, and despite the general lack of any confidence in the merit of M/P's claims, WMATA succeeded in achieving board approval for its August 1989 agreement with M/P to facilitate the continuation of the project performance. Accordingly, the parties formally executed the August 1989 Agreement on September 1, 1989.

## VIII.  The August 1989 Agreement

The August 1989 Agreement, which modified the contracts in various ways, was intended to get the project moving again.  SAF Nos. 1291-1302.  The Agreement recognized that most of the dates in the original contracts had passed and established revised milestone completion dates of September 1, 1990 for Shaw Street Station and December 15, 1990 for U Street Station.  M/P agreed to use their best efforts to complete the projects.  In exchange, WMATA promised to pay $4.4 million against M/P's outstanding reimbursement claims and to use best efforts to settle the remainder of those claims as soon as possible.  Regarding the previous work history, WMATA agreed to relinquish its right to terminate the contracts for default based on events that had

116

occurred before to the agreement.  In return, M/P agreed not to stop working based on prior events, including WMATA's alleged failure to process their reimbursement claims.  Apart from these reciprocal waivers of the right to terminate, the parties expressly disclaimed any intent to relinquish their claims in the pending lawsuit.  In addition, the agreement set forth a new batch of milestone and completion dates for both contracts and set a project completion date of September 1, 1990 for Shaw Station and December 15, 1990 for U Street Station (subject to receiving approval for certain street closings).[83]  The interim dates were the same or later than those dates initially proposed by WMATA on August 1, 1989, and some were later than initially proposed by M/P.[84]

Regarding funding, the agreement also made reference to a separate, written agreement that provided for certain payments under the contracts to be reached by September 1, 1989.  In addition, the agreement allowed M/P to combine the contract work of both contracts into a unified operation while requiring the parties to hold weekly meetings to monitor progress and effort.  All terms and conditions of the two contracts would remain unchanged except as provided in the new agreement.

_____

[83] The provision of the August 1989 Agreement relating to schedule contained two conditions – one related to full block closures and the other related to payment to a subcontractor for the difference in M/P's bid and the cost to perform certain restoration work.  The Court finds that these conditions related to underground utilities and restoration, only affecting the final completion dates.  Thus, the two conditions had no relationship to the interim completion dates. Retr. 10/18/2001, at 3092-93.  These were the only conditions set forth that related to M/P's schedule commitments.

[84] The Court disagrees with what appears to be a characterization of this new schedule by M/P as not binding.  Pls. Mergentime's, Perini's & INA's Post Trial Br. on Legal Issues ("M/P Br.") at 9-10.  The fact that the parties agreed to use "best efforts" to meet this schedule does not render the schedule itself a nullity.

On or about August 25, 1989, M/P received payment from WMATA totaling approximately $1.45 million, the first payment under the disbursement plan.  SAF No. 1303.  At the time of executing the agreement, the parties also executed a September 1, 1989 disbursement plan calling for payments of the remaining $2,971,357 owed by WMATA of its $4.4 million commitment.  The agreement identified the sources for this remaining payment as coming from the Shaw Station project: Mod 15, Part IC; CPN 139, Part I, for void fill grouting and dewatering; and "against outstanding claims for which merit has been recognized and 'U' Street outstanding PCO's and/or Modifications."  Pl. Ex. 442; SAF No. 1305.  WMATA generally made these payments in a timely manner on their installment dates in September and October 1989, meaning that M/P had received the full amount of $4,420,825 by October 13, 1989 as anticipated.  SAF No. 1307.

On September 1, 1989, pursuant to the new agreement, Mr. Bradford forwarded to WMATA a cost loading for the combined schedule of the two projects and a revenue forecast as of that date.  Pl. Ex. 526.  The forecast provided an estimate of the money that M/P anticipated would be required to complete the work under the August 1989 Agreement going forward.  Bradford explained that in September M/P planned to earn $402,000 for the Shaw Station project and $1.1 million on the U Street Station project, a total of $1.5 million.  In that month, because M/P expected no additional fund, the mobilization payments would carry the costs of the extra work.  Starting in October 1989, however, the payments would be augmented per the disbursement plan.  Tr. 9/28/2001, at 1491-93.  The document forecasts the claims payments for six months, through March 1990.  Pl. Ex. 526.

This revenue forecast showed $13,556,527.40 remaining in the two contracts and an

estimated cost to complete of $19,565,274.40, leaving a revenue shortfall of approximately $6 million (exclusive of past due payables).  This shortfall was caused in part by the number of work items in the M/P schedule that were underfunded.[85]  Thus, $6 million would be required to fund the remaining work.

The Court finds that WMATA made no commitment during the negotiations of the August 1989 Agreement, in the agreement itself, or in any other agreement to continually fund M/P's shortfalls.  Indeed, at the first trial, M/P witnesses acknowledged that, in entering into the August 1989 Agreement, WMATA did not have an obligation to fully fund any shortfall in funding between the amounts required to complete the work and the amounts available under the existing cost-loaded schedule and the disbursement plan.  Id. at 59-60; Tr. 12/9/1992, at 133-34; see also Revercomb Op. at *105.  Further, M/P understood that if the claims were settled for less than the $6 million funding shortfall, it "would have had to finish the work with either the costs that were provided, meaning cutting costs, or come up with alternate sources of funds."[86] WMATA made no promise to completely fund remaining work or to cover the Joint Venture's losses to date.  Tr. 11/21/1991, at 78; Retr. 10/17/2001, at 2805.  Further, while WMATA agreed to use its best efforts to resolve all outstanding claims with respect to the projects upon a review of their merits, no commitment was made to resolve claims that were unsupported or determined to be without merit.

---

[85] Some were underestimated at the start of the job.  Tr. 11/5/1991, at 56-57.

[86] Tr. 11/5/1991, at 61-63; see also Revercomb Op. at *105, 116.  Given that the contracts were now joined as one operation and would use one schedule, M/P could reduce costs by combining certain supervisory positions, such as project manager, for the two jobs.  However, the two contracts did remain separate in every other respect.  Tr. 11/21/1991, at 69-70.

### IX.  M/P Performance from September 1, 1989 to Termination

Initially, M/P remobilized, committed sufficient resources, and performed at a satisfactory level.  However, M/P continued to have problems with quality control, e.g., Tr. 12/17/1991, at 36-38, 79-80, the lack of equipment and other resources due largely to the inability to pay subcontractors and suppliers, e.g., Def. Ex. 1988, at 58-60, and diligent prosecution of the work, e.g., Retr. 10/3/2001, at 2007, 2039-40.  M/P's manpower also fluctuated during this time, e.g., Retr. 10/3/2001, at 2007, with the work slowing substantially by the end of the year and continuing to decline in the following months.

As a result of these conditions, M/P was unable to meet the new interim completion dates established in the August 1989 Agreement.  As WMATA expert Mr. O'Brien testified, M/P "did not progress the work after August 1989 in accordance with their own schedule and accordingly failed to earn projected or available revenue." Retr. 10/18/2001, at 2989; see also Def. Exs. 1615, 1616.  Indeed, by the week of January 7, M/P was already over three months behind the August 25, 1989 schedule.  Def. Ex. 1516, at 254.  In response to the flagging performance and M/P's continuing cash flow problems, WMATA approved payments totaling of $2.6 million in December 1989 and February 1990.  SAF Nos. 1375, 1377.

Regardless of the continued influx of cash from WMATA, M/P's workforce remained at depressed levels (after brief bursts of revival after the payments).  In February 1990, a conflict between Mr. Egbert and Mr. Mergentime led to M/P's threat to cut the work staff on the projects by 25%.  Retr. 10/3/2001, at 2040; Def. Ex. 1521.  Indeed, in February and March, M/P terminated parts of its work force, jeopardizing completion goals.  Def. Ex. 1516.  By March 15, 1990, M/P's Shaw Station job workforce was cut in half to 29 workers.  Def. Ex. 1244; Tr.

120

12/16/1991, at 50-51.  For the U Street Station project, the workforce had decreased 20% from the September 1989 level by the end of the year.  Def. Ex. 1517; Retr. 10/12/2001, at 2466-67. The cuts continued through February and March 1990, dropping M/P's workforce to 70% below the September 1989 level at its lowest point in March.  Def. Ex. 1517; Retr. 10/12/2001, at 2470. As a result, M/P's failure to keep on schedule worsened.[87]

In this retrial, M/P has focused on certain restoration work it alleges was added by WMATA after the August 1989 Agreement.  Retr. 9/13/2001, at 80-81.  This line of argument regards the Fort Myer restoration premium, the Fort Myer utility premium, PCO 085, expanded restoration limits, and concrete gutters and granite curbs.

### A.  Fort Myer Premium

WMATA agreed to pay the premium needed to hire a subcontractor for restoration work as a term of the August 1989 Agreement.  As referred to above, this agreement made the project completion date "[s]ubject to WMATA approval to permit and pay for subcontracting for asphalt and concrete paving in excess of the cost beyond that contained in Mergentime bid."  Def. Ex. 981, at 4; SAF No. 1291.  WMATA believed that a competent contractor specializing in restoration work would complete such work more effectively than M/P.  Tr. 12/16/1991, at 57-58.  In this sense, it would "accelerate" the scheduled completion, which would justify the anticipated added cost of retaining a specialty subcontractor to do the work.  Retr. 10/17/2001,

---

[87] For example, the escalator wellways for the Shaw Station were scheduled to be completed on December 7, 1989.  The wellway work remained incomplete as of April 27, 1990. Def. Ex. 1332, at 3.  Also, despite the January 1, 1990 deadline for the Shaw Station elevator hoistway and machine room completion, at least six weeks of work remained as of April 27, 1990.  Id.  Similar deadlines were missed for the U Street Station escalators and elevators.  Id. at 4.  M/P has offered no explanation for missing these deadlines.

at 2907-08; Tr. 12/16/1991, at 57-58.  This change ultimately became know as the "Fort Myer Premium."

The "subject to" is a parenthetical note to the final completion date and addresses the paving work that would follow all of the underground, structural, and utility work.  Mr. Couch, who had primary authority for negotiating the interim completion dates, explained that this caveat to the final completion date had no logical, work-related relationship to any of the many interim completion dates set forth in the August 1989 Agreement and schedule.  Retr. 10/18/2001, at 3092-93.  Further, the proviso is not an affirmative contractual obligation, but rather a qualification on the final completion date involving the last of the activities that would be performed under the contract:  street restoration (asphalt and paving).  Under this proviso, WMATA would pay the difference between the cost of the work as performed by a subcontractor in excess of the cost of that work as set forth in M/P's bid, Retr. 9/21/2001, at 893-94, thus defraying any additional cost of hiring a subcontractor to do the restoration work rather than increasing net revenue for M/P.

In January 1990, after receiving bids from three potential restoration subcontractors, Def. Ex. 1140, M/P selected Fort Myer Construction Co. ("Fort Myer") from among the three bidders. Tr. 11/1/1991, at 43.  Fort Myer's bid was $3,892,497.  Def. Ex. 1140, at 2.  In February, M/P submitted two proposals to WMATA, one for the restoration work of each station project, seeking an increase in the contract price purportedly in accordance with the proviso.  Pl. Ex. 617 (Shaw Station); Pl. Ex. 578 (U Street Station).

To ensure that work began and to avoid any adverse impact on M/P's cash flow, WMATA developed a funding mechanism for Fort Myer's work.  Fort Myer insisted on being

paid directly by WMATA, which resulted in WMATA issuing joint checks to Fort Myer and Mergentime for the work performed. As such, WMATA instituted the following mechanism: determination and approval by the WMATA board of a contract modification that measured and reflected the difference between M/P's bid and the subcontractor cost. WMATA, based on such board approval, would pay for actual work performed based on submitted invoices from Fort Myer. Pl. Ex. 590; Pl. Ex. 744, at 671. The funds advanced to pay for the work would come from existing appropriations to the contract that remained in the contract to pay for work that would be performed in the future.[88] This payment mechanism was accepted by M/P without objection. Thus, as reflected in the contemporaneous documents, the parties intended for WMATA's board to ultimately approve a contract modification that reflected the increased costs of hiring Fort Myer, even as the costs were being defrayed by these direct payments of Fort Myer's costs. The Court finds no evidence that the WMATA board was either unaware or unwilling to fulfill these plans.[89]

As of May 1990, very little of the restoration work had been performed and there was still a great deal of money already in the contract to continue funding the Fort Myer work as performed. Retr. 10/3/2001, at 2018-19, 2023. M/P had not used most of the money included in its cost-loaded schedule for restoration work at the two project sites, spending no more than

---

[88] At no time was WMATA close to exhausting the existing contract funds being used to pay Fort Myer so that any increase to the total money then appropriated to the contract was necessary. Pl. Ex. 512, at 1, 2 (showing $1.49 million of funding for restoration work for Shaw Station project and $1.16 million for U Street Station project remaining in contracts as of April 1990); Retr. 9/28/2001, at 1545.

[89] The Court gives credence to the testimony confirming the board's awareness of the general arrangements in the August 1989 Agreement, Retr. 10/17/2001, at 2906-07, and intention to abide by the terms of that agreement. Retr. 10/23/2001, at 3225.

$660,000 of the $2.15 million for Shaw Station and none of the $1.1 million for U Street Station. Pl. Ex. 512.  After receiving a permit for the full block closure on 7th Street between R and S Streets, M/P initially made some progress but lapsed into inactivity and was a long way from completion at the time of termination.  Tr. 12/16/1991, at 59-60.  Regardless, WMATA allowed and approved the funding of Fort Myer work using contract funds as the work was actually performed.  Indeed, due to the lack of progress, WMATA never had to obtain board approval to increase the total contract price to continue to fund the restoration work being performed by Fort Myer.  Tr. 12/2/1991, at 170-72, 174-75.

WMATA never determined a specific amount to increase the funding of the overall contract due to the nature of M/P's proposal, which included improper efforts to inflate the amount of money it was owed.  For example, M/P was to set forth the amount in its bid for the work, and the contract would be increased to reflect the delta between that bid price and the cost of having Fort Myer do the work.  However, M/P's proposal for the work incorporated Fort Myer's bid price and inappropriately added an additional profit and various indirect costs to increase the delta.  P. Ex. 617, at 4.  In addition, as revealed by a WMATA audit, M/P appears to have misstated its own bid, using a figure to represent its "bid" that was far lower than the actual bid price set forth in M/P's conformed bid and showed that M/P had always intended to subcontract the work.  Def. Ex. 1317, at 1; D. Ex. 1320, at 1, 6.  The total audit adjustments were $621,994 on the total proposed "delta" claimed by M/P of $1,114,967.[90]

---

[90]  Notwithstanding the audit report and M/P's contemporaneous agreement with it, D. Ex. 1320, at 3, 6 ("Contractor personnel now acknowledge that the original conformed bid amount is a valid base for measuring restoration costs."), the figures M/P used at trial to represent the "Fort Myer premium" supposedly owed were these erroneous proposed amounts.

Thus, the Court finds that WMATA fulfilled its obligations with respect to the Fort Myer premium and nothing about the Fort Myer premium prejudiced M/P in any way.  To the contrary, WMATA's payments of the Fort Myer premium for actual work performed, even before a final modification increasing the overall price, reduced the financial burden on M/P of performing the utility and restoration work on which it would have lost money.  M/P's contention that WMATA's failure to increase the contract funding caused the Fort Myer payments to flow from funds owed to M/P is contradicted by the facts outlined above, including the existence of funds still in the contract and the apparent ongoing process at the time (delayed by M/P's faulty proposal) for a board approved modification.

### B.  Transition Chamber and the Fort Myer Utility Premium

M/P argues that, under the August 1989 Agreement schedule, the parties expected the utility work on the Shaw Station and U Street Station projects to proceed concurrently. In addition, it contends that employing a transition chamber or similar mechanism, such as a manhole or sewer flume, was necessary.  Alternatively, M/P contends that, in light of WMATA's alleged disapproval of any such mechanism, M/P needed to (and did) retain Fort Myer to begin work on the Shaw Station site sewers while U Street Station work progressed to comply with the new schedule.  In addition, this disallowance allegedly entitled M/P to an adjustment of the completion date by 101 calendar days.  The Court disagrees with M/P, finding no evidence that the concurrent utility work on both projects, which was contemplated by the parties, was somehow dependent on any particular technical approach.  Moreover, the Court finds no evidence that M/P ever submitted a plan to WMATA or the DPW for a proposed transition chamber, let alone evidence of WMATA's disallowance of such a plan.

As the Resident Engineer's diary reveals in August 1989, M/P intended to proceed first with the sewer work at the Shaw Station site and then attend to the permanent sewers at the U Street Station location.  Def. Ex. 1522.  The diaries appear to show that M/P could have laid pipe up to the U Street Station and that the DPW would consider any proposal for temporary work-arounds.  Id.; see also Retr. 10/12/2001, at 2483-84.  However, M/P never submitted any proposal for a transition chamber or any other type of work-around.  Id. at 2491.  In addition, nothing in the August 1989 Agreement conditioned the schedule on a "transition chamber,"  Def. Ex. 981; Tr. 11/5/1991, at 42-43, nor did the initial schedules developed by M/P under that agreement show any activity or schedule restraints for installation of a transition chamber, manhole or use of the flume.  Retr. 9/28/2001, at 1510; Tr. 11/5/1991, at 44-45.  To the contrary, WMATA believed that M/P should initiate pipe laying at the Shaw Station site to facilitate the U Street Station sewer work in order to meet the schedule.  Def. Ex. 1522.

M/P has cited a graphic schedule prepared by WMATA that lacked a transition chamber to argue that the project was delayed by this absence.  Pl. Ex. 1000.  However, this schedule is clearly a graphic depiction of the schedule submission of M/P from October 3, 1989, Pl. Ex. 537, which WMATA disapproved for failing to logically depict the utility work.  Pl. Ex. 570.  Thus, the lack of a transition chamber in the graphic is attributable wholly to M/P.

The first indication that M/P considered the post-August 1989 work conditioned on a transition chamber occurred with M/P's schedule submission of November 30th, which was submitted to WMATA on January 3, 1990.  Tr. 12/20/1991, at 100-01.  M/P stated that the lack of approval for a transition chamber prompted it to insert a restraint between the completion of the Shaw Station project utilities and the start of the U Street Station utilities, which extended the

126

U Street Station project schedule.  Pl. Ex. 565, at 3.  M/P's schedule update on January 3rd

repeatedly referenced WMATA's decision to disallow a transition chamber and cited this

disallowance as causing M/P to be "constructively accelerated," ostensibly requiring M/P to hire

Fort Myer to start on utility work at WMATA's expense.  Id.  However, as M/P's Mr. Bradford

conceded at the retrial, the Court finds that WMATA never disallowed the transition chamber or

any other proposed work-around in the form of a manhole or flume, Retr. 9/28/2001, at 1512,

given that M/P had not even submitted a plan or proposal for such.  Id. at 1510-11.

    In summary, M/P offers no credible evidence that the transition chamber or mechanism to

allow concurrent utility work was a predicate to progressing all of the utility work for the

U Street Station job.  Instead, the evidence suggests that M/P was able to proceed on other

aspects of the utility work, even though it may have been less efficient.  M/P has not claimed an

equitable adjustment for any perceived inefficiencies in this litigation and did not submit any

contemporaneous claim for such.  Thus, this Court finds that M/P's argument concerning the

necessity of the transition chamber to support concurrent utility work is not sufficiently

supported.

### C.  PCO 085 (Utilities Conflict)

    PCO 085, for which M/P has claimed that WMATA owes $697,000, resulted from a

conflict between the S-35 sewer under the southern curb line of Rhode Island Avenue and an

electrical ductbank.  As the parties were negotiating the August 1989 Agreement, M/P allegedly

came across this conflict while installing the sewer on or around August 17, 1989.  Def.

Ex. 1521; Tr. 12/18/1991, at 95-96.  M/P formally notified WMATA on August 23, 1989.  Pl.

Ex. 606, at 7.

WMATA eventually approved a plan to address the work in mid-September 1989.  The solution involved the construction of a new manhole and a parallel ductbank to eliminate the vertical conflict.  The parties agreed that, in order to mitigate delay, formal approval by the DPW of the correction of the electrical ductbank would not hold up that work.  Tr. 12/18/1991, at 101-02.  During that time, M/P began work on an agreed fix, completing its portion of the work by November 9, 1989, though PEPCO did not complete its portion until January 8, 1990.

On November 6, 1989, WMATA agreed that a change to the contract was warranted and assigned the PCO number.  Pl. Ex. 606, at 14.  M/P submitted a time and cost claim for $478,863 in late December, which included a delay of 50 work days and approximately $24,000 in direct costs.  While WMATA did pay M/P's direct costs associated with this PCO, Def. Ex. 1830, its internal time analysis recommended no time extensions to Part I and Part II completion milestones despite acknowledging a total work day delay of 80 days.  Pl. Ex. 606, at 6.

The parties do not dispute that the conflict was not completely resolved until January 8, 1989.  However, they disagree about the cause of the conflict and the responsibility for the delay.  M/P argues that WMATA is responsible for the changed condition and the delay, which impacted the completion of the utility work and the restoration activities and ultimately the overall project.  WMATA argues that, while it took responsibility for the extra manhole required given that it was beyond the original contract and it justified paying the direct costs because there arguably was a design conflict, M/P actually caused this conflict.  Moreover, WMATA argues that any delay was not its responsibility because the ductbank had been previously built in a manner not shown on the drawings or approved by WMATA and that M/P has mistakenly put the ductbank directly in the path of the sewer.  Lastly, WMATA argues that any delay caused by PEPCO would not be

128

compensable as a third-party delay.

The Court finds that the conflict is attributable to M/P.  Indeed, the evidence shows that Mr. Gary Rigsby, the Mergentime Utility Foreman who had been responsible for putting the duct bank in front of the S-35 sewer, admitted that the conflict between the sewer line and ductbank was his own fault.  Def. Ex. 1521.  Mr. Rigsby explained that he simply forgot about the new sewer line when constructing the duct bank.  In short, Mr. Rigsby had moved the ductbank to avoid the waterlines and placed it in front of the sewer.[91]  Indeed, a comparison of the as-built elevations with the contract drawings confirms this admission that M/P created the direct conflict with the sewer in placing the ductbank in its path.  Def. Ex. 1587; Tr. 12/18/1991, at 108.

In addition, having found that the August 1989 Agreement did not condition the concurrent utility work on a transition chamber, the Court finds that PCO 085 did not impact the overall completion dates for the two jobs to the extent claimed by M/P.  In fact, the record reflects that M/P could have worked on other utilities despite claimed delays of PCO 085 and the lack of a transition chamber.  Utility work could have progressed in other areas.  This is evidenced by the fact that M/P hired Fort Myer to work on a portion of the sewer outside of the main cut area at a higher elevation between S and T Streets.  Also, M/P crews themselves performed work on a portion of the S-39 sewer between R and S Streets that was deeper within the ground and could be addressed under the decking without the closure of traffic, albeit with more difficulty.

_____

[91] Retr. 10/3/2001, at 2033.  Further, there is no evidence that M/P notified or received permission from WMATA to move the ductbank earlier in the project.  Thus, the Court finds that WMATA was in no position to address or prevent the conflict earlier in the project.  Given that M/P did not place the ductbank where it was shown on the contract drawings, id. at 2034, WMATA's responsibilities cannot extend to the delay created by M/P's own actions.

**D. Expanded Restoration Limits (PCO 071) and Concrete Gutters (PCOs 025 and 090)**

PCO 071 involved extending the limits of restoration on the Shaw Station project beyond the limits shown on the original contract drawings, Tr. 12/18/1991, at 114, which was a situation known to the parties well before the August 1989 Agreement was negotiated. Def. Ex. 734. M/P never completed more than a little of the restoration work, and extended limits had only minimal effect to the actual contract performance. Tr. 12/18/1991, at 117; Tr. 1/17/1992, at 135-36.

To cover the expanded limits as it was being performed, on March 6th, 1990, WMATA issued a Part I modification in the amount of $477,190. Pl. Ex. 601, at 10-11. Fort Myer was paid on its invoices for this work during its performance through the mechanism of the Part I modification that increased the contract price. Pl. Ex. 744, at 671; see also Pl. Ex. 590. Fort Myer (and M/P) were paid for the work performed under this heading. Retr. 10/3/2001, at 2023. WMATA sent the modification to M/P for signature; however, M/P returned it unsigned on April 5, 1990. M/P relayed that it would not sign any modification without total satisfactory resolution of all outstanding contractual matters. Id. at 2024; Pl. Ex. 601, at 20. On December 20, 1989, M/P submitted a proposal for the additional restoration work at Shaw, seeking additional payments of $1,099,910.49 -- including approximately $417,000 for direct costs.[92]

The bulk of the requested additional payments reflected in M/P's proposal was in the form of a request for extended time calculated as "84 cal days x $5,500/day." After adding profit and overhead factors, M/P's proposal would account for nearly an additional $600,000 for M/P in overhead on work that was actually to be performed by Fort Myer. Pl. Ex. 601, at 3. That

---

[92] Pl. Ex. 601, at 2. The Part I Modification for over $477,000 that was issued by WMATA corresponded to the direct costs associated with this work. Id. at 10-11.

subcontract work, in the form of street restoration, was to be performed by Fort Myer in large

measure after M/P had concluded virtually all of its construction work on the contract.  WMATA

audited M/P's proposal, finding no basis for the $5500 per day claim of daily field overhead.

Def. Ex. 1318, at 1, 8-9.

Further, the audit noted that because entitlement to a daily overhead rate for the extended

time was "subject to technical evaluation as to extension delay merit[,] . . . some functions in the

overhead pool may not be impacted by the work scope required by this PCO."  Id. at 9.  This

comment reflects the fact that the work in question is primarily subcontract work to be performed

largely after the remaining contract work has been completed.  M/P did not need a large field

office to watch Fort Myer do its work at the tail end of the original contract.  The work scope

simply did not impact the overhead pool, if there was an overhead pool at that stage of the

contract.  The Court agrees with the audit's conclusions, as did M/P's Mr. Bradford, who

generally agreed with the findings.  Id. at 3.

PCO 090 involved concrete gutters for the Shaw Station job, work that could have

proceeded concurrently with the expanded restoration work, Tr. 1/17/1992, at 136, and that was

known by the parties before the August 1989 Agreement was formed.  Def. Ex. 1271, at 113-14.

The installation of concrete gutters is additional work performed side-by-side as part of the

sequence of other restoration work on the block, requiring additional operations at the site

without adding to the total time needed to complete the work.  Retr. 10/3/2001, at 2028-30.  M/P

now claims entitlement to an additional extension of time, amounting to $327,000.  Retr.

9/28/2001, at 1460.  However, M/P never submitted a separate PCO 090 proposal during the

contract term.  The direct costs for the Shaw Station concrete gutters were actually submitted as

part of PCO 071.  Id. at 1459-60.  M/P now seeks "extended performance costs" for PCO 090, id., even though the PCO 071 proposal included a request for extension of time for all the work included therein.  Thus, this new figure tendered by M/P at trial is apparently for separate time-related costs associated with concrete gutters.

While M/P strains to characterize the evidence so that this claim does not appear completely new, the Court finds these efforts unpersuasive.  Despite the attempt to conjure up a 42-day request buried in a March 30, 1990 claim document, Retr. 9/27 /2001, at 1410-11, there is no explanation in the record for why installing concrete gutters entitled M/P to this 42-day extension beyond the extension already claimed in PCO 071, which also included concrete gutters.  Pl. Ex. 601, at 8, 13-15, 32.  Further, even the March 30th submission lacks any analysis for how M/P calculated the 42-day claim to total $327,000 as now claimed by M/P.

Even had such a claim for the extended time costs of the Shaw Station project's concrete gutters been made during the contract term as a properly supported proposal, the Court finds no extended performance independently associated with installing concrete gutters because that work would proceed concurrently with the additional restoration of PCO 071.  Retr. 10/3/2001, at 2027-30.  Any extension associated with work for concrete gutters would also suffer from the basic defect (discussed above) that there is no entitlement to daily field overhead in the amounts that M/P was claiming where the work involved, requiring an extension of contract completion, is simply added subcontract work to be performed after the main contract work was concluded.

Finally, PCO 025 involved concrete gutters and granite curbs for the U Street Station project, Pl. Ex. 562, work that M/P never began.  Retr. 9/21/2001, at 903-04.  M/P did submit this proposal, claiming a total direct cost of the work of $134,644 in subcontract payments to Fort

132

Myer.  Now M/P's proposal amounts to $447,027, the bulk of which was a claim for a 57-day

extension priced using a daily overhead rate of $4135 per day.  Pl. Ex. 562.  However, as

described above in connection with PCO 090, this type of work was extra and could be

performed concurrently with other restoration work.  Thus, the claim for any extension for this

work was similarly problematic because the work would be concurrent with the extended

restoration limits.  The Court also concurs with WMATA's audit, which found M/P's daily rate

inflated and the claim "subject to technical evaluation as to entitlement."  Def. Ex. 1319, at 6.

### E.  "CPN XXX" for U Street Station

M/P also claims money owed because of "two CPN-XXX's for additional utility work."

Retr. 9/27/2001, at 1440.  While this work was neither proposed by M/P nor requested by

WMATA, M/P claims that the work was based on discussions occurring onsite.  Id.  However,

the Court finds that, despite whatever discussions may have occurred, WMATA neither directed

such work nor did M/P make any proposals before termination.  Retr. 9/28/2001, at 1468-69,

1537-38.  According to Mr. Bradford, these were "not proposals just as yet," and were merely

"estimates based on where [M/P] thought [it was] going at the time."  Id. at 1529.  However, a

potential "trend" of work, id. at 1538, amounts to nothing more than a hypothetical change that

was never approved by WMATA and cannot lead to the recovery sought by M/P.

### F.  Full Block Closures

Regarding "full block closures," which M/P claims also affected its post-1989

performance, M/P understood that any such closures required approval of the District of

Columbia.  Tr. 11/5/1991, at 38-39.  The responsibility to obtain necessary permits fell on M/P,

id., and WMATA agreed to assist this process under the August 1989 Agreement.  Def. Ex. 981,

at 4.  However, obtaining approval for full block closures proved difficult, as the DPW initially

resisted granting full block closures because of M/P's poor performance under prior closures.[93]

M/P finally received the needed permit for full block closure at its Shaw Station site on

February 12, 1990.  Def. Ex. 1521.  Before receiving the permit, it had backfilled up to the level

of utilities and worked on the installation of permanent utilities.  After receiving the full block

closure, M/P continued to work on utilities.  However, its sporadic efforts left the work

uncompleted.  Tr. 12/17/1992, at 38-40.  Indeed, even though this permit allowed closure for 90

days,[94] M/P virtually halted its restoration work on the block after 30 to 45 days.  Tr. 12/16/1991,

at 46-47.  Obviously, M/P made no other requests for permits to close blocks prior to the

termination on May 11, 1990.  Tr. 11/5/1991, at 41.  The slow pace of the restoration work made

further full block closures unnecessary.

For the U Street Station project, M/P only sought a full block closure on U Street between

10th Street and Vermont Avenue to facilitate work on the east escalator wellway.  Id. at 39.  M/P

argues in this litigation that it anticipated receiving this full block closure immediately after its

work began under the August 1989 Agreement schedule, and WMATA's delay in approving that

closure hampered M/P's performance in the area of the proposed closure according to the

schedule.

The DPW initially rejected the proposal of a full block closure at U Street, citing M/P's

───────────────

[93] Def. Ex. 1522; Tr. 11/18/1991, at 101-03; Tr. 11/21/1991, at 161-62; Tr. 12/16/1991, at 48.

[94] On January 10, 1990, M/P submitted a specific schedule for street restoration at the Shaw Station site that set forth a 90 day timeline for completing the restoration relevant to the street closure.  Def. Ex. 1910.

past poor performance and broken promises.  Def. Ex. 1522.  On August 31, 1989, WMATA

representatives met with the DPW to reverse this opposition.  After some negotiation, the DPW

relented, compromising with WMATA and M/P to allow for a 45-day closure.  Id.; Tr.

12/20/1991, at 61-63.  The Court finds that the permit for this closure was not late, and the

duration of the permit was reasonable.[95]

### X.  Claims Administration after the August 1989 Agreement.

Under the August 1989 Agreement, WMATA was required to use their exercise of "best

efforts and due diligence" to settle the outstanding claims.  M/P claims that WMATA breached

this requirement, asserting that the claims administration process was unreasonable and faulty.

The Court finds that the claims process was reasonable, and disagrees with M/P's contentions.

WMATA and its representatives proceeded with the claims process in good faith, exercised due

diligence, and made best efforts to settle M/P's claims after August 25, 1989.

WMATA, which formed a negotiating team that attended weekly meetings with M/P in

an effort to negotiate settlements, made a number of concessions and advance payments for

settlement purposes in an effort to generate payments to M/P and keep the contractor working.

Pl. Ex. 443; Tr. 11/21/1991, at 87-88.  In addition, WMATA performed detailed analyses of

M/P's claims, often finding that M/P had caused the claimed delays.  Other times, WMATA's

investigations led to time extensions and increased funding for M/P.  For example, Part I

---

[95] Tr. 12/9/1991, at 124-25.  When M/P asserted delay in receiving the full block closure, Mr. Schmidt found such complaints unfounded because M/P had access to two-thirds of the block in August 1989 but failed to clean up the area to allow more efficient access; no application for permit had been submitted until September 11, 1989; the DPW would not provide an open-ended permit; and M/P itself caused delays with its unfinished vent structures and utility supports needed to allow the deck beam removal.  Def. Ex. 1075 (PPRM Minutes No. 40); Tr. 11/12/1991, at 20-23.  Based on the record, the Court agrees with Mr. Schmidt's assertions.

modifications were issued in excess of $6 million to allow pre-settlement advances to be made to M/P during negotiations between the parties.  Tr. 12/4/1991, at 22.

Further WMATA took various effort to assist the settlement process, clearing all of its actions with its board.  WMATA provided M/P with assistance in presentation of its claims. Retr. 9/18/2001, at 481.  The Court finds credible Mr. Egbert's testimony that he was committed to using his best efforts to settle by giving "the benefit of the doubt" to M/P, he assembled documentation in an effort to justify settlements, and he suggested approaches for M/P to pursue in their claims.  E.g., Tr. 11/20/1991, at 5-6, 50-51, 118, 154.

Indeed, for some claims, WMATA's representatives decided not to raise legitimate issues relevant to settlement of the claims (e.g., the 7th Street closure) or chose to interpret facts to the benefit of the claim (e.g., CPN 139) in the interests of facilitating settlement.  Tr. 11/19/1991, at 71-72; Tr. 11/20/1991, at 50-54, 138-40.  In various situations where WMATA was entitled to a credit, it did not enforce this entitlement during the performance of the contract.  Tr. 12/3/1991, at 199-208.

Regardless of WMATA's efforts, the claims evaluation process was fated to be a time consuming process.  The evaluation and negotiation of CPNs 002 and 139 involved a number of difficulties and disputed issues.  In addition, M/P's submissions were often inadequate, lacking critical factual information to support its claims.  Retr. 10/17/1991, at 2810-11.  Indeed, as Mr. Egbert testified, this lack of support prevented WMATA from relying on M/P's claims as they existed prior to August 1989.  Id. at 2811.  Even after August 1989, the difficulty in auditing the claims continued because of M/P's reluctance to give WMATA access to supporting information. Tr. 12/2/1991, at 87-91; Tr. 1/14/1992, at 72-76, 128-35, 156-59.  The information M/P did

provide was often suspect when compared to the audit reports on the claims.  Def. Ex. 1317, at 2; Tr. 1/14/1992, at 71-94.  All the while, M/P continued to repeatedly change the format, documentation, layout, and amounts.  For example, it continually escalated the CPN 002 claim to increase the amount claimed, expand the activities allegedly impacted, and add to the nature of the claimed impacts,[96] often without documentation to support the increased amounts.  E.g., Tr. 11/22/1991, at 47-48; Pl. Ex. 498; Tr. 12/2/1991, at 88-90, 93-95.

Despite WMATA continuing claims administration process and M/P's continuing failure to document its escalating claims, WMATA continually provided advance payments and other funding to M/P to encourage work progress.  At the August 25, 1989 meeting, WMATA issued checks to M/P totaling approximately $1.45 million.  SAF No. 1303.  On September 1, 1989, the parties entered into a Supplemental Agreement under which WMATA paid M/P $2,971,357, principally against Part I modifications issued under CPN 139.  SAF No. 1304-05.  On December 21, 1989, Mr. Egbert presented a request to the Board of Directors to enter into a supplemental agreement to provide two additional payments to M/P in the amount of $1 million each "for the purpose of sustaining progress" on both projects "while outstanding claim issues [were] being reconciled."  Pl. Ex. 1019, at 2.  Another agreement regarding advance payments on February 9, 1990 called for advances to M/P in the amount of $1.1 million on February 16 and an additional $500,000 on March 16, 1990.  Def. Ex. 1189, at 2.  In addition, Part I modifications in excess of $6 million were made to allow partial payments to M/P during negotiations between the parties.  Also, WMATA approved the release of retainage after August 25, 1989 for both jobs,

---

[96]  E.g., Def. Exs. 1058, 1143, 1532; Pl. Ex. 478C.  Indeed, the direct costs claimed by M/P by March 30, 1990 were twenty times the amount of direct costs sought in its November 20, 1986 claim.

137

Tr. 12/3/1991, at 187-90, even though M/P did not meet WMATA's standards for such releases.[97]

Regarding WMATA's ultimate assessment of M/P's total cost claim, the Court agrees with the assessments of Messrs. Egbert and McElhenny that M/P could not justify a total cost settlement.  Retr. 10/17/2001, at 2806-07, 2832; Tr. 12/4/1991, at 24-25.  In particular, M/P never established the fourth element required for a total cost settlement – a cause and effect relationship between the changes and the dollars that M/P was claiming.  Tr. 11/21/1991, at 115. The settlement efforts ultimately failed due to this missing causal relationship.  Id. at 121.

## XI.  Last-Ditch Negotiations and Termination

Faced with the deteriorating condition of these projects and their potential completion, WMATA issued "show cause" notices to M/P for both projects on April 25, 1990.  SAF No. 1391.  These notices asked M/P to "show cause" why the contracts should not be terminated for default given that "the work . . . [had] fallen significantly behind schedule" and suffered from performance deficiencies in apparent violation of M/P's commitment from the August 1989 Agreement to maintain a significant level of effort to meet interim dates.  Def. Exs. 1326, 1327. The decision to issue these notices, which was made after discussion at the Board of Directors meeting of April 25, 1990, was not taken lightly by WMATA and was appropriately issued in light of the status of the projects.  Tr. 1/15/1992, at 85-86; Def. Ex. 1330.

M/P responded to the show cause letter two days after their issuance.  SAF No. 1395; Def. Ex. 1332.  Rather than denying its continuing failure to meet the interim completion dates of

---

[97]  Retr. 10/18/2001, at 3084.  Retainage is a sum of money that is withheld from normal progress payments and can be released by WMATA after the contractor performs 50% of work if it has satisfactorily progressed the work.  Id. at 3081.  Thus, retainage is used "to protect [WMATA's] interest" and "ensure performance and completion of the job."  Id.

the August 25 Agreement or providing any assurance of future adequate performance, M/P

accused WMATA of failing to meet its obligation under the same agreement to fund M/P's

prosecution of the work.  While attributing its failure of performance to this alleged breach, Mr.

Mergentime's response did not acknowledge the advance payments and retainage releases made

by WMATA to fund performance.  In addition, M/P abruptly denied safety and quality control

problems (though the Court has found above that these conditions did exist and were attributable

to M/P's deficient performance).  Further, the response accused WMATA of breaching its

promise to "use due diligence and best efforts to settle" Mergentime's claims and accused

WMATA of bad faith.  The letter threatened to reinitiate litigation to solve the problem.[98]

WMATA responded in a May 9, 1990 letter, which denied M/P's allegations regarding

WMATA's funding responsibilities and reasserted complaints regarding M/P's flagging

performance.  Pl. Ex. 670.  The letter concluded by stressing that M/P had "failed to provide

documentation which would support time extensions to the interim completion dates the Joint

Venture has failed to meet and the contract final completion date as agreed to in the August 25,

1990 agreement" and "continued to fail to properly discharge . . . financial obligations" "[d]espite

unprecedented actions by [WMATA] to improve [M/P's] financial position." Id. at 3.

Rather than responding to the "show cause" notice with increased manpower or diligent

performance, M/P's performance deteriorated further.  The workforce on both sites dwindled into

the single digits.  Def. Ex. 1516,; Def. Ex. 1517.  Work stalled in major portions of the projects,

---

[98] M/P made a number of false assertion, including perpetuating the myth that WMATA
somehow had rejected the transition chamber or other work-around, citing this nonexistent event
as a "breach [that] is the direct cause of the delay of the U Street utilities."  Def. Ex. 1332, at 6.

and streets remained closed and unusable.[99]  The Court finds that, as of May 10, 1990, M/P had

virtually abandoned both jobs.  Tr. 12/11/1991, at 58; see also Revercomb Op. at *110-13.

As a result, milestones due months ago remained unmet through termination.  In addition,

the project sites in the final weeks were wrought with unsafe conditions, lack of maintenance,

and stray debris.  The Court agrees that the sites resembled "a war zone."[100]  In light of M/P's

performance after the August 1989 Agreement and its manpower levels as of May 1990,

WMATA was rendered incapable of determining when the jobs might be completed.  Tr.

1/22/1992, at 29-30.

The parties held a last-ditch meeting on May 9, 1990, with termination looming as a

possible option.[101]  In response to WMATA's inquiries about M/P's schedule, Mr. Mergentime

made a schedule presentation of a plan detailing the specific work to be accomplished in monthly

periods beginning on May 14th.  Def. Ex. 1353, at 1-4; Def. Ex. 1359, at 1-3.  He also promised

to prosecute the Shaw Station project with 60 men on his payroll, working two shifts operating

---

[99] Tr. 12/16/1991, at 46-47.  These minimal staffing levels contrasts starkly with the workforce of the reprocurement contractor, which averaged 150 people each day for both jobs during the completion contract.  Retr. 10/24/2001, at 3386-87.

[100] Tr. 12/16/1991, at 59-60.  A videotape and photographs of the project sites taken by WMATA shows that no work activity was occurring in the trashed and unsafe conditions at the Shaw Station project site.  Def. Exs. 1740, 1741; see also Retr. 10/3/2001, at 2048-69 (narrating videotape).  The Court finds that Mr. Kolodne's testimony that the videotape was representative of the level of work activity at that site in the week before termination is credible.  Retr. 10/3/2001, at 2069.  After termination, WMATA expended 21,906 man hours cleaning up the sites.  Def. Ex. 1395, at 2.

[101] Def. Ex. 1715.  While Mr. Mergentime at the retrial claimed a lack of understanding that termination was a possible outcome of this meeting, Retr. 9/19/2001, at 576-79, the Court finds that M/P certainly understood this potential in light of the "show cause" notices and the tenor of the meeting.

up to six days a week in addition to subcontractors.  Def. Ex. 1359, at 1.  For the U Street Station

project, Mr. Mergentime promised two shifts of 60-100 men and deck beam operations around

the clock, plus subcontractors.  Id. at 3; Def. Ex. 1353.  However, M/P presented a list of

conditions to achieve its promised schedule plan.  For example, Mr. Mergentime sought an

"agreement in principle" for street closings, timely resolution of change orders, biweekly and

monthly payments, and a settlement of disputes from 1988 before beginning this projected

performance plan.  Id. at 5.

      Both Perini and INA were asked about their role in funding the projects.  Perini declined

the opportunity to voice support for funding performance, Def. Ex. 1359, despite its obligation to

WMATA under the contracts.  Def. Ex. 1995, at 27.  In addition, INA indicated it had no role to

play, Def. Ex. 1353, at 9, though the bonding company was obligated to WMATA under the

performance bonds.  Def. Ex. 17, at 48.

      As a result of the meeting, WMATA justifiably understood that M/P persisted in its

demand for a settlement of the consolidated claim as a condition to prosecuting the work.  In

addition, Perini voiced no willingness to provide funding, and INA believed that it was not

required to act.  Despite these positions and the deplorable performance and site circumstances,

WMATA attempted to negotiate a settlement to meet M/P's condition to proceed.  Tr. 12/4/1991,

at 25.  Though WMATA made clear the need for a "wrap up" agreement resolving all issues on

both contracts to preclude further demands and work stoppage, M/P presented a proposal seeking

another $7.9 million from WMATA that *would not* "wrap up" all remaining issues.  Def. Ex.

1715, at 7.  The offer was over and above the $6.8 million already advanced against the Shaw

Station claims.  Tr. 12/3/1991, at 140.  Mr. Mergentime made clear this proposal was his final

position, <u>id.</u>, and M/P rejected outright WMATA's suggestions of $2-3 million.  Retr. 9/19/2001, at 592.  While Mr. Mergentime's retrial testimony for the first time suggested scenarios in which performance without a settlement could have occurred -- in contrast with his stated position -- the Court finds that M/P never backed away from its insistence that settlement was required before proceeding.

WMATA decided to terminate the contracts for default following the meetings on May 9, 1990 based on the parties' positions and the circumstances surrounding their dispute.  Tr. 12/4/1991, at 38, 62.  The primary reason behind the termination was the lack of "best efforts" to finish the projects (as required by the August 1989 Agreement), caused by the nonexistent workforce levels and other circumstances.  Indeed, the Court agrees with Mr. McElhenny's view that M/P made this failure to prosecute the work with best efforts intractable by its positions on funding in light of its March 28, 1990 threat, its April 1990 "show cause" response, and its requirement of a settlement before any remobilization at the May 9, 1990 meeting.  Tr. 12/4/1991, at 25-26, 112.  Further, WMATA could not see any justification for M/P's $7.9 million proposal, which amounted to $14.7 million demand when accounting for the $6.8 million already advanced on the Shaw Station project claims, failed to account for WMATA's credit claims, and left open issues and the opportunity for further M/P claims and work stoppages.  Thus, Mr. McElhenny concluded that the parties were too far apart to settle, and concluded that M/P would not proceed with the work if a settlement was not reached.  Tr. 12/3/1991, at 142-43; Tr. 12/4/1991, at 25-27.

On May 11, 1990, WMATA issued notices of termination for default of the Shaw Station and U Street Station contracts, citing the failure to meet completion dates, failure to prosecute the

work with diligence, inadequate response to show cause notices, continuing safety hazards, failure to correct deficiencies, and other reasons.  Def. Ex. 1367 (Shaw Station); Def. Ex. 1368 (U Street Station).  The notices recounted WMATA's efforts under the August 1989 Agreement, including the advance payments, as well as M/P's failure to fulfill its obligations under that agreement.  Thus, if found in default, M/P would be considered in default of contract obligations as of May 11, 1990.

## XI.  Reprocurement

After the termination for default, WMATA entered into Contract 1E0019 it contracted with Perini ("Perini Contract") to complete the work left on the Shaw Station and U Street Station contracts.  Def. Exs. 1384, 1402, 1573.  Their Memorandum of Agreement, dated May 22, 1990, set forth the basis for payment as follows:

> Perini agrees to complete the remaining work of the . . . terminated contracts, pursuant to their terms and conditions, except as otherwise noted herein, on a cost reimbursement basis.  This basis will include all costs of work (including all field office expense) for so completing the terminated contracts together with a factor for home office overhead to be either mutually agreed to or established by an audit performed by WMATA at its sole cost and expense.  Such basis shall not include profit or a fee.  Cost reimbursements under this agreement are limited to costs incurred for work performed and materials purchased by Perini . . . .

Def. Ex. 1384, at 1-2.  Perini also agreed that completion of the projects on a cost reimbursement basis satisfied WMATA's obligation to mitigate excess costs under the terminated contracts.  Id. at 3.  Mergentime and INA agreed to this stipulation as well.  Def. Ex. 1392, at 1.  Perini completed the contracts more than a year and a half later and at an additional cost to WMATA of over $16 million.  Def. Exs. 1981A, 1982A.

143

## CONCLUSIONS OF LAW

Given that this litigation involves at its foundations contractual agreements between various parties, the Court is governed by contract law.  In addition, because these contracts involve a government authority, the Court will also turn to relevant government contracts case law and statutes regarding the various clauses and provisions that are commonly used in federal government contracts of this kind.  Many of the contractual provisions are similar or identical to certain standard clauses prescribed for construction contracts by the Federal Acquisition Regulation, e.g., F.A.R. §§ 43.205(d), 52.243-4, 52.236-2, 52.249-10, 52.233-1, 52.249-2, and the contracts were funded in part by the federal Urban Mass Transit Administration.

### I.  Termination for Default

WMATA bears the burden to justify its termination of M/P for default.  Lisbon Contractors v. United States, 828 F.2d 759, 765 (Fed. Cir. 1987).  According to bedrock government contracts law, "a party can justify a termination if there existed at the time an adequate cause, even if then unknown."  Pots Unlimited, Ltd. v. United States, 600 F.2d 790, 793 (Ct. Cl. 1979) (citing College Point Boat Corp. v. United States, 267 U.S. 12, 15-16 (1925)).

A government entity uses its discretion when deciding to terminate for default, and this "exercise of . . . discretion must be fair and reasonable, not arbitrary or capricious."  Darwin Constr. Co. v. United States, 811 F.2d 593, 597 (Fed. Cir. 1987).  It cannot use "the technical default position" of the contractor as a "pretext for the taking of action felt to be necessary on other grounds unrelated to the [contractor's] performance."  Schlesinger v. United States, 390 F.2d 702, 709 (Ct. Cl. 1968).  A contracting officer exercises his discretion properly when there is a nexus between his termination decision and the contractor's performance.  McDonnell

Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999).

Once the government establishes a prima facie basis for the default termination, the "burden shifts to [the contractor] to prove the default was excusable and its failure to perform was beyond its control and without the fault or negligence of both itself and its subcontractors or suppliers." Cantrill Dev. Corp., ASBCA No. 30160, 89-2 BCA ¶ 21,635 at 108,849. Further, regarding the propriety of the contracting officer's decision given the presumption that public officials act conscientiously in the discharge of their duties, M/P would bear the burden of proving that the default termination is arbitrary and capricious and therefore constitutes an abuse of discretion. Morganti National, Inc. v. United States, 49 Fed. Cl. 110, 131 (2001); Florida v. United States, 33 Fed. Cl. 188, 196 (1995), aff'd, 81 F.3d 1093 (Fed. Cir. 1996). M/P must either show the existence of bad faith, no reasonable basis for the decision, a limited degree of discretion for the decision maker, or a violation of a relevant statute or regulation. Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 422-423 (1993); see also McDonnell Douglas Corp. v. United States, 182 F.3d 1319, 1326 (Fed. Cir. 1999).[102]

## A.  Grounds for Termination

As a threshold matter, the Court notes that both contracts were entered into by a joint venture composed of Mergentime and Perini, whose individual financial and technical

---

[102]  The factors prescribed by regulation for the contracting officer to consider in deciding whether to terminate the contract do not "confer rights on a defaulting contractor." DCX, Inc. v. Perry, 79 F.3d 132, 135 (Fed. Cir. 1996). Such factors are "not prerequisites to a valid default termination," although "the extent to which a contracting officer considers them may aid [the Court] in determining whether the contracting officer has abused her discretion in terminating the contract." Imperial Props./Constr., Inc., ASBCA No. 49,899, 01-1 BCA ¶ 31,382, at 154,977 (finding that termination for default was proper, though Board's findings "cast doubt upon the extent to which, if at all," the contracting officer considered the factors of the Federal Acquisition Regulations); see also Laumann Mfg. Corp., ASBCA No. 51249, 01-2 BCA ¶ 31,517 at 155,593.

capabilities were of dire importance to WMATA when selecting the Joint Venture's bid proposal. Not surprisingly, the contracts impose an individual liability to WMATA for both contractors with respect to all contract obligations.  Def. Ex. 1, at 17 ("If the Contractor hereunder is comprised of more than one legal entity, each such entity shall be jointly and severally liable hereunder.").[103]

Thus, both Mergentime and Perini were bound by the contractual provisions requiring them to meet schedules and diligently prosecute the work to completion.  Id. at 51.  Even if disputes arose regarding the need for an equitable adjustment to the contract price or schedule due to WMATA's change or a differing site condition, M/P and both parties individually were still required to "proceed diligently with the performance of the contract[s] and in accordance with the Contracting Officer's decision."  Id. at 7.  Indeed, the contracts' specific grounds for default termination include the failure or refusal to diligently prosecute the work.[104]

To help ensure progress was maintained, M/P was required to submit a schedule against which progress could be monitored.  The Contracting Officer could direct increased shifts or work days and require submission "for approval [of] supplemental progress schedules detailing the specific operational changes to be instituted to regain the approved schedule, all without additional cost to [WMATA]."  Id. at 22.  The failure to comply with such requirements was also "grounds for determination . . . that [M/P was] not prosecuting the work with such diligence as

---

[103] The Court's use of the moniker "M/P" in this opinion to describe the plaintiffs in no way should be interpreted as contradicting the fact that both contractors are individually liable to WMATA under the applicable contracts.

[104] Def. Ex. 1, at 7.  The grounds for default termination and remedies in this clause are not exclusive, as it provides that these "rights and remedies of [WMATA] . . . are in addition to any other rights and remedies provided by law or under this contract."  Id.

will insure completion with the time specified."  Id.

In addition, the August 1989 Agreement, signed by WMATA and M/P,[105] makes

reference to the existing contracts by stressing that their obligations survived and notes the

existence of "outstanding claims, disputes, backcharges, and demands" under the Shaw Station

contract.  Def. Ex. 981, at 1.  However, WMATA "relinquishe[d] any right . . . to terminate either

of these contracts . . . for default" and M/P "relinquishe[d] any right . . . to be relieved of further

responsibility for performance of either of these contracts as a result of events occurring prior to

this agreement."  Id. at 6.  Further, WMATA preserved its right to collect liquidated damages,

while M/P preserved its right to pursue its claims.  For its part, WMATA agreed to do its utmost

to decide M/P's pending claims for excusable delay subject to M/P supporting its claims.  Id.  at

981, at 6-8.  In addition, given the new specific interim completion dates established by this

agreement, M/P committed to a level of effort necessary to meet those dates.  Id. at 3. Indeed, the

agreement required M/P to "promptly advise of any potential slippage to anticipated progress and

[to] propose recovery actions necessary to make up any lost time."  Def. Ex. 981, at 6.

Thus, these provisions created several grounds for terminating M/P for default.  First, the

contractors had the duty to proceed diligently with performance of the contracts notwithstanding

disputes over their claimed right to an equitable adjustment to the contract price or schedule, and

failure to do so would justify termination.  As the case law overwhelmingly shows, not

proceeding diligently in accordance with a contract's "Disputes" clause pending resolution of

---

[105]  Mergentime signed on behalf of the Joint Venturers, representing that it had the power
to bind Perini to its terms.  Def. Ex. 981, at 2 ("Mergentime . . . has represented that it is the
managing venturer of the Joint Venture Contractor with full power and authority to enter into
negotiations and bind the Joint Venture Contractor and each of the individual venturers by
entering into this agreement to the same extent as in the original contract undertakings.").

claims warrants termination for default,[106] and a work stoppage is not justified even if it is later determined that the contractor's position in the dispute was correct. <u>Skip Kirchdorfer, Inc. v. United States</u>, 229 Ct. Cl. 560, 564 (1981).  Indeed, the failure to proceed as directed pending dispute resolution is equated with anticipatory repudiation. <u>Brenner Metal Prods. Corp.</u>, 82-1 BCA ¶ 15,462 at 76,619; <u>A.N. Xepapas</u>, VABCA No. 3087, 91-2 BCA ¶ 23,799.  Similarly, coupling a work stoppage with demands of advance payments, cost reimbursement, or agreement with claims for increased contract price or extension would also justify default termination. <u>SanColmar Indus., Inc.</u>, ASBCA No. 16478, 16479, 74-1 BCA ¶ 10,391; <u>Brenner Metal Prods. Corp.</u>, ASBCA No. 25294, 82-1 BCA ¶ 15,462 at 76,619.  Accordingly, when a contractor abandons work under a contract, it has the burden to prove that its inaction is contractually excusable or due to the government's material breach of the contract. <u>F&D Constr. Co,</u>, ASBCA Nos. 41441, 41442, 41443, 41444, 91-2 BCA ¶ 23,983 at 120,030.

Another ground for which such a default termination may be justified occurs when a contractor fails to meet interim completion dates in a revised schedule that it previously agreed was reasonable. <u>Clover Builders, Inc.</u>, VABCA No. 2033, 2034, 88-2 BCA ¶ 20,629 at 104,270. The prospective inability to meet future schedule dates due to a demonstrated lack of diligence is also basis for default if the contracting officer reasonably believed that no reasonable likelihood existed that the work could be completed within the remaining performance time.[107]  A contractor

---

[106]   <u>H & H Mfg. Co. V. U.S.</u>, 168 Ct. Cl. 873, 879 (1964); <u>Atterton Painting & Constr., Inc.</u>, ASBCA No. 31471, 88-1 BCA ¶ 20,478 at 103,581; <u>Accu-Met Prods., Inc.</u>, ASBCA No. 19704, 75-1 BCA ¶ 11,123 at 52,923.

[107]   <u>Discount Co.</u>, 554 F.2d at 439, 441; <u>see</u> <u>Florida v. United States</u>, 33 Fed. Cl. 188, 194 (1995), <u>aff'd</u>, 81 F.3d 1093 (Fed. Cir. 1996); <u>Cox & Palmer Constr. Corp.</u>, ASBCA No. 38739, 92-1 BCA ¶ 24,756 (1992); <u>American Dredging Co.</u>, ENG BCA No. 2920, 2952, 3168, 72-1

"can be terminated in advance of the actual contract completion date when it is apparent that [it] can not finish the work on time."  Square Constr. Co. & LaFera Contracting Co., ENG BCA No. 3494, 76-1 BCA ¶ 11,747, at 56,072; see also Morganti Nat'l, Inc. v. United States, 49 Fed. Cl. 110, 131 (2001).  The government must meet its burden by showing a lack of progress that endangered contract completion, which would then shift the burden to the contractor to prove that there was not a lack of progress or that any lack of progress was excusable or not endangering performance.  RFI Shield-Rooms, ASBCA No. 17374, 77-2 BCA ¶ 12,714 at 61,735; see also Thomas S. Rhoades, ENG BCA No. 6025, 97-1 BCA ¶ 28,672.

A third ground for default is M/P's alleged abandonment of performance.  TCH Indus., Ltd., AGBCA No. 88-224-1, 91-3 BCA ¶ 24,364 at 121,724.  A governmental entity may demand adequate assurances of due performance if it reasonably believes that its contractor may not be able to perform the contract on a timely basis.  When faced with a justifiably issued cure notice, the contractor must either provide assurances of progress toward a timely completion of the contract or explain that the reasons for prospective delay are not its responsibility.  A failure to give such assurances may be treated as a repudiation of the contract,[108] as may qualified

_____

BCA ¶ 9316, aff'd, 207 Ct. Cl. 1010 (1975).  The amount of time allowed to the contractor to complete the work after a default termination is irrelevant in determining whether the contracting officer had a basis for terminating the defaulting contractor's right to proceed, as is whether the defaulted contractor could have finished by the completion contract date.  Square Constr. Co. & LaFera Contracting Co., ENG BCA No. 3494, 76-1 BCA ¶ 11,747.

[108]  Danzig v. AEC Corp., 224 F.3d 1333, 1337-39 (Fed. Cir. 2000); see also Tubular Aircraft Prods. Inc. v. United States, 213 Ct. Cl. 749, 750 (1977) ("Plaintiff's minimal performance efforts coupled with its perilous financial situation warranted the issuance of a cure notice.  Thereafter, plaintiff's failure to advise the government that corrective action would be taken in order to make performance at levels reasonably commensurate with contract requirements financially possible, justified the default termination.").  The existence of a dispute does not excuse a refusal to perform.  Charles Bainbridge, Inc., ASBCA Nos. 15843, 16204, 72-1

promises of performance stating a willingness to perform on conditions not within the terms of

the contract at issue (Restatement (Second) of Contracts § 250 cmt. b (1981); see also U.C.C.

§ 2-610 cmt. 2) including demands to modify the contract.  Kaiser-Francis Oil Co. v. Producer's

Gas Co., 870 F.2d 563, 569 (10th Cir. 1989); Copylease Corp. v. Memorex Corp., 403 F. Supp.

625, 631 (S.D.N.Y. 1975).  In determining whether a contractor's response amounts to

repudiation, a court should consider the contractor's actions, and any "language that is

accompanied by a breach by non-performance may amount to repudiation even though, standing

alone, it would not be sufficiently" clear to be regarded as a repudiation.  Restatement (Second)

of Contracts § 259 cmt. b; e.g., Danzig, 224 F.3d at 1339.

Another basis for default could lie in M/P's failure to finance its work.  Courts have held

that the "contractor assumes the risk of providing funds sufficient to perform the contract,"

meaning that "neither undercapitalization nor insolvency (actual or impending) will excuse a

failure to perform."  El Greco Painting Co., ENG BCA No. 5693, 92-1 BCA ¶ 24,522 at 122,379

(citing, inter alia, Consolidated Airborne Sys., Inc. v. United States, 348 F.2d 941, 946 (Ct. Cl.

1965)); Willems Indus., Inc. v. United States, 295 F.2d 822 (Ct. Cl. 1961)); Thomas S. Rhoades,

ENG BCA Nos. 6025, 6062, 6097, 97-1 BCA ¶28,672 at 143,232.  Thus, a "contractor's

financial difficulties are not a legitimate excuse for its failure to make progress."  Danzig, 224

F.3d at 1338.  The loss of performance capability caused by a contractor's financial condition

constitutes a constructive abandonment of performance or anticipatory breach entitling the

---

BCA ¶ 9351; see also J. Parr. Constr. & Design, Inc. v. United States, 24 Cl. Ct. 228, 232 (1991); Leming Constr. Co., ASBCA No. 32425, 91-1 BCA ¶ 23,300 (abandonment not excused by dispute over whether rework ordered by Government exceeded the contract requirements; contractor's appropriate remedy was under the Disputes clause).

150

government to terminate for default.  Overhead Elec. Co., ASBCA No. 25656, 85-2 BCA

¶ 18,026, aff'd, 795 F.2d 1019 (Fed. Cir. 1986) (Table).  As such, a court should uphold a default

termination if the contractor "was either inadequately financed when it signed the contracts, . . .

used its funds for purposes other than the performance of the contracts during the contract

period," Preuss v. United States, 412 F.2d 1293, 1299 (Ct. Cl. 1969), or overextended itself on

other projects.  E.g., Ramdel Constr. Corp., ASBCA No. 27801, 85-3 BCA ¶ 18,502.

Also, termination for default is justified if a contractor neglects a promise to exert "best

efforts" to accomplish the contract.  Such a promise must be executed "in good faith and to the

extent of [the contractor's] own total capabilities."  Bloor v. Falstaff Brewing Corp., 454 F. Supp.

258, 267 (S.D.N.Y. 1978), aff'd, 601 F.2d 609 (2d Cir. 1979); accord United Roasters, Inc. v.

Colgate-Palmolive Co., 649 F.2d 985, 990 (4th Cir. 1981).  As such, contractual performance is

not excused for financial difficulty or economic hardship.  Bloor, 454 F. Supp. at 267 n.7.

Finally, a government entity may terminate a contractor for default for failing to perform

other material provisions of the contract, including poor work quality, violation of specifications,

violation of environmental regulations, J. Parr Constr., 24 Cl. Ct. at 236-37, or failure to comply

with quality control requirements.  Orchids Paper Prods. Co., GSBCA No. 10555, 91-2 BCA

¶ 23,965 at 119,968-119,969.

## B. Contractor's Excuses

If WMATA does establish a prima facie basis for the default termination, the Court would

then evaluate the excuses relevant to this litigation.  The possible excuses relevant to M/P's

performance are financial difficulty and excusable delay.

The existence of financial difficulty during contractual performance is a normal business

risk facing contractors. Thus, as mentioned above, "the failure to plan to absorb the costs relating to contract problems until a dispute can be resolved does not excuse performance." DWS, Inc., ASBCA No. 33245, 87-3 BCA ¶ 19,960 at 101,050, aff'd on reconsideration, 87-3 BCA ¶ 20132 (1989) (citing Southeastern Airways Corp. v. United States, 673 F.2d 368 (Ct. Cl. 1982)); see also Martin Mach. Works, Inc., ASBCA No. 28755, 86-2 BCA ¶ 18,837 ("The ability to perform within the constraints of any financial difficulty is a normal business risk and the contractor's sole responsibility.").[109]  Even if changes to a contract that was terminated contributed to the financial problems, nonperformance on the remainder of the work still in inexcusable if the contractor's "initial undercapitalization, its subsequent decision to divert borrowed funds to other projects, as well as other concurrent causes of its problems for which it must bear responsibility, were the significant, driving factors underlying its failed performance" on the portion of the job that was terminated for default. El Greco Painting Co., 92-1 BCA ¶ 24,522, at 122,380; see also In re Boston Shipyard Corp., 886 F.2d 451, 457-58 (1st Cir. 1989) (alleged financial burdens caused by delays in resolving change orders rejected as excuse given contractor's thin capitalization).  Accordingly, a work stoppage is not justified when the government entity refuses to pay for changed work in accordance with the contractor's estimate, regardless of claims that the cost of the change has drained operating capital. Holt Roofing Co., GSBCA No. 8270, 91-1

---

[109]  M/P's obligations under the U Street Station Contract would not be excused by any contractual issues relating to the Shaw Station Contract. See Kirk Casavan, AGBCA No. 76-192, 78-2 BCA ¶ 13,459 (contractor improperly refused to perform until it was paid the amount of its claim under another contract); Clinical Supply Corp., ASBCA Nos. 15466, 15652, 15653, 72-1 BCA ¶ 9452 (contractor required to continue work despite government claim under another contract that was ultimately resolved in contractor's favor); John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 944 (3d ed. 1995) ("The Disputes clause duty to proceed provision . . . precludes a contractor from stopping work on one contract because of a pending dispute on another contract.").

BCA ¶ 23,361 (citing Yukon Serv., Inc. v. United States, 24 CCF ¶ 81,822 at 87,216, adopted by

order, 215 Ct. Cl. 942 (1977), and Great Lakes Mktg. & Sales Assocs., ASBCA No. 26462, 82-2

BCA ¶ 16,026 at 79,420).

   The financial incapacity to continue performance can only be a justified excuse if the

contractor proves such incapacity was caused by a material and serious breach by the

governmental entity that rendered continued performance a practical impossibility.  Thomas S.

Rhoades, 97-1 BCA ¶28,672 at 143,232.  The contractor must prove that specific governmental

actions or inactions were the primary or controlling cause of the financial incapacity.  E.g.,

Defense Systems Co., ASBCA No. 50918, 00-2 BCA ¶ 30,991 at 153,002.  However, when the

contractor claims an exception to its duty to proceed based on the government's failure to make

payments, only payments required by contract or subsequent bilateral amendments matter.  In

other words, claims for additional payment which are not yet resolved are irrelevant.  Ralph C.

Nash, Jr., Government Contract Changes 6-9 (2d ed. 1989).[110]

   Excusable delay is another justification used by contractors for nonperformance.  "It is

well settled that the contractor has the burden of proving the excusability of a delay."  John

Cibinic, Jr. and Ralph C. Nash, Administration of Government Contracts 583 (3rd ed. 1995);

accord Arctic Corner, Inc., ASBCA No. 29405, 88-1 BCA ¶ 20,396 at 103,188, aff'd, 862 F.2d

321 (Fed. Cir. 1988).  The burden must be established by a preponderance of the evidence.  Mil-

---

[110] Even if payments were slow, the contractor's inaction cannot be excused if its
financial position was adversely affected by matters that were its own fault, such as defective
work or disputes with suppliers.  Pruett Mfg. Co., ASBCA No. 30378, 87-1 BCA ¶ 19,378.  A
termination for default is proper even when the government failed to make progress payments
where "the delay in initiating progress payments was due to [the contractor's] failure to provide
sufficient supporting information regarding costs incurred."  Finast Metal Prods., Inc., ASBCA
No. 19860, 77-1 BCA ¶ 12,331.

Craft Mfg., ASBCA 19305, 74-2 BCA ¶ 10,840.

### C.  WMATA's Termination of M/P for Default

Based on the record and the case law set forth above, the Court finds that WMATA has clearly established a prima facie basis for its termination decision, in light of the factors detailed throughout this opinion.  Because M/P was in default of its obligations under the contracts, including the August 1989 Agreement, the termination was justified in light of the circumstances facing WMATA in May 1990.  For example, M/P clearly was not "diligently" prosecuting the work as explicitly required in the contracts.  To the contrary, the work was described by witnesses for both sides as idle and essentially shut down.  Manpower had been drastically reduced and was virtually nonexistent by termination.  The Court has found that M/P effectively abandoned its performance obligations to work diligently.  In the same vein, M/P was in default of its obligation to perform notwithstanding its unresolved claims, again breaching its fundamental obligation to diligently prosecute the work.

Also, M/P was not providing "the capability of the Joint Venture . . . to meet" the August 1989 Agreement's schedule or fulfilling its "representations" that "such a level of effort shall be committed to meeting these dates."  Def. Ex. 981, at 3.  In other words, M/P was not applying its best efforts to the task as required in that supplemental agreement, as it admits by claiming it failed to meet the new schedule due to a lack of financial support.  In fact, the failure of Perini to fulfill its obligations to the Joint Venture, including the provision of financial support, is itself an indication that the *best* efforts were not made.[111]  This failure also is reflected in M/P's

---

[111] Thus, no matter what characterization M/P makes now of its performance at the time, see, e.g., Pls. Mergentime's, Perini's & INA's Post Trial Reply Br. ("M/P Reply Br.") at 2 ("M/P had already put into the projects tens of millions more than it had been paid [and] . . . had

plummeting level of effort and repeated claims that it was not responsible for timely completion of restoration work.

M/P argues that the schedule in this agreement does not equate to a definitive schedule it was contractually bound to meet; however, the Court finds this line of argument irrelevant. Regardless of whether the dates set forth in the agreement equate to a firm schedule or mere hopeful milestones, the parties certainly agreed that M/P would use its best efforts to meet these dates.  As one court has explained:

> Obligations imposed under a best efforts contract are different from contracts that guarantee performance.  If, despite its best efforts, the contractor cannot meet the contractual requirements, the other party has obtained precisely what it bargained for, namely, the contractor's best efforts.

Hughes Commc'n Galaxy, Inc. v. United States, 47 Fed. Cl. 236, 238-39 (2000) (internal quotations, citations and alterations omitted) (emphasis added).  Thus, even if M/P is correct, it still flunked its obligation to make its "best efforts" to meet the schedule.  The Court cannot simply excuse M/P's behavior -- even if the schedule is characterized as nothing more than a set of "best efforts" dates -- given that it failed to apply its best efforts to meet these dates as described above.[112]

---

soldiered on with the projects for the next nine months after signing the August Agreement . . . ."), it could never equate to M/P's best effort if half of the Joint Venture opted out of its responsibilities to support continued diligent performance while claims remained outstanding -- especially given the admitted financial struggles facing the Joint Venture.

[112] M/P's argument that the termination decision rested only on M/P's failure to meet the completion dates is unavailing.  Indeed, the language M/P quotes -- "I find that you have failed to pursue the work with such diligence as will insure the completion by the proscribed dates" -- clearly is based on a lack of "diligence" needed to meet the schedule (exactly what WMATA bargained for in this "best efforts" contract), rather than being based on a mere failure to meet the schedule.  M/P Br. at 14 (emphasis removed).

Indeed, M/P's failure to diligently perform was deliberate given its pattern of demanding pre-settlement payments while threatening to drastically reduce its workforce and warning that it would not be responsible for timely completion.  Regardless of WMATA's repeated advance payments, M/P eventually delivered on its threat by slashing its workforce and virtually halting its performance.  As described above, 7th Street between R and S Streets remained closed, unrestored, unworked, and in dangerous condition at the time of termination.  Indeed, the Court finds that M/P was intentionally taking advantage of the political pressure facing WMATA to complete the projects and the difficulty in finding a replacement, as shown by its statement to the surety.  Def. Ex. 1291, at 5.  This deliberate refusal to diligently perform continued even after WMATA's show cause notices citing M/P's failure to perform and other breaches, which lead to M/P's inadequate response that failed to provide any assurance of improvement.  Instead, M/P demanded more funding and denied its performance problems.  Thus, its communication with WMATA and overall performance provided no adequate assurance of performance, displaying an intractable position that the Contracting Officer could rightly deem a repudiation.  Indeed, as M/P itself explained, "negotiating proposals do not constitute repudiation of a contract unless they represent an unequivocal and positive expression of intent not to perform now and forever."  M/P Reply Br. at 14-15 (citing Keefe Co. v. Americable Int'l, 755 A.2d 469 (D.C. 2000)) (emphasis removed).  As the Court has found, such an expression of intent was manifested by M/P's intractable and unjustified demands during the negotiation.

Finally, M/P also defaulted its obligations relating to public safety.  After another review of the relevant testimony, the Court agrees with Judge Revercomb: "Although deficiencies in safety and quality control are not expressly set forth as grounds for default termination in article

5 of the contracts, they may assuredly have an impact on the contractor's ability to proceed in a diligent way, as Mr. McElhenny testified, and default terminations on these grounds have been upheld in cases in which the contractor failed to proceed or abandoned the contract."  Revercomb Op. at *119 (citing J. Parr Constr., 24 Cl. Ct. 228; Skip Kirchdorfer, Inc., 91-1 B.C.A. (CCH) ¶ 23,380 (1990)).  The work sites were a hazardous and unsecured mess as documented by the videos in the record, which certainly hindered diligent performance.  These dangerous conditions were persistent notwithstanding complaints from the community and orders from WMATA to correct the situation.  In light of M/P's clear obligations in the contract to maintain safe project sites, this breach itself was material and grounds for default termination given the effect on diligent performance.

      With WMATA's overwhelming prima facie showing, the burden has shifted to M/P to prove its principal excuses.  However, M/P has not satisfied this burden.  First, as described above, its alleged financial incapacity does not amount to a valid excuse, and the demand for payments to cure such incapacity while withholding performance served as a repudiation. Further, no such incapacity actually existed given Perini's refusal to adequately fund the projects. As described above, Perini itself was contractually obligated to assure that appropriate financial resources were available for timely performance, and its failure to provide such resources helped cause the performance delinquencies.  In any event, even if some genuine financial problems existed, WMATA was not responsible for those limitations in light of the extraordinary financial assistance WMATA provided M/P through advance payments far beyond the owed progress

payments.[113]   In fact, to the extent that Mergentime's financial problems are relevant despite the availability of funds from Perini, these problems were due in large part to the Perini divorce and losses on other jobs rather than by WMATA's conduct.

Regarding M/P's claim that its performance properly depended on further settlement payments, the Court notes that the contracts place the burden to finance the projects on the contractors.  Notably, the project was marred by M/P's improper related party transactions and other suspect funding decisions, including Perini's decision to not participate in financing the project after the buyout.  Thus, if financial support was lacking, the blame falls squarely on the shoulders of M/P.  Further, the agreement did not equate to some sort of promise by WMATA to ensure funding for the project.  Rather, WMATA only promised its best efforts to settle, an obligation it satisfied (unlike M/P's obligation of "best efforts" to meet the schedule) by giving M/P assistance to properly document its claims, suggesting possible bases for evaluation, making concessions, and making pre-settlement payments in advance of justifications.  While such clauses requiring "best efforts" to negotiate are generally regarded as unenforceable, Pinnacle Books, Inc. v. Harlequin Enters., Ltd., 519 F. Supp. 118, 121-22 (S.D.N.Y. 1981), aff'd, 661 F.2d 910 (2d Cir. 1981), WMATA was applying due diligence and best efforts in an attempt to reach a settlement by any standard that might reasonably be applied.

In any event, the Court finds that M/P's claims lacked substantial merit at that time as outlined above, and that WMATA certainly was not required to make an unjustified settlement.

---

[113]   Indeed, this claim of financial incapacity is further undermined given that the contemporaneous cost records reveal that Mergentime was diverting such payments from WMATA after August 1989 to its own use.  In addition to precluding any financial excuse, this behavior itself constitutes a material breach of promises to use payments to progress the work as set forth in the agreements.

Rather than substantiate the range of recovery sought in its settlement demands, the record

supports the conclusions of the predecessor judges that M/P's total cost claim for the Shaw

Station job was inflated, as a bulk of M/P's overruns was its responsibility and non-reimbursable.

E.g., compare Def. Ex. 1271, with Def. Ex. 1277.  M/P's settlement demands based on inflated

claims that were conflicted by its own internal evaluations provide no justification for

nonperformance.[114]  Further, even if WMATA was not entitled to hold back such payments, M/P

must show that "the withholding of progress payments was the primary or controlling cause of

[its] default," Sterling Millwrights, Inc. v. United States, 26 Cl. Ct. 49, 90 (1992) (citation

omitted).  As the record clearly reveals, the Perini divorce, the mismanagement of funds, and the

other problems attributable to M/P were, at the very least, significant enough to render

WMATA's alleged withholding of payments neither the primary nor controlling cause of

default.[115]

Any attempt to use the "excusable delay" excuse is equally unavailing.  As the Court has

found throughout this opinion, M/P was responsible for the delays through its financial

mismanagement, work stoppages, failure to pay subcontractors, staff cutbacks, unsatisfactory

---

[114] While M/P argues that WMATA "refused to pay millions of dollars that senior WMATA executives knew the agency owed," M/P Br. at 1, the Court finds these allegations unconvincing.  Though M/P argues that "WMATA's own witness conceded that they understood, as of the date of termination, that there was merit to at least another $3.2 million on pre-August 1989 claims," id. at 13 (emphasis removed), this $3.2 million apparently is the difference between the $10 million Mr. McElhenny would have felt comfortable with in total settlement, Pl. Ex. 1532, at 201, 207, and $6.8 million already paid.  His feelings about a possible settlement amount do not amount to a concession on the merits of M/P's claims.  In any event, senior WMATA executives knew by then that its presettlement advances had not been justified. E.g., Retr. 10/17/2001, at 2824-25.

[115] M/P complains of WMATA's failure to execute MOA 1 in 1987, but such a failure does not excuse M/P from its obligations of diligent performance or best efforts.

159

work quality, and other reasons.  As such, M/P clearly cannot prove by a preponderance of the

evidence that it should somehow be excused for its lengthy delays.  In any event, the potential

existence of "excusable delay" -- including M/P's argument that it was entitled to further

payments and time extensions -- would not excuse M/P from its obligations to maintain best

efforts and diligent performance given that such efforts were lacking in large part due to Perini's

failure to contribute.

At retrial, M/P stressed and/or introduced other miscellaneous excuses, all of which are

either irrelevant to M/P's many defaults, unsupportable, or not credible.  First, M/P argued

through Mr. Mergentime's testimony that they had viewed the May 1990 discussion as part of

settlement negotiations, rather than a discussion involving a possible termination for default.

M/P assumed that settlement negotiations would continue; otherwise, it would have sought the

issuance of final decisions on its claim that would have facilitated obtaining cash from Perini and

INA.  Retr. 9/19/2001, at 577-79.  However, the Court finds this assertion unlikely given M/P's

threats of work stoppage and litigation and WMATA's show cause notice that specifically

invoked the possibility of termination.  Indeed, M/P's counsel clearly understood the

implications of the notices and meetings.[116]  Thus, M/P's new surprise theory lacks merit.

Another newly emphasized theory involved claimed amounts that would have been owed

to M/P had the contracts not been terminated.  However, these potential payments merely were

hypotheticals for unissued changes, proposals that had not been submitted, and proposals that had

been found to be inflated by audit.  Further, these amounts were for extended overhead for

---

[116] Def. Ex. 1715, at 2 (referring to the show cause letters as the reason why M/P needed
Mr. Mergentime's "presentation on the record" at the May 9, 1990 meeting).

compensable time, to which M/P was not entitled under the facts or applicable law. <u>Charles G. Williams Constr., Inc. v. White</u>, 271 F.3d 1055, 1058 (Fed. Cir. 2001); <u>Sauer Inc. v. Danzig</u>, 224 F.3d 1340, 1347-48 (Fed. Cir. 2000).

Further, the "Fort Myer premium" issues provided no excuse defending M/P from default termination. As an initial matter, this argument is irrelevant to M/P's failure to apply "best efforts" or to proceed with diligence. Given that the "premium" was not an affirmative contract requirement -- it was a proviso to the August 1989 final completion dates -- the added payments for restoration work had no relationship to the interim completion dates to which M/P failed to apply its best efforts or with its obligation of diligent performance. Moreover, WMATA took the extraordinary step of funding the work performed by Fort Myer at the subcontractor's rate as that work was actually performed. Thus, as the record reflects, M/P's untimely performance was unrelated to Fort Myer's work given that WMATA footed the bill. For PCO 085, WMATA paid direct costs then estimated at less than $25,000, covering the out-of-pocket cost. The bulk of the hypothetical claim at retrial for $685,000 purported to be for extended overhead based on the assertion that this change would have delayed final completion of the Shaw Station contract. The job records reveal that M/P personnel admitted such delay was due to their own error. Thus, M/P's failure to perform was unrelated to this issue as well. In any event, even had M/P proven any of these hypothetical claims for future payments, they would not justify M/P's existing defaults in performance at the time of termination.[117]

_____

[117] Further, WMATA cannot be blamed for the fact that no final modifications were issued on these issues, which surely does not signal bad faith given its efforts to perpetuate unjustified funding to M/P. M/P's proposals were found to be grossly inflated. The Court finds no indication that once a proper price could be determined, the WMATA Board would have declined to issue modifications to cover any work that was to be performed.

M/P also claims that it was entitled to schedule extensions for claims arising after the August 1989 Agreement.  However, these claims are without merit given that the asserted changes were known prior to the agreement, which did not identify them as conditions to M/P's schedule commitment in any event.  M/P knew of the requirements for extended restoration and gutters, as well as its sewer conflict that led to PCO 085, when it consented to the achievable schedule.  Not only did the August 1989 Agreement not identify a transition chamber as a condition to the schedule, M/P never submitted a proposed plan for such a transition mechanism and none was ever disapproved.  Indeed, as WMATA properly concluded, the PCO 085 proposal warranted rejection because the problem -- which was M/P's fault in the first place -- was not producing delay as work largely could proceed.  Finally, even if PCO 085 had merit as a delay, it did not amount to the entire 22 months of delay projected by WMATA.  In any event, even if any of these schedule extensions could be quantified or sustained, they would be irrelevant to the defaults that existed in the months prior to termination or to M/P's conditions on remobilizing and diligent performance given that the default of the interim completion dates were unrelated to these asserted delays in surface restoration work.

Finally, M/P continued its attempts from the first trial to show that the Contracting Officer abused his discretion when he terminated the contracts for default.  However, the Court finds that Mr. McElhenny acted in good faith.  Given that the record makes clear that M/P's default termination was not pretextual and that its performance was consistently faulty and delayed, there is no violation of the standard default clause as applied to the issue of bad faith or pretext.  McDonnell Douglas Corp., 182 F.3d at 1326.  Mr. McElhenny could heave reasonably concluded that termination was warranted given M/P's performance, the state of the job sites,

and the apparent intractability of M/P's position regarding more payments.  Indeed, M/P clearly

spurned explicit requests to provide adequate assurances, instead placing impermissible

conditions on diligence performance.  While M/P complains that the Contracting Officer failed to

consider various matters bearing on settlement (including the Nielsen-Wurster report)[118] and

certain statutory factors,[119] the Court finds that Mr. McElhenny was justified in basing his

decision on the clear pattern of poor performance and the obvious work stoppage.  See

Revercomb Op. at *118-19.

## II.  M/P's Claims

There is no dispute that, regardless of the default termination, M/P is entitled to a credit

for work performed on the contracts prior to termination, including extra work for which M/P

was seeking an equitable adjustment at the time of termination.  Accordingly, the Contracting

Officer decided all pending claims and awarded M/P delay costs and other various sums on its

claims.  E.g., Def. Exs. 1362, 1363, 1566.  To obtain additional amounts on its claims, M/P must

show the merit of those claims and its entitlement to receive more than the already awarded

amounts.  During the term of the contracts, WMATA paid or advanced to M/P $7.2 million

against various claims and PCOs, including $4.2 million against CPN 139 for the Shaw Station

---

[118]   The Court finds that this report was itself flawed given its failure to consider all necessary information to verify claims and lack of objective analysis of the facts.  Tr. 11/27/1991, at 67-69, 77-78.  In any event, despite being largely irrelevant to the issue of termination given its failure to address M/P's myriad breaches discussed above, the report was still considered by WMATA as termination was being weighed.  Pl. Ex. 678, at 17, 20, 24.

[119]   M/P argues that the Contracting Officer should have considered various factors suggested by the Federal Acquisition Regulations; however, as set forth above, this regulation "does not confer rights on the defaulting contractor."  DCX, Inc., 79 F.3d at 135 (Fed. Cir. 1996).

job and $401,000 against PCO 001 for the U Street Station job.[120]  The Court must determine whether M/P is entitled to retain these payments and advances, or whether WMATA is entitled to recoup some of these amounts.  If M/P can show that it is entitled to keep what it was paid/advanced, it must then demonstrate entitlement to any additional damages beyond the $7.2 million already paid.  Revercomb Op. at *123.  In addition, M/P claims that WMATA breached the contracts by its unreasonable delay and bad faith in processing M/P's claims, entitling M/P to interest on the payments.

Given the exclusion of exhibits reflecting M/P's new damage claims,[121] the Court turns to the evidence relating to M/P's total cost claims from the first trial.  At that trial, M/P presented total cost claims to recover additional damages, seeking recovery of the entire difference between its estimated costs and actual costs for the contract work.  Pl. Ex. 742, at 3.  Judge Revercomb rejected this approach in light of M/P's mismanagement and inefficiencies which caused most of the cost overruns.  Revercomb Op. at *94, 123.  The Court has conducted a second and independent review of M/P's claims, which were fraught with inadequate documentation as described above.  The burden of proof for these claims lies with M/P, and the Court again finds that M/P has failed to meet this burden.

---

[120] Def. Exs. 1981A, 1982A.  Such payments are not evidence that those claims had merit or value, even to the extent of the amount paid or advanced by WMATA toward those claims. Further, consultant reports obtained for the purpose of promoting settlement, and based upon statements made in the course of an effort to compromise, are inadmissible to prove liability under Rule 408.  Ramada Dev. Co. v. Rauch, 644 F.2d 1097, 1106-1107 (5th Cir. 1981). However, such evidence is admissible to address issues of breach or bad faith.

[121] At retrial, M/P introduced new damage claims supported by new exhibits that identified the costs for items of work allegedly impacted by WMATA's changes, Pl. Exs. 1697a-h, but the Court sustained WMATA's objections to admitting these damages exhibits for lack of foundation and other grounds.  Retr. 10/1/2001, at 1882-84.

## A.  Burden of Proof

M/P bears the burden of establishing the fundamental facts of liability, causation, and damages for their claims, e.g., Massman Constr. Co. v. Tennessee Valley Authority, 769 F.2d 1114, 1123 (6th Cir. 1985), by a preponderance of the evidence.  Space Age Eng'g , Inc., ASBCA No. 23178, 80-2 BCA ¶ 14,703, at 72,511.  This burden cannot be satisfied with "[g]eneralized, conclusive, unsupported opinion testimony and evidence." J.E.T.S., Inc., ASBCA No. 28083, 88-2 BCA ¶ 20,540 at 103,857.  Because recoverable damages are not recoverable by a mere claim for a return of costs (even where such costs are verified), M/P must show that these costs are connected to fault by WMATA.  Id. at 103,858.

M/P also has the burden of proving its claims for upward adjustments due to alleged change order costs.  To meet this burden of proof, M/P must establish both the reasonableness of its claimed costs as well as the causal connection between those costs and the change order on which the claim is based.  Lecher Constr. Co., ASBCA No. 35543, 88-2 BCA ¶ 20,695 at 104,588.  If M/P has overstated its claim, the Court may use the Contracting Officer's determination as a basis for adjusting the contract price.  Id.

For acceleration claims, M/P must establish that any delays giving rise to the directions to accelerate were excusable, that the demanded completion date did not account for time extensions to which M/P was entitled, and that M/P did accelerate performance and incur extra costs.  E.g., Norair Eng'g Corp. v. United States, 666 F.2d 546, 548-50 (Ct. Cl. 1981).  A request to a contractor to submit a plan showing how lost time could be regained is not an acceleration order.  A. Teichert & Son, Inc., ASBCA Nos. 10265, 10804, 11444, 11580, 68-2 BCA ¶ 7175.

Further, M/P must also show that WMATA caused disruption and must establish the

extent of such disruption.  Generalized statements that it suffered an impact is not sufficient proof, and a lack of contemporaneous documents proving the disruptive effects to the work may be reason enough to reject the claim.  Bechtel Nat'l, Inc., NASA BCA No. 1186-7, 90-1 BCA ¶ 22,549 at 113,177.  Specifically, M/P must prove that inefficiencies existed in order to recover for them.  Excavation-Constr., Inc., ENG BCA No. 3851, 84-3 BCA ¶ 17,646; Robert M. Tobin, Tobin Eng'rs & Constructors, HUD BCA Nos. 79-388-C20, 79-383-C15, 84-3 BCA ¶ 17,651.  A claim of inefficiency must be proven by fact witnesses who participated in the work and can precisely describe the nature and extent of the inefficiencies.  R.W. Contracting, Inc., ASBCA No. 24627, 84-2 BCA ¶ 17,302.

Finally, with regard to unreasonable delays, M/P has the burden of proving with reasonable certainty the extent of such delay resulting from WMATA's actions.  M/P also must provide a basis for making a reasonably correct approximation of the damages resulting from the government's actions.  See Massman Constr., 769 F.2d at 1123.  In addition, M/P must establish by a preponderance of the evidence both the existence of delay and the impact on final completion.  C&D Lumber, Inc., VABCA Nos. 2877, 3204, 91-1 BCA ¶ 23,544; see also William F. Klingensmith, Inc., 731 F.2d at 809.  If both parties contributed to the same delay, neither can recover damages without proof of a clear apportionment of the delay and expense attributable to each party.  Sauer, Inc., 224 F.3d at 1347.  Specifically, in such a circumstance, the contractor would need to show that the governmental entity was the sole proximate cause of the delay and that no concurrent cause would have equally delayed the contract regardless of the government's action or inaction.  Avedon Corp. v. United States, 15 Cl. Ct. 648, 653 (1988).  A lack of sufficient records to segregate costs incurred from specific causes of delay will doom the

166

claim.  Wilner Constr. Co., ASBCA No. 26621, 84-3 BCA ¶ 17,669.

## B.  Total Cost Claims

The standard for the total cost method requires proof that the contractor (1) had losses of a nature that were impossible or highly difficult to determine with reasonable accuracy, (2) provided a realistic bid, (3) had reasonable actual costs, and (4) cannot be held responsible for the added expenses.  WRB Corp. v. United States, 183 Ct. Cl. 409, 426 (1968); see also Servidone Constr. Corp. v. United States, 931 F.2d 860, 861-62 (Fed. Cir. 1991).[122]  In assessing whether a contractor has met this burden, a court should dismiss the applicability of the total cost basis if the contractor has failed to maintain or sort documentation in a manner that segregates the costs of change orders or otherwise identifies specific costs attributable to a change.  See Tele-Sentry Sec., Inc., GSBCA No. 10945(7703)-REIN, 91-2 BCA ¶ 23,880, aff'd, 950 F.2d 730 (Fed. Cir. 1991) (Table); Corban Indus., Inc. v. United States, 24 Cl. Ct. 284, 288 (1991).  In

---

[122] M/P argues that it has not relied on the "total cost approach."  M/P Reply Br. at 21-22 (e.g., claiming it asserts a "modified total cost method").  To the extent that it has attempted to "detail[] the actual additional costs it incurred because of the changes, problems and conditions for which WMATA is responsible," id., the Court has dealt with these claimed costs throughout this opinion.  However, the Court finds that the bulk of M/P's claimed damages must meet the four criteria of total cost claims regardless of the nomenclature.  Indeed, M/P has focused much of its post-trial arguments for its claims attempting to satisfy this criteria.  M/P Br. at 35-39.

M/P also reaches for the "jury verdict approach" in the alternative to its total cost claims; however, the threshold matter of any damages calculations approach still must be whether M/P is entitled to such damages.  As the record clearly shows, M/P has not established that WMATA is responsible for its injuries given the effects of the Perini divorce, M/P's mismanagement of funds, and other problems solely attributable to M/P.  Further, this method "may be appropriate when damages cannot be ascertained by any reasonable computation from actual figures."  Northrop Grumman Corp. v. United States, 47 Fed. Cl. 20, 97-98 (2000) (citation to internal quotation omitted).  Thus, the "jury verdict" approach shares a common requirement with the total cost method: damages that are difficult to ascertain.  Compare id., with WRB Corp., 183 Ct. Cl. at 426 (1968).  As such, even if M/P could show injury caused by WMATA, it cannot satisfy this important criteria as seen in this Court's evaluation of the total cost claim.

addition, the contractor must have retained records reflecting the amount of additional work and must show that these claimed costs are realistic.  <u>Michael, Inc.</u>, ASBCA No. 35653, 92-1 BCA ¶ 24,412.

The total cost approach is appropriate only when the costs claimed were all directly related to a single changed condition or change and where the government entity is clearly responsible for the damages.  <u>Moorhead Constr. Co. v. City of Grand Forks</u>, 508 F.2d 1008, 1015 (8th Cir. 1975); <u>Servidone Constr. Corp. v. United States</u>, 19 Cl. Ct. 346, 386 (1990), <u>aff'd</u>, 931 F.2d 860 (Fed. Cir. 1991).[123]  Accordingly, a contractor must show that the governmental entity was responsible for the excess costs in question while eliminating its own inefficiencies from its claim.  <u>E.g.</u>, <u>Gaffny Corp.</u>, ASBCA No. 36497, 91-2 BCA ¶ 23,811.

### 1.  Shaw Station Total Cost Claim

At the first trial, M/P based its Shaw Station total cost claims on the March 30, 1990 total cost claim submitted to the WMATA Contracting Officer.  Pl. Ex. 506, at 1, 129.  M/P sought recovery of $6,958,660 for CPN 002, which was based upon the CPN 002 component of M/P's March 30, 1990 claim.  Def. Ex. 1532, at 4.  For CPN 139, M/P claimed  $5,824,800.  Pl. Ex. 742, at 5.  WMATA's Contracting Officer determined that M/P was entitled only to $187,385 for CPN 002 (not counting whatever credit was due from the 7th Street closure), Pl. Ex. 682, at 16, and to $3,823,147 for CPN 139.  Pl. Ex. 679, at 21.

M/P's total cost claims for the Shaw Station job meet none of the requisite criteria.

---

[123] "The contractor must prove that nothing other than the matter for which the Government was responsible caused the increase in cost.  It is probably this requirement which is most difficult for the contractor to overcome."  John Cibinic, Jr. and Ralph C. Nash, <u>Administration of Government Contracts</u> 518 (2d ed. 1986).

Regarding the first element, M/P failed to show that the discrete impacts of CPN 002 could not

be quantified with reasonable precision.  Indeed, its contemporaneous claim attempted to do so,

and was prepared by project personnel responsible for the work.  Further, both WMATA and

M/P displayed that quantifying CPN 002's impact was possible, as seen by the Contracting

Officer's determination, the alternative calculations by its expert James J. O'Brien, and the

coding of M/P documents.[124]

M/P also fails the second element.  The Court has noted above that M/P's bid for the

Shaw Station job was not realistic in several respects, including failing to fully account for

warnings of unstable soil conditions in the North Tunnel that would require extra stabilization

efforts.  The Court agrees with Mr. O'Brien's assessment that M/P's "bid was too low in some

points." Tr. 1/22/1992, at 15.  Indeed, M/P's Mr. Diehl admitted that certain installation costs

for the Shaw Station elevator had been left out of the bid, forcing it to "find money" from other

activities to perform that work.  Tr. 12/17/1991, at 35.

Regarding the third element, M/P has not proven the reasonableness of its costs.  As a

threshold matter, its claims suffer from a lack of supporting documentation.[125]  Indeed, as the

---

[124] Mr. O'Brien testified that the costs associated with CPN 002 could be isolated to the
utility, maintenance of traffic, and other related work under Rhode Island Avenue.  By
identifying affected cost codes and the period of time when the traffic patterns on the street were
affecting the underground work, M/P could be able to isolate the alleged specific cost impact of
the change.  Tr. 1/22/1992, at 10-11.  Similarly, M/P's own November 20, 1986 claim isolated
specific utility-related costs that were allegedly affected by the more limited work space created
by the Rhode Island Avenue traffic change.  Def. Ex. 240.  Further, M/P did establish separate
costs accounts, coded as "997," to capture extra labor costs associated with CPN 002 and other
changes, Retr. 9/24/2001, at 978, and at one point submitted a claim stating the "true cost" and
"total cost" of the traffic change.  Def. Ex. 1058, at 1.

[125] M/P leans heavily on the memorandum of Mr. Egbert to the WMATA Board (dated
February 14, 1990) for support; however, this communication in aid of settlement cannot be used

Court has described, Mergentime's failed cost accounting and projections, related party transactions, inadequate records and support for claimed costs, overstatement of costs, and other problems show that M/P's cost records are highly unreliable.

Further, M/P bases its total cost claim for CPN 002 on a "ripple effect" theory whereby the traffic plan problems affected work activities beyond the immediate area of Rhode Island Avenue and 7th Street, impacting later activities such as station excavation and station concrete. M/P alleges that WMATA's failure to grant a time extension for the CPN 002 delays forced M/P to accelerate and resequence follow-on activities and defer other activities, resulting in added cost, delay, and inefficiency.  Specifically, M/P maintains that CPN 002 delayed the project by some 100 days by delaying excavation in the area of Rhode Island Avenue, which in turn delayed the mobilization of the TBM and the start of excavation of the South Tunnels.  For these allegedly impacted items of work, M/P claimed the entire difference between its estimated and actual costs, with no allowance for its own documented inefficiencies.  Tr. 12/12/1991, at 139-40.  On this basis, M/P claimed $5,225,473 in direct costs, calculated on a "modified" total cost basis.  Tr. 11/4/1991, at 19-21.  However, the Court finds that the traffic plan snafu did not have the sweeping impact envisioned by M/P.[126]  Rather than impacting station excavation and station concrete operations throughout the entire project, the effect was substantially mitigated and ended by November 1986.  As described above, WMATA mitigated the impact of the Rhode

─────────────────

to prove the merits of M/P's claims under Federal Rule of Evidence 408.

[126] Thus, M/P's assertion that WMATA should have disclosed its knowledge of the DPW's likely disapproval of the proposed traffic detour and other plans, though correct, is immaterial given the lack of impact of the changes (and the other problems with the total cost claim described herein).

Island traffic change with, among other things, a plan that squeezed four lanes of traffic into what previously had been three lanes.  M/P was also not required to perform any more major traffic switches than required under the original contract.  Further, the impact was also virtually offset by the 7th Street closure, the benefits of which M/P failed to account for in its total cost claim.[127] M/P's total cost claim fails to take into account any of these limitations upon its recovery.

In addition, M/P failed to segregate the impacts from CPN 005, which was a value engineering change requested by M/P.  However, the Court has found that CPN 005 (i.e., M/P's proposal to realign utilities under R Street) was the controlling delay to the project -- a fact that is a sufficient basis to deny the CPN 002 claim.  Given that the critical path ran through the excavation under R Street, CPN 005's many months of delay caused a longer overall delay than the traffic plans change.  Thus, as described above in the Findings of Fact, the delay caused by the Rhode Island Avenue traffic plan change was thus concurrent with the CPN 005 delay resulting from M/P's own proposed realignment of the R Street utilities.[128]

For CPN 139, M/P seeks to charge WMATA for direct costs, as well as delay and

---

[127]  M/P's witness Mr. Goedjen offered an explanation, but the Court finds his rationale unpersuasive.  First, contrary to his testimony, the 7th Street closure and the Rhode Island Avenue change were clearly related.  Second, this contention that M/P obtained the closure through its own efforts is contradicted by the records showing WMATA requesting the closure in return for disallowing the use of Q Street.  Def. Ex. 56, at 2.  Finally, the benefits from the closure were significant given that activities were on the critical path, saved significant costs and time, and improved job safety.  E.g., Retr. 9/19/2001, at 664-65.  M/P offered no real evidence as to the value of those benefits, and the Court adopts the only substantive evidence in the record as to such value, the detailed and unrebutted assessment of WMATA's estimating staff showing an estimated savings of $912,379 for M/P.  Def. Ex. 1394A, at 199.

[128]  As an alternative basis for explaining away the effect of CPN 005, M/P argued at the first trial that CPN 005 was necessary to correct a design conflict for which WMATA is responsible.  As described above, this contention is contradicted by the evidence.

inefficiency costs, allegedly resulting from grouting performed in the Shaw Station North

Tunnels.  The parties dispute the scope of grouting performed compared with the grouting

actually directed by WMATA, the extra costs M/P incurred as a result of the directed grouting,

the delays in performing the North Tunnel excavation, and the responsibility for those delays.

Much of the facts necessary to decide this claim has been stated above.  M/P had an obligation to

support the ground, thus making its attempt to hold WMATA responsible for the failure to

support the soil while tunneling misplaced.  Further, the soil situation at issue was not a differing

site condition, as M/P was aware of the soil conditions in the North Tunnel area and the potential

need for grouting.  The scope of the directed grouting is described above, and M/P clearly caused

most of the delays on the North Tunnel drive -- though it has not reduced its claim by the delays

and costs that it caused.  While M/P claims critical setbacks in the tunneling of 113 calendar days

due to grouting, dewatering, and boulders, M/P's calculation did not account for equipment

breakdown or repair, the decision to turn the TBM around in the crossover between the Shaw and

U Street Stations, and other decisions and issues for which M/P is responsible.

For the fourth element of the total cost claim criteria, M/P has not shown that its claimed

cost overruns were caused by WMATA changes rather than by its own well-documented

mismanagement and inefficiencies, including poor performance and turnover by subcontractors,

equipment shortages and breakdowns, safety violations, lack of quality control and need for

costly rework, and manpower cutbacks and resulting schedule slippages.  Indeed, these

performance deficiencies likely place the responsibility for most of the cost overruns on M/P.

Regarding its resequencing and acceleration claims, the Court finds that M/P has failed

to meets it burdens here as well.  For the resequencing claim, major changes in sequence

occurred after November 1986 in south and north tunneling operations, as well as the station invert and arch pours.  However, as described above, these changes were in large part at M/P's election and for its own benefit.  Similarly, there is no basis for M/P's acceleration claim either.  First, M/P has not proven any meaningful excusable delays, given the hundreds of days of delay that accumulated from 1987 to 1989 due to M/P's own performance flaws.  Second, M/P's accusations that WMATA "accelerated" the Shaw Station work by failing to grant timely extensions for CPN 002 lack merit.  While M/P points to letters from WMATA requesting a plan for making up lost time, such a request by itself plainly does not constitute acceleration.  A. Teichert & Son, Inc., 68-2 BCA ¶ 7175.  In any event, M/P did not provide such a plan or even accelerate its performance.  The long delays belie the claim that acceleration occurred, and M/P's use of multiple shifts was both planned and unrelated to its higher than expected costs.

### 2.  U Street Station Total Cost Claim

M/P's comprehensive proposal on PCO 001 and other U Street Station utility issues claimed that 462 of the 521 days that M/P was behind schedule as of July 31, 1989 were compensable and thus chargeable to WMATA.  In addition, M/P claims that 57 days of delay that were non-compensable still entitled it to a time extension, and two days represented a bilateral time extension agreed to by the parties.  Tr. 12/12/1991, at 156-59, 160, 162.  Notably, the 57 days of non-compensable time extension represents time lost due to M/P's crane accident, which the Court has deemed attributable to M/P only.  Id.  In its financial impact claim dated March 13, 1991, M/P claimed damages up to July 31, 1989 of $14,885,332.  Def. Ex. 1448, at 159.  In a revised damage analysis provided in May 1991, M/P revised its claim relating to the 1986 utility changes to $10,253,472.  Def. Ex. 1451, at 30.

Like its Shaw Station job claim, M/P's comprehensive claim for the U Street Station project also was calculated on a total cost basis. Def. Ex. 1451, at 2-3; Tr. 12/12/1991, at 167-73. In calculating its damages, M/P determined the percent complete of each item of work as of July 31, 1989, and then applied that percentage completion to M/P's budgeted costs for that item of work. After making adjustments for permanent materials, M/P took the difference between its actual costs for the work item and its budgeted cost, without making any adjustment for M/P's inefficiencies. Id. After making adjustments for such items as the overrun on permanent material (not affected by the changes), the total net impact to M/P from the WMATA changes was calculated at $6,324,324. After adding extended performance costs for the alleged 462 days of compensable delay, home office general and administrative expenses, and profit, the total of the claim was $10,253,472. Def. Ex. 1451, at 24-30; Pl. Ex. 742, at 5.

However, like its Shaw Station claim, M/P again does not meet the requirements for recovering on a total cost basis. First, the changes at issue only had a discrete impact over a discrete period of time on identifiable areas of the job. With respect to the early utility-related changes at U Street Station, the impact of the principal utility change, PCO 001, occurred in 1986 and ended when the first slurry panel was poured in the second week in January 1987. In contrast to the more than $10 million total cost claim that M/P presented at the first trial regarding 1986 utility changes, M/P's August 1989 claim identified extra costs associated with these changes of $843,400. Through WMATA's analysis of the cost impact of PCO 001, WMATA issued Part I Modifications totaling $401,000. Thus, it was not impracticable to price the specific impact of the changes. Indeed, the direct costs of the changes were often settled for relatively modest amounts.

174

Second, M/P's bid for the U Street Station project was problematic.  For example, Mr. Dean, who served as M/P's chief estimator, admitted that the U Street Station bid was reduced by $300,000 based on the planned use of the concrete traveler forms being used on the adjacent Shaw Station project, a risky assumption because if these materials were not available, the new forms would have to be purchased.  Def. Ex. 1969, at 164-66.

Further, M/P has failed to establish its claim as reasonable.  Not only does M/P again suffer from unreliable cost records, its total cost claim for U Street Station is based on the same flawed theory that doomed its Shaw Station claim -- a theory that virtually every work activity on this project was impacted by the early utility changes, leading to resequencing and acceleration of the follow-on activities.  First, no such "ripple effect" even occurred.  WMATA's schedule analysis, which was based on contemporaneous job records, displayed that PCO 001 and other utility-related changes in 1986 delayed the start of slurry wall work by (at most) 80 calendar days.  Retr. 10/15/2001, at 2584-85.  Thus, the remainder of delays between January 1987 and the original contract completion date of August 2, 1989 were within M/P's control.  Indeed, given that these delays were due to insufficient manpower, inadequate equipment, and the other problems chronicled above that were attributable to M/P, it also cannot demonstrate that its cost overruns were caused by WMATA's changes rather than its own actions.

Also, there is no basis for M/P's claims of subsequent resequencing or acceleration. M/P could only identify departures from the planned sequence of work in two respects, neither of which was requested or mandated by WMATA.  The only significant departure from the planned sequence of work resulted from M/P's decision to pour the two eastern most inverts at the crossover between Shaw and U Street Stations for its own convenience.  Also, the alleged

175

acceleration claim lacks merit.  M/P contends that WMATA's requests beginning in 1987 to make up lost time amounted to an acceleration of the work given M/P's entitlement to time extensions.  Like its acceleration claim for the Shaw Station project, M/P has failed on its burden of proving the elements of acceleration.  First, there was no proof of excusable delay.  Second, there were no real directives to accelerate given that WMATA's request merely sought M/P's plans to make up lost time caused by faulty work and to improve the logic of the proposed schedule .  Further, M/P was not entitled to the time extensions it sought given that its performance was "dictated by corporate constraints on manpower and equipment."  Def. Ex. 817. In any event, rather than accelerate, M/P continued with its consistent schedule slippage, even decelerating activities with a reduced workforce through 1988 and 1989.[129]

Further, the U Street Station shift work was set for M/P's convenience, meaning that M/P's contention that it was forced to increase the number of shifts it worked is not supported in the record.  The Court concurs with the testimony of WMATA expert James O'Brien, who noted that shift work and extended overtime is usual in the heavy construction industry.  Indeed, shift work is not more costly (as M/P contends), as it is used for cost efficiency.  Retr. 10/18/2001, at 3005-07.  Thus, the shift work did not constitute acceleration by WMATA as it (1) was not initiated at WMATA's direction and (2) is not considered an acceleration in any event.

----

[129] The Court disagrees with M/P's contention that WMATA engaged in "schedule manipulation" and that the approved CPM Schedule and updates became useless for planning or managing the work, Tr. 10/30/1991, at 183-86, especially given that M/P continued to submit schedule updates and narratives measuring schedule slippage against the approved CPM.  Retr. 10/12/2001, at 2450.  The approved CPM schedule always reflected the project status, but the problem was M/P's failure to prosecute the critical work.  Id. at 2445-46, 2450.

176

### 3. Measurement of M/P's Damages

In the first trial, M/P claimed damages on this total cost basis, asserting entitlement to the entire difference between its total costs on the Shaw Station and U Street Station contracts and the payments received from WMATA. On this basis, M/P claimed damages of $23,010,393 for the Shaw Station project and $22,339,223 for the U Street Station project, for a total of $45,349,617. Pl. Ex. 742, at 3. However, given that M/P has failed to satisfy the required elements of a total cost claim as chronicled above, the Court cannot use this method as the basis of determining M/P's damages.

Thus, because M/P has presented only unsupportable total cost claims and now-excluded damages exhibits, the only evidence of record regarding the value of M/P's claims is the final decisions of WMATA's Contracting Officer and analysis of WMATA's experts. Aside from being the only available evidence, the Court finds much of these determinations credible and adopts them as described below.

First, regarding the CPN 002 claim at the Shaw Station job, the final decision of the Contracting Officer accepted WMATA's alternative analysis of CPN 002 and thus determined that Mergentime was entitled to a 40-day compensable time extension. Def. Ex. 1363, at 16. Based upon this decision, the amount owed by WMATA to Mergentime for CPN 002 is $187,385. However, a WMATA report evaluated the cost impact as $744,000, and found no entitlement to compensable time because CPN 005 was the controlling delay to the start of the South Tunnel excavation. Tr. 1/21/1992, at 150; Tr. 1/22/1992, at 10-11. The Court adopts the analysis in the report, and finds that M/P is owed this $744,000.

For CPN 139, the Contracting Officer found M/P entitled to a 57-calendar day

compensable time extension for the North Tunnel grouting.  Def. Ex. 1362, at 19, 21.  Based on

WMATA audit reports, he identified the various costs associated with the North Tunnel grouting

program.  Retr. 10/24/2001, at 3341-43.  After adjusting the amounts by deleting an unjustified

M/P claim for dewatering and deducting the credit of $200,000 under the cost-sharing agreement,

he concluded that M/P was due $3,823,147 for CPN 139.  Def. Ex. 1965; Retr. 10/24/2001, at

3343-45.  Under modifications issued both before and after August 25, 1989, WMATA has paid

Mergentime $4,236,937.  Def. Ex. 1964.  Thus, the Court finds that WMATA is entitled to a

credit for CPN 139 of $413,790.  Def. Ex. 1981A; Retr. 10/24/2001, at 3345.

For the U Street Station utility changes, the Court has found no basis for M/P's claim of

extensive impacts of the 1986 utility changes on broad categories of work under the U Street

Contract.  WMATA determined that the direct costs associated with PCO 001 and extended

overhead for 59 days of compensable delay totaled $401,000.  Retr. 10/11/2001, at 2368-72.

That amount has been paid, even though M/P did not complete certain portions of the work prior

to termination.  Def. Ex. 1566.  The Court agrees with the Contracting Officer's final decision

that M/P owes WMATA a credit for this uncompleted work of $29,768.

### 4.  Breach of Contract Claims

M/P also argues that WMATA breached the contracts.[130]  First, M/P claims that

WMATA breached its duty to promptly process the outstanding claims.  While this Circuit has

found that an "unreasonable delay by WMATA's Contracting Officer in processing claims for

---

[130]  While Judge Revercomb previously held that M/P had waived its right to claim breach of contract pursuant to the August 1989 Agreement, the Court of Appeals determined that M/P had not done so "because in the August 1989 agreement the contractors waived only their right to terminate performance because of the alleged breach, not their right to sue for breach." Mergentime Corp., 166 F.3d at 1264.

extra work constitute[s] a breach of contract," <u>Granite-Groves v. WMATA</u>, 845 F.2d 330, 342 (D.C. Cir. 1988), the record here does not reveal such unreasonable delay.  Rather, the lengths of time for reviewing the claims were reasonable given M/P's inadequately documented or supported claims, its frequent revisions and updates, and refusal to account for offsetting credits and benefits.[131]

M/P also claims that WMATA's failure to disclose the DPW's opposition to the original Shaw Station project traffic plans was a breach of its legal duty to disclose to contract bidders information vital to the preparation of estimates for contract performance.  The Court does not agree with WMATA that it was without fault in this omission; however, this failure to disclose ultimately does not give rise to a breach of contract given that the effect was only an adjustment of work (<u>i.e.</u>, a constructive change) that could potentially be accounted for through an equitable adjustment under the contract.  Indeed, the contracts allowed WMATA to impose unilateral changes on M/P.  Anyway, M/P's own behavior was a concurrent cause of any delays arising from the traffic changes (<u>e.g.</u>, its proposal to realign utilities), the effect of which were largely mitigated by WMATA's assistance and the 7th Street closure.[132]

---

[131] To the extent M/P argues that WMATA had an obligation to grant extensions and funds even before M/P had made or properly supported a claim, the Court disagrees.  Though M/P highlighted the definition of "claim" in WMATA's Management Memorandum 707 as "any written demand . . . for money and/or time . . . even if the amount of money or time requested is unstated," M/P Br. at 24 (quoting Def. Ex. 6, at 9), this document makes clear that any "claim" lacking sufficient detail should lead WMATA to "require a Contractor proposal with a suitably itemized price breakdown and/or time extension."  Def. Ex. 6, at 75.  The contracts require contractor proposals to include price and time breakdowns and justifications.  Def. Ex. 1, at 18.

[132] M/P concedes that prejudgment interest is available only for claims for breach of contract.  M/P Br. at 41; <u>see also</u> <u>WMATA v. Nello L. Teer Co.</u>, 618 A.2d 128, 131 (D.C. 1992).  Given that there is no breach of contract, M/P is not entitled to recover prejudgment interest.

In any event, disputes arising over the scope of work do not give rise to breach claims given that the contracts provide the potential for relief (in the form of an equitable adjustment) for fact patterns that "would more likely be placed under theories of implied contract or breach of contract" at common law. Cibinic and Nash, Administration of Government Contracts 320-21 (2d ed. 1986); Johnson & Son Erectors, ASBCA No. 24,564, 81-1 BCA ¶ 15,082 at 74,599. As such, what would otherwise be claims of contractual breach are converted into claims for equitable adjustment compensable under the contract. Johnson & Sons Erectors Co., 231 Ct. Cl. 753, 757-58 (1982). Illustration of such constructive changes are claims involving withholding of superior knowledge, failure to cooperate, and impossibility. See, e.g., Chemical Technology, Inc. v. United States, 645 F.2d 934 (Ct. Cl. 1981); S.A. Healy Co. v. United States, 576 F.2d 299 (Ct. Cl. 1978); L.W. Foster Sportswear Co. v. United States, 405 F.2d 1285 (Ct. Cl. 1969). Further, this doctrine encompasses the contractor's duty of continued performance. E.g., Johnson & Sons Erectors, 231 Ct. Cl. at 757 ("One major purpose is to keep the work going at all events, despite controversies that may arise").

### III. WMATA's Claims

The Court finds that WMATA is entitled to much of the damages it seeks under the contracts. To summarize the following discussion, WMATA suffered excess reprocurement costs totaling $8,093,548 for Shaw Station and $8,356,620 for U Street Station (for a total of $16,450,168), credits for unperformed work and overpayments amounting to $3,259,034 for Shaw Station and $148,972 for U Street Station ($3,408,006 in total), credits for other items equaling $1,163,835, and damages to system-wide contractors of $234,815. The grand total of

WMATA damages is $21,256,824,[133] plus prejudgment interest on its damages at the statutory rate.

## A. Excess Reprocurement Costs

Under the Contracts' Default clause, if the terminations for default are upheld, WMATA would be entitled to recover "any increased costs occasioned . . . in completing the work." Def. Ex. 1, at 7. To recover excess reprocurement costs, WMATA must show that the reprocured services are the same as or similar to those involved in the termination, that it actually incurred excess costs, and that it acted reasonably to minimize the excess costs resulting from the default. E.g., Astro-Space Labs., Inc. v. United States, 470 F.2d 1003, 1017-18 (Ct. Cl. 1972). Once WMATA has made this prima facie showing, the claimed amount would be sustained unless M/P shows that the amount was excessive or unreasonable. Systems Eng'g Corp., ASBCA No. 11349, 69-2 BCA ¶ 8018.

After the termination for default, WMATA entered into the Perini Contract for completion of the work for both stations. For the Shaw Station contract, excess reprocurement costs were calculated by taking the most recent pay estimate on the Perini Contract and isolating those costs paid to Perini that related to the scope of work under the M/P contracts (i.e., the "back-chargeable" amounts). E.g., Retr. 10/24/2001, at 3310-36. This methodology revealed that $10,716,746 in costs were paid to Perini for the Shaw Station base contract work.[134] The

_____

[133] Any damages awarded to M/P are accounted for in this grand total as a set-off. Def. Ex. 1981A, at 1-2; Def. Ex. 1982A, at 1-2. The Court further notes that its citation to Def. Ex. 1981A assumes an adjustment in the amount of $556,615 to account for the fact that the Court awarded M/P $744,000 for CPN 002, not $187,385.

[134] Def. Ex. 1963A, at 3. In calculating the base contract amount, the amounts paid by WMATA to Perini for contract modifications issued after termination, which totaled $1,506,970,

remaining contract balance for the Shaw Station Contract at the time of termination, based upon the final pay estimate to M/P, was $2,724,160, Def. Ex. 1961; Retr. 10/24/2001, at 3337-39. Thus, the amount recoverable by WMATA in excess cost of reprocurement pursuant to General Provision 5 of the Shaw contract is $8,093,548. Def. Ex. 1981A; Retr. 10/24/2001, at 3339; see also Melville Energy Sys. v. United States, 33 Fed. Cl. 616, 620 (1995).

For the U Street Contract, the costs paid for base contract work under the Perini Contract were $14,022,731. Def. Ex. 1963A, at 3; Retr. 10/24/2001, at 3393-94. The remaining contract balance for U Street Station work, based upon the final pay estimate, was $5,666,111. Def. Ex. 1962; Retr. 10/24/2001, at 3395. Therefore, the amount owed to WMATA for excess costs of reprocurement under the U Street Station contract is $8,356,620. Def. Ex. 1982A; Retr. 10/24/2001, at 3395-96; see also Melville Energy Sys., 33 Fed. Cl. at 620.

Several disputed items also warrant the Court's attention, given that the base contract amounts for the work at both sites as reflected in the final pay estimate for the Perini Contract included approximately $2 million in "Disputed Items" (i.e., $1,192,435 for the Shaw Station contract and $930,561 for the U Street Station contract). Def. Ex. 1963A, at 5, 6. These items consist of work for which WMATA paid Perini, but which Perini argues was not part of the base contract[135] or disputes the method of payment. Retr. 10/24/2001, at 3327-36.

The Court agrees with the testimony of WMATA's witness Mr. Kolodne that

_____

were excluded. Thus, amounts paid to Perini for PCO 071 (extended restoration limits) and PCO 090 (concrete gutters) were excluded from the base contract amount. Id.

[135] This work includes maintenance of traffic and clean up work, location of sewer laterals from buildings along the subway route to the main sewer lines, demobilization of the M/P shop building, and remedial work to correct M/P's non-compliant work.

"everything under disputed items . . . is base contract work."  Retr. 10/24/2001, at 3336.  Indeed,

Dennis Hammond, who was Perini's witness on the reprocurement contract, admitted that

reprocurement work by Perini to remediate improperly installed items by M/P was properly part

of the base contract work.  He claimed that several items listed as "disputed" in the final pay

estimate fell within the category of remedial work, including correction of M/P's utility conflict

between a sewer line and a 30-way duct bank, corrective work for entrance granite pavers, and

remedial work on entranceway paver tiles.  Retr. 10/25/2001, at 3469-71, 3474-78.

   Further, Mr. Hammond's attempts to identify other disputed items as outside the base

contract were unsupported or not credible.  His claim that subplatform insulation became

damaged because WMATA turned off the sump pumps during the shutdown between

termination and start of the reprocurement contract, Retr. 10/25 (Hammond) 3462-63, is

contradicted by his letter stating that the cause was pressure from rising groundwater that leaked

into the station.  Id. at 3473.  Further, he confessed a lack of knowledge about whether the water

damage had occurred before the termination.  Id. at 3472-73.

   M/P also attempts to reduce back-chargeable amounts of the Perini Contract by

deducting several items that allegedly do not represent base contract work.  Pl. Ex. 1563, at 1.  In

addition to contract modifications and disputed items, Perini deducted termination costs for Shaw

Station ($645,051) and U Street Station ($545,696), general and administrative expenses by

Perini ($1,408,900), "Perini General Conditions" ($2,637,501), and additional costs from

subcontractors ($782,000).  However, though Mr. Hammond asserted that extra termination costs

were incurred by Perini because the contract was terminated and the projects were shut down

before Perini resumed work, he admitted that these costs arose because of termination and restart.

Retr. 10/25/2001, at 3485-86.  In addition, despite claimed additional subcontractors costs for premiums to induce subcontractors to resume working after the termination (allegedly needed in light of WMATA's bad treatment of subcontractors as a result of not processing change orders that included subcontractor work), Mr. Hammond had no personal knowledge about such disgruntlement and admitted hearing that subcontractors had threatened and caused work stoppage due to M/P's failure to make routine payments.  Id. at 3482-83.  Also, he could not explain the $4 million deduction for "General & Administrative" expenses and "General Conditions" from the base contract amount, admitting that these costs came from the "legal staff," while conceding that these costs were properly charged to the Perini Contract in accordance with the terms of that agreement.  Id. at 3487-90.

Accordingly, the Court agrees with WMATA's contentions regarding its reprocurement costs.  WMATA is entitled to payments for completion of the projects after termination of $8,093,548 for the Shaw Station contract and $8,356,620 for the U Street contract, for a total of $16,450,168.

## B.  Liquidated Damages

The Court has found that WMATA's role in the delays and other problems for the projects did not give rise to contractual breaches or a level of responsibility for which M/P can be compensated, given the multiple ways M/P itself contributed to the outcome.  However, as the Court has noted, WMATA did make some problematic decisions, including its failure to warn M/P of the DPW's position on the traffic plans.  This conduct, while not giving rise to liability, does vitiate WMATA's claim for liquidated damages.  When delays are occasioned by the mutual fault of the parties, the court will refuse to enforce the provision for liquidated damages.

E.g., United States v. Kanter, 137 F.2d 828, 830 (8th Cir. 1943); see also Wilner v. United States, 26 Cl. Ct. 260, 263 (1992) (citing Klingensmith, 731 F.2d at 809); Revercomb Op. at *122.

### C.  Credits for Unperformed Work and Overpayments

The contracts entitle WMATA to reduce the contract price for work that is deleted or not performed.  Based upon the Contracting Officer's final decisions on M/P's claims and WMATA's credit claims, WMATA is owed credits on the Shaw Station Contract of $3,815,649 for unperformed or incomplete work and other overpayments to M/P.  Def. Ex. 1981A, at 1-2.

Among the credits sought, WMATA claims entitlement to a repayment of $1.6 million for an advance to M/P for Part I modifications issued against M/P's CPN 002 and CPN 139 claims in February and March 1990.  These modifications were issued to compensate M/P for impacts on unchanged work stemming from the events associated with CPNs 002 and 139, and were expressly conditioned on M/P providing and identifying current and accurate cost and pricing supporting data for all payment made for the claims and change orders under the Shaw Station contract.  Retr. 10/24/2001, at 3346-47.  Further, the parties agreed to the tentative nature of these advances, and that a Part II modification would be subsequently issued for final settlement of the equitable adjustment to the contract.

The Court agrees with the final decision of the Contracting Officer on CPN 139:  M/P never justified entitlement to this $1.6 million.  Def. Ex. 1362, at 19.  Mr. Egbert told the WMATA Board of "the dilemma which [WMATA] face[s] trying to proceed in advance of more conclusive submissions promised by [M/P]."  Def. Ex. 1203, at 4.  As Mr. Egbert testified, M/P was never able to provide justification for the $1.6 million advance payments.  Retr. 10/17/2001, at 2822-25.  Similarly, in December 1999, WMATA paid Mergentime a $1 million advance

185

payment, Def. Ex. 1957, to facilitate the schedule they had set forth in the August 1989 Agreement.  Def. Ex. 1110, at 1.  As the Contracting Officer ultimately found, M/P's failure to substantiate its claims warranted the return of this $1 million as well.  Def. Ex. 1362, at 19; Retr. 10/24/2001, at 3372-74.

WMATA is also owed a credit of $912,397 for the benefits that M/P received as a result of WMATA allowing full closure of 7th Street during the performance of the Shaw Station work. Def. Ex. 1394A, at 1; Retr. 10/24 (Kolodne) 3360-63.  While M/P has conceded that this closure increased efficiency for some operations, it never submitted a proposed quantity for the value of the closure.  WMATA has  quantified the cost savings associated with the closure, set forth in its Findings of Fact and an exhibit as totaling $912,379.00.  Def. Ex. 1394A; Def. FOF ¶ 1087.  The largest single item involves the efficiency benefits brought by various construction activities including utility work, slurry wall construction, soldier pile installation, excavation to deck beam bottom, and backfill to subgrade.  Def. Ex. 1394A, at 199, 202.

For the U Street Station project, the Court concurs with the Contracting Officer's final decision.  As such, the Court finds that M/P owes WMATA credits totaling $148,972.  Def. Ex. 1982A, at 1-2; Retr. 10/24/2001, at 3396-99.

### D.  Other Backcharges

Various agencies "backcharged" WMATA for the cost of making corrections resulting from M/P's deficient performance on both jobs.  These backcharges are chargeable against M/P, and total $176,500 from PEPCO, Retr. 10/24/2001, at 3402-04, and $112,336 from the DPW. Def. Exs. 1681, 1719, 1722, 1724.

In addition, WMATA deleted several contractual requirements from the work M/P was

required to perform on both contracts.  M/P was allowed to perform the work at the 8th Street

fanshaft at Shaw Station without placing deck beams and deckmats over this area, for a saved

value of $73,627.  Retr. 10/24/2001, at 3404-05.  Also, WMATA deleted some landscaping

requirements from both contracts, which amounted to savings of $85,852.  Id. at 3405-06.

Further, WMATA expended $78,209 for tunnel realignment studies caused by M/P's

"out of tolerance tunneling," Def. Ex. 1004, and $23,047 for repair, relocation, and replacement

of bearing pads for the floating slabs that M/P should have remedied.  Def. Ex. 1955; see also

Retr. 10/24/2001, at 3406-08.  In addition, WMATA also paid for a review of the draft

reprocurement contract drawings and other documents prior to award of the reprocurement

contract to Perini, an effort resulting in a cost of $16,018.  Def. Ex. 1968.  These costs are

chargeable to M/P.

WMATA also incurred damages stemming from extra work for its system-wide

contractors to remedy deficient work by M/P totaling $234,815. The modifications to the contract

of the traction power substation contractor were primarily for damage to the equipment of that

contractor resulting from flooding of the traction power substation.  The Court believes that

three-quarters of the responsibility for the flooding problem lies with M/P's failure to control

infiltration of water, while a fourth of the responsibility lies with WMATA's design flaw in

waterproofing system.  Accordingly, three-forths of the damages paid to the traction power

substation contractor for water infiltration damage is chargeable to M/P.[136]

---

[136] Tr. 1/23/1992, at 11-13; Retr. 10/24/2001, at 3411-12. These extra costs were the
subject of change orders issued to the contracts for the automatic train control subcontractor,
communications subcontractor, traction power substation subcontractor, and track work
subcontractor.  WMATA made no claims for costs paid to these contractors for M/P's delays
because such costs would be duplicative of WMATA's liquidated damages claim.  The claimed

After the termination, WMATA expended over 20,000 man hours to clean up the site, installing a mile of safety fence to protect residents from the work site hazards, removing almost 350 tons of scrap steel, and removing 350 tandem dump truck loads of trash.  Def. Ex. 1390.  The cost of this effort, which is chargeable to M/P, is $598,246.  Retr. 10/24/2001, at 3413-15;

### IV.  Subcontractors Claims

M/P also is asserting claims against WMATA on behalf of its subcontractors: Truland, Thornton, and Fort Myer.  However, because none of these firms had privity of contract with WMATA, e.g., Retr. 10/2/2001, at 1826, there is no basis for their making any direct claim against WMATA.  United States v. Johnson Controls, Inc., 713 F.2d 1541, 1550-51, 1557 (Fed. Cir. 1983); James Reeves Contractor, Inc. v. United States, 31 Fed. Cl. 712, 714 (1994).  In turn, M/P has no basis for sponsoring the subcontractor's suit unless it has paid the subcontractor or remains liable to reimburse it in the future.  James Reeves Contractor, 31 Fed. Cl. at 714.  Thus, M/P could only recover for these claims if the subcontractors incurred extra costs due to changes attributable to WMATA, they made timely claims against M/P for those costs, M/P paid or agreed to be liable for those costs, and M/P initiated a claim against WMATA for this cost or liability.  The Court finds that these elements have not been met.

### A.  Fort Myer's Claims

Fort Myer's claim involves alleged damages resulting from the termination of M/P and subsequent reprocurement of the contracts with Perini.  These alleged damages resulted from being hired by Perini at prices that were lower than the subcontract that Fort Myer originally had signed with M/P.  Retr. 10/2/2001, at 1825-26.  In essence, Fort Myer complains that Perini

costs total $1,378,601.  Def. FOF ¶ 1093.

188

drove a harder bargain in negotiating for restoration work on the completion contract than M/P

had driven for the same work on the base contract.  The Court finds that WMATA cannot be held

liable for these "damages."[137]

Fort Myer's subcontract with M/P, signed in February 1990, incorporates the contractual

agreements made between M/P and WMATA, and Fort Myer agreed to be bound to both M/P

and WMATA by those terms and provisions.  Pl. Ex. 584, at 24.  Thus, Fort Myer is also bound

by the termination for default and termination for convenience clauses.  These clauses set forth

the provisions that govern the parties' rights and obligations after termination should the

contractors be determined to have not been in default.  Contractors are limited to recovery of the

cost of work performed prior to termination and a reasonable profit on such claims.  Def. Ex. 1,

at 16.  Thus, these contractual protections do not provide Fort Myer with compensation for  costs

for work performed after M/P was terminated, which make up the subcontractor's entire claim.

Retr. 10/2/2001, at 1825.

In addition, Fort Myer has previously stated in a pleading in this Court that one of its

"crucial allegations" in its litigation against M/P was that WMATA had "paid M/P for Fort

Myer's work in place to the time of termination."  Def. Ex. 2221, at 3.  Thus, if Fort Myer has a

claim for payments owed on completed work, that claim must be asserted against M/P and not

WMATA.

---

[137] As M/P conceded at the first trial, Fort Myer's claim cannot succeed if the Court
determines that WMATA properly terminated M/P for default.  Tr. 1/23/1992, at 152 ("If we
don't prevail, then you wouldn't have to hear [the subcontractor] anyway.").  Given that the
Court finds here that M/P was properly terminated, Fort Myer's claim fails for this reason.
However, even if M/P was not properly terminated, the subcontractor's claim still fails for a
variety of reasons, as discussed in this section.

Fort Myer appears to base its claim on alleged promises made by WMATA to Fort Myer regarding payment for its work.  Retr. 10/2/2001, at 1786-87.  However, these claims run contrary to Fort Myer's previous assertion in a pleading submitted in this Court in 1994.  In response to M/P's suggestions "that [Fort Myer] sue WMATA directly," Fort Myer argued that "it is clear from the meetings and the facts that there is no privity of contract between [Fort Myer] and WMATA."  Def. Ex. 2179, at 5; see also id. at 10.  Correspondence between Fort Myer and M/P and the discovery in their litigation confirm that Fort Myer held to this position.  Def. Ex. 2186, at 2; Pl. Ex. 1751 (Kerns Dep.) 62.  Indeed, a contemporaneous letter of February 14, 1990 from Fort Myer's Vice President Lewis Shrensky to Mr. Mergentime confirms that Fort Myer did not believe that WMATA had guaranteed payment for future work, as Mr. Shrensky's expresses "concern[] about the ultimate payment of future Fort Myer . . . invoices" given that "WMATA [would] not go so far as to guarantee payment to Fort Myer."  Pl. Ex. 582, at 3.

The Court agrees with Fort Myer's belief that it could not hold WMATA responsible for these losses based on unperformed work.  No written contracts or documents signed by WMATA guaranteeing rights to Fort Myer were ever created.  P. Ex. 1751, at 63-64, 84-85.  Fort Myer's subcontract was with M/P, and WMATA was not a party.  Pl. Ex. 584, at 5.  As a Fort Myer's witness explained, the relevant terms between WMATA and M/P required WMATA to fund the work in some fashion, determined that money designated for Fort Myer work would not be offset by any claims between M/P and WMATA, contemplated that the work would be based on unit prices, and required the work be installed in accordance with local government standards and specifications.  Retr. 10/2/2001, at 1778-79.  Rather than guaranteeing that Fort Myer would not be terminated or creating any standard for unperformed work, these terms focus on payments to

190

Fort Myer for work already performed.

Fort Myer claims that it learned from M/P during subcontract negotiations that WMATA had guaranteed that it would fund the restoration work at their prices, Retr. 10/2/2001, at 1780, apparently referring to the provision in the August 1989 Agreement between M/P and WMATA subjecting project completion dates to WMATA's funding of the cost of restoration work in excess of M/P's bid for that work. Def. Ex. 981, at 4. However, the August 1989 Agreement could hardly provide a basis for Fort Myer's understanding of its contractual relationship with WMATA, given that this agreement was not disclosed to Fort Myer until after the M/P and WMATA litigation arose. Def. Ex. 2221, at 2. In any event, Fort Myer has made clear that M/P's obligations to Fort Myer "have never been dependent or made conditional upon any alleged WMATA agreement." Id.

Finally, regarding its claim for extended home office overhead, Fort Myer alleges that its contract was suspended for 100 days after M/P was terminated. Pl. Ex. 1749, at 3. However, Fort Myer has previously acknowledged that its claim "involves wrongful termination and breach of contract, [and] . . . wrongful termination is substantially different than a mere delay or interference resulting from a delay."[138] In a 1996 pleading, Fort Myer again asserted that its claim is one for "direct and consequential damages that Fort Myer has suffered as a result of the abrupt and wrongful termination by M/P." Def. Ex. 2221, at 1. In fact, Part II of Fort Myer's

---

[138] Def. Ex. 2179, at 9. Although Fort Myer argues that this sentence in the pleading refers only to its utility claim rather than its restoration claim, Retr. 10/2 (Kerns) 1836, the pleading makes no such distinction. In contrast, the factual background section of the motion describes Fort Myer's contract with M/P as one to "reconstruct streets and sidewalks (and related subsurface utilities)." Def. Ex. 2179, at 2. Nowhere in the pleading does it distinguish between the restoration claim and the utility claim. The Court finds this effort to recharacterize the pleading unpersuasive.

claim is titled "Damages from Termination Inefficiencies."  Pl. Ex. 1749, at 3.

In addition, the project weekly highlights for April 29 to May 5, 1990 note that Fort Myer had "advised that [it had] completed all work which [it had] been authorized to do and can proceed no further."  Def. Ex. 1516, at 203.  Conflicting with Fort Myer's claim that its employees were locked out of the site without access to its equipment on the termination date, Retr. 10/2/2001, at 1794-95, this contemporaneous diary reveals that it "ended . . . operation on 5/3/90."  Def. Ex. 1516, at 283; Retr. 10/3/2001, at 2045-46.

### B.  Other Subcontractor Claims

The other subcontractors also have no direct claim against WMATA.  Truland Systems Corp.'s claims appear to run directly against M/P for delays and disruptions allegedly experienced when M/P failed to make areas available for the subcontractor's work.  Such a claim cannot be brought against WMATA.  Similarly, Thornton's claim runs against M/P as well.  Further, Thornton presented no evidence that the delays of which it complains were caused by WMATA.

### CONCLUSION

For the reasons set forth above, the Court concludes that the default termination of M/P was justified and that WMATA did not breach its contractual obligations.  Further, the Court finds that WMATA and M/P are entitled to the damages as set forth above.

February 22, 2006                                    _____/s/_____

                                                          Thomas F. Hogan
                                                          Chief Judge

192